UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,                    Case No. 18-cr-122-pp

                    Plaintiff,

v.

JACOB L. MACLIN,

                    Defendant.

## ORDER GRANTING DEFENDANT'S SECOND MOTION FOR REVIEW OF DETENTION ORDER AND ORDERING DEFENDANT RELEASED ON CONDITIONS (DKT. NO. 26)

The grand jury indicted the defendant on charges relating to his possession of marijuana and a gun. Dkt. No. 1. At the time of his indictment (and the issuance of the arrest warrant that followed), the defendant was on state bond, having been charged in state court for these same offenses. When he learned that there was a federal arrest warrant, he turned himself in, and appeared voluntarily for his arraignment and plea. See Dkt. Nos. 2, 3.

Judge Duffin detained the defendant pending trial, expressing concern that the defendant knew that he could not possess firearms because he had a prior conviction for being a felon in possession, and yet he'd had a gun on the day of the arrest. Judge Duffin acknowledged that it did not appear that the defendant posed a risk of flight; his concern was with whether the defendant posed a danger to the community. He said, "It's the ongoing refusal to acknowledge that you're not supposed to possess a firearm is, I think, what

1

concerns the Government . . . ." Dkt. No. 15 at 14. Noting that pretrial services also had recommended detention, Judge Duffin concluded that there were no conditions of release that could ensure the safety of the community, and ordered the defendant detained. Id.

Four days later, the defendant filed a motion for bond. Dkt. No. 10. He pointed out several things in this motion. First, he noted that he had turned himself in when he learned of the federal charges. Id. at 1. Second, he pointed out that, based on the limited information available to Judge Duffin at the time of the arraignment, Judge Duffin may have gotten the wrong idea about some of his criminal history. For example, he explained that the "strong-arm" robbery conviction the defendant earned in 1999 involved him stealing a bicycle from another person. Id. at 2. He argued that his 2003 conviction for possessing cocaine and being a felon in possession of a gun involved only three $10 bags of cocaine, yet he received a sentence of five years. Id. Third, he argued that since his release from custody on the 2003 conviction, he had turned his life around, working at Community Warehouse for ten years and working his way up to manager. Id. He got the job through a program at the Milwaukee County District Attorney's Office, and helped other employees who, like him, had overcome obstacles on their way to becoming stable employees. Id. at 3. Fourth, he argued that he didn't intend to sell the marijuana he had when he was arrested; he was going to share it with friends at a party. Id. Fifth, he argued that he didn't use the gun he possessed against anyone. Id. The

defendant attached to the motion several articles about his work at Community Warehouse. Dkt. No. 10-1.

Judge Duffin denied the motion. Dkt. No. 11. He maintained that the defendant had, on three occasions, possessed guns when he knew he could not legally do so (because of his felony conviction). Id. at 3. Judge Duffin also concluded that while the defendant had provided more detail about his employment with Community Warehouse, the information was not new, and could have been presented at the previous hearing. Id.

Six days after Judge Duffin issued his order, the defendant asked this court to review his request for bond. Dkt. No. 16. In this motion, he provided information about the defendant's 2014 misdemeanor conviction for possessing guns and body armor. He explained that his mother, who'd lived in Michigan, had been hospitalized for a suicide attempt, and the defendant had gone there to collect her things and bring them back to Milwaukee. Id. at 3. He indicated that his mother had had a gun and a bullet-proof vest; during a traffic stop, police searched the defendant's car and found these items. Id. Because of the "unique" circumstances, prosecutors dropped the felony charges, and the defendant received a misdemeanor conviction and a non-custodial sentence. Id.

The defendant acknowledged that the circumstances of his arrest gave rise to a presumption under 18 U.S.C. §3142(e)(3) that there were no conditions of release that would ensure the protection of the public, but reminded the court that that presumption was rebuttable. Id. at 5. He argued that the only things he'd been accused of doing were possessing marijuana and

possessing a gun—both things that many people do legally every day. Id. at 6-7. He pointed to a Tenth Circuit case which held that being a felon in possession of a gun does not mean that a defendant poses a danger to the community. Id. at 7 (citing United States v. Ingle, 454 F.3d 1082, 1086 (10th Cir. 2006). He argued that the facts of the current case did not suggest that he was a drug dealer—he claimed he was taking the marijuana to a party to share with friends. Id. He argued that he never had been accused of using a gun, or threatening anyone with a gun. Id. at 8. And he pointed to the support he has in the community—particularly from the CEO of Community Warehouse, Nick Rinnger—as evidence that he did not pose a danger. Id.

The court scheduled a hearing on the defendant's motion. Dkt. No. 19. Meanwhile, the court granted the defendant's unopposed motion to adjourn the jury trial, which had been scheduled for September 24, 2018. Dkt. No. 22. As of now, there is no trial date on the calendar; the parties are scheduled to appear for a status conference on October 25, 2018.

At the hearing, the defense reiterated many of the points it had made in earlier hearings and pleadings. Dkt. No. 24 (audio recording of hearing). The defendant's wife was present in the courtroom; the defense proffered that the defendant could live with her if released. The court expressed concern that, at the time of the bond study, the defendant and his wife had told the pretrial services officer that they were separated; they had not been living together due to marital issues. The defendant had been living with his parents at night, and visiting his children during the day. The defendant's wife told the court that the

incidents that had happened between the couple (including some domestic violence) had happened a long time ago, and that they had been living apart because they needed to try to get to know each other again and start over.

The government pointed out that the defendant had not been truthful about the gun found in his car at the time of the arrest. He told the police officers on the scene that the gun in the car belonged to his wife. While he later admitted to having known the gun was in the car, the defendant's wife separately had told police that she did not own a gun and that she knew nothing about the one in the car. The government also argued that, as Judge Duffin had pointed out, the defendant had a pattern of possessing guns when he knew he was not supposed to do so.

The court agreed with the defense that his was not the worst criminal history it had seen, and that there were positives—such as the defendant's history with Community Warehouse—in his background. The court was concerned, however, that the defendant was proposing to live with his wife upon release; they'd been separated prior to his arrest, and she wasn't home much due to her job requirements. The court also expressed concern that the defendant was unemployed, and would be sitting at home all day. The court did not feel comfortable releasing the defendant to live with his wife under the current circumstances, but told defense counsel that if he had other proposals, the court would consider them.

That was on August 7. On August 15, 2018, the defendant filed this second motion for bail review. Dkt. No. 26. First, counsel addressed the court's

concern about allowing the defendant to live with his wife. Counsel stated that according to the defendant's wife, she and the defendant *had* been separated in March 2018, at the time of the defendant's arrest. Id. at 2. Despite this separation, she said, they had seen each other often, shared a car, and co-parented their children; the defendant simply was sleeping somewhere else. Id. Ms. Maclin claimed, however, that after the defendant was arrested, he had moved back home, and had been living with her from March through July 2018. Id. She indicated that during that time, their marriage had been good. Id.

Counsel also explained that Ms. Maclin would be home more often if the court were to release the defendant; she had been working double shifts to make up for his missing financial contributions. Id. at 3. Counsel stated that it would be very helpful for Ms. Maclin to have the defendant at home, because he could help with the children, freeing her for work and her on-line studies. Id. Finally, defense counsel explained that the defendant's children were everything to him, and that his mental health (and theirs) would benefit from him being home. Id.

In the alternative, defense counsel proposed that the defendant could live with one of two cousins who live in Milwaukee and would be happy to have him. Id.

As for occupying the defendant's time during release, counsel indicated that the defendant has a pending interview for a full-time property management position. Id. at 4. He could also "return" to his part-time job at Cosmo Beauty, where he had been working security. Finally, Mr. Rinnger had

"created" a part-time volunteer position for the defendant at Community Warehouse. Id. Counsel argued that this combination of positions would allow the defendant time to participate in AODA and mental health counseling, if the court required it. Id. He also indicated that the court could impose GPS monitoring as a condition, for "additional oversight." Id.

The government responded, continuing to oppose release. Dkt. No. 27. The government argues that the representations the defendant made in his second motion "directly contradict" the information that he and his wife made to pretrial services a little over a month ago. The defendant told the pretrial services officer on July 16, 2018 that he had been unemployed for almost four months (dkt. no. 2 at 1), while he stated in the second motion for review that he had been working part-time at Cosmo Beauty. The government argued that, while the defendant *had* told pretrial services that he worked odd jobs, part-time employment as a security officer at a known business did not appear to fall into the "odd jobs" category. Dkt. No. 27 at 1. Similarly, on July 16, 2018, the defendant told the pretrial services officer that he and his wife had been separated since December 2014. Dkt. No. 2 at 1. The bond study indicates,

> Mr. Maclin was candid noting he and his wife have issues to work through, including two separate battery incidents that occurred in 2013 and 2014. He also notes they have incurred problems based on financial stressors and other problems. The address [listed in the bond study] is where his wife and children reside. Mr. Maclin disclosed he does not actually live in the home; but reports he travels to the house daily to see his children. He then leaves the residence once they are asleep and stays with Ms. Maclin's parents at [their address]. Ms Maclin verified this information. When asked what residence Mr. Maclin could return to if released, she reported he could reside

with her parents or with her. She would prefer that he stays
close by but did not endorse a specific release residence.

Dkt. No. 2 at 1-2. In contrast, defense counsel represented in the second

motion for bond review that Ms. Maclin told counsel that the couple had been

living together from March 2018 through July 2018. Given these discrepancies,

the government seconded the court's conclusion that releasing the defendant to

live with his wife was not appropriate. Dkt. No. 27 at 1-2.

The defendant replied. Dkt. No. 28. Defense counsel asserted that the

prosecutor had not been present for the pretrial services interview, or for the

interview defense counsel had with Ms. Maclin. Id. at 1. While conceding that

he was not present at the pretrial services interview either, defense counsel

argued that he had sat in on "countless bond study interviews." He asserted

that "the question that is often asked of a defendant—especially for a defendant

in custody—is where they were living at the time of their arrest." Id. Counsel

indicates that while the defendant's address at the time of the arrest usually is

the defendant's address as of the time of the interview, it wasn't in this case,

because the federal bond interview took place some four months after his

arrest. Id. Counsel states, "[t]hat may serve to explain any discrepancy between

the contents of the bond study and Maclin's motion." Id. He argues that the

statement in the bond study that the couple had been separated since

December 2014 "is an obvious typographical error," and asserts that the couple

separated in December 2017, "just months before Mr. Maclin's arrest." Id.

Finally, counsel disagreed with the government's view that a part-time job as a

security guard would not qualify as an "odd job," stating that "[a]fter losing the

stable, full-time job he had for ten years, Mr. Maclin understandably viewed what he was doing at [the beauty shop] as an 'odd' or temporary job." <u>Id.</u> at 2. Counsel argued that any discrepancy as to work history was "likely the product of a reasonable misunderstanding." <u>Id.</u>

1.   <u>The Defendant Is Subject To A Rebuttable Presumption of Detention.</u>

Section 3142(e)(3) states that the court must "presume" that there is no condition or combination of conditions that will reasonably assure the safety of the community if there is probable cause to believe that the defendant committed certain types of crimes. One of those is an offense under 18 U.S.C. §924(c) (18 U.S.C. §3142(e)(3)(B)); the grand jury charged the defendant with that offense in Count Three of the indictment. The defendant does not dispute that the indictment gives rise to the presumption there is no condition or combination of conditions that will assure the public's safety if the court releases the defendant.

2.   <u>The Defendant Has Met His Burden of Production to Rebut That Presumption.</u>

The statute provides that the defendant may rebut this presumption. The presumption is rebutted "when the defendant meets a 'burden of production' by coming forward with some evidence that he will not flee or endanger the community if released." <u>United States v. Dominguez</u>, 783 F.2d 702, 707 (7th Cir. 1986). "The burden of production is not a heavy one to meet." <u>Id.</u> Once the defendant meets that burden of production, "the rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors

listed in § 3142(g)." Id. (citing <u>United States v. Jessup</u>, 757 F.2d 378, 384 (1st Cir. 1985)). Even if the defendant does not meet the burden of production, however, a court cannot base a finding that no condition would assure the community's safety "on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future conduct." Id. Nor must a defendant subject to the presumption show that he is not guilty of the crime with which he is charged. Id.

The defendant has met his burden of production. He has produced evidence that he never has been convicted of using a firearm against anyone. He has produced evidence that he has a family—a wife, children. He has produced evidence that for ten years, ending only recently, he had a stable, productive job, and he has the respect and support of the CEO of the company. The court finds that this is sufficient to rebut the presumption of detention.

3.  <u>Weighing The §3142(g) Factors, The Court Concludes That There Are Conditions of Release That Would Reasonably Ensure the Safety Of The Community.</u>

The fact that the defendant has rebutted the presumption means that the court returns to the factors listed in §3142(g) to decide whether, based on all the information the court now has before it, there is any combination of conditions that will reasonably assure the safety of the community if the court were to release the defendant.

a.  *The nature and circumstances of the offense (§3142(g)(1))*

Section 3142(g)(1) requires the court to consider the offense itself, including whether it was a crime of violence, whether it involved a controlled

substance, and whether it involved a firearm. The grand jury charged the defendant with one count of being a felon in possession of a firearm (an offense involving a firearm); one count of knowingly and intentionally possessing marijuana (a controlled substance offense); and one count of knowingly possessing a gun in furtherance of a drug trafficking crime (both a gun and a drug offense). Dkt. No. 1.

The court must look further than the actual charges, however, in making a bond determination; a defendant seeking to rebut the §3142(e)(3) presumption, for example, could "show that the specific nature of the crimes charges, or that something about their individual circumstances, suggests that 'what is true in general is not true in the particular case . . .'." Dominguez, 783 F.2d at 707 (quoting Jessup, 757 F.2d at 384). At the first detention hearing before Judge Duffin, the government described the specific circumstances of the defendant's arrest:

> There was a complaint of drug dealing in the 2600 block of North 34th Street. And in response to those complaints, the Milwaukee Police Department set up surveillance units in that area. A vehicle pulled up, and Mr. Maclin's vehicle pulled up, and officers believed that a drug exchange had occurred. An individual jumped into Mr. Maclin's car, quickly exited, and Mr. Maclin quickly left the area. Officers were unable to see exactly what occurred inside of the vehicle because of the amount of tinting on Mr. Maclin's vehicle.

> In any case, this suspected controlled buy occurred in a residential neighborhood. After the individual exited Mr. Maclin's car, Mr. Maclin sped off at approximately 50 miles per hour in a residential neighborhood. Officers conducted a traffic stop soon after he left the location where he was observed making the suspected drug deal. And once they approached his vehicle and he opened his window, they immediately smelled marijuana, fresh marijuana.

11

Mr. Maclin was asked if there's anything illegal in the vehicle. He indicated that there was, that there was a firearm.

A subsequent search of the vehicle revealed there was also marijuana. There were two jars of what officers believed to be high-grade marijuana totaling 46 grams in total. Mr. Maclin also had approximately $2,400 in United States currency, all in smaller denominations, which, of course, can be consistent with drug dealing.

Mr. Maclin tried to explain away the firearm and indicated that it belonged to his wife; however, officers later had contact with Mr. Maclin shortly after his arrest, and she indicated that she knew nothing about a firearm and did not own one.

In any case, Mr. Maclin did provide a post-arrest statement indicating that he knew that the firearm was in the vehicle that he was operating, and also indicating that the marijuana was his, and that he intended to distribute it to others at a party he was headed to.

. . . [The defendant] was also convicted in that 2003 case with being a felon in possession of a firearm.

So, obviously, Mr. Maclin knows that he is prohibited from possessing any firearm yet continues to do so.

Dkt. No. 15 at 7-9.

Viewing all of this with an eye toward danger the community, there are facts that weigh in favor of a finding of dangerousness, and facts that weigh against it. Weighing in favor of a finding of dangerousness are the following facts: There is evidence indicating that the defendant engaged in a drug transaction prior to being stopped. If that is true, he engaged in that transaction with a gun in his car, and the combination of drugs and guns is a dangerous one. The suspected deal took place in a residential neighborhood, and the defendant departed the scene at a higher rate of speed than one would

expect in such a neighborhood. The defendant was in a car with a gun, despite being fully aware that he was a prohibited person. The defendant appears to have lied about who owned the gun, when the police questioned him about it. And the defendant's story about why he had the drugs—that he was going to share them with people at a party—does not match the facts on the ground: the police observing what they believed to be a drug deal, the rapid departure, the presence of a gun and the presence of $2,400 in small bills.

Weighing against a finding of dangerousness are the following facts: The defendant did not pull the gun on the officers, or use the gun. When the officers asked him if he had anything illegal in the car, he admitted right away that there was a gun. The drug involved was marijuana—assuredly illegal, but not as lethal as heroine or methamphetamine. There is no evidence that the defendant did not cooperate with the police. And, for what it is worth, the state court released the defendant after he was arrested.

On balance, the court concludes that the nature and circumstances of the offense do not show that there are no circumstances that would assure the safety of the community. The defendant had a gun, and drugs, under suspicious circumstances, and was not supposed to have either. But he did not commit a crime of violence and did not use the gun.

b.    *The weight of the evidence against the person (§3142(g)(2))*

The government has asserted that its evidence is strong. To an extent, the facts support that assertion. No one has disputed that the defendant was in the car with a gun—he admitted it to the police officers. He disputed only

whether he owned it, a fact that is irrelevant to the question of whether he *possessed* it. While defense counsel made the irrelevant and unpersuasive argument that people legally possess guns every day, no one disputes that it was not legal for the defendant to possess a gun. No one has disputed that the defendant had marijuana—again, the defendant admitted that he had it, arguing only that he did not have it to sell, but to share. That fact, as the court noted at the detention hearing, is also irrelevant; federal law prohibits possession with intent to *distribute*, not possession with intent to sell. Defense counsel similarly argued that many people legally possess marijuana every day, another fact that is true but irrelevant when possession of marijuana is illegal in Wisconsin, and possession of marijuana with the intent to distribute is illegal under federal law. So the evidence that the defendant possessed a gun despite being a prohibited person, and possessed marijuana with the intent to distribute it, is strong.

One might argue, however, that the most serious charge in the indictment is Count Three, the charge that the defendant knowingly possessed the gun in relation to a drug trafficking offense. This crime carries a mandatory minimum sentence of five years, and a maximum of life. The facts surrounding this charge—at least, those that the court has seen thus far, and noting that it has not seen the discovery—are a bit murkier. The defendant has not admitted that he had the gun in relation to a drug trafficking offense; he has denied that he was trafficking drugs. The government asserted that prior to stopping the defendant, the officers saw someone get into the defendant's car, then get out,

and saw the defendant depart at speed. This is suspicious behavior, and the officers believed it looked like a hand-to-hand buy. But the evidence is not as strong on this count as it is with regard to the first two counts, which carry less severe penalties.

So there is strong evidence as to the less serious charges, and—at this point—weaker evidence as to the most serious charge.

  c. *The history and characteristics of the person (§3142(g)(3))*

   1. The defendant's character

In contrast to many cases, the court has some evidence of the defendant's character at this early stage. The defendant has presented evidence that for ten years prior to his arrest, he worked at the Community Warehouse. He got the job through a program run by the Milwaukee County District Attorney's Office. He worked his way up from the most entry level of jobs, eventually becoming a manager who helped others in their rehabilitation efforts. His work garnered him positive attention in the press, for his apparent dedication to helping others turn their lives around. The CEO of Community Warehouse submitted a glowing letter on his behalf, appeared in court at the bond review hearing, and according to defense counsel, has set up a volunteer position for the defendant should the court release him. These facts speak well of the defendant's character.

There is some negative character evidence. The defendant told police that his wife owned the gun in the car, when she indicated that she did not own a gun and knew nothing about it. The court does not know what the truth is—

only the Maclins do—but it has the flavor of the defendant trying to blame the gun on his wife to stay out of trouble. The government accurately points out that the defendant (and his wife) have given contradictory information about their living situation and his job situation to different parties over the past month or so; their stories seem to evolve as they realize the significance of their circumstances to the question of whether the defendant remains in custody. This is troubling.

Something of a double-edged sword is the defendant's history with anger. He has admitted to two battery incidents with his wife in 2013 and 2014. He has completed several anger management programs. On the positive side, the battery incidents are years old, and the defendant completed the anger management programs. The fact that the incidents happened, and that the programs were needed, falls on the negative side.

### 2.     The defendant's physical and mental condition

The court has no evidence that the defendant has any mental health issues. He does report suffering from back issues (which apparently were the reason for his having to leave his job at Community Warehouse), for which he was receiving chiropractic treatment before being detained.

### 3.     Family ties

As the case history demonstrates, the facts around the defendant's family situation are confusing. He is married; he has children, and the court has no reason to doubt the defense assertion that he loves them very much. The state of the defendant's marriage is a mystery. Defense counsel's most

recent argument is that when the defendant and his wife told pretrial services in July that they were separated, they meant that they had been separated at the time of the defendant's arrest in March, not at the time of the interview in July. This assertion is frankly hard to credit. The bond study was detailed, specific and in the present tense. There is no indication that the defendant or his wife thought the pretrial services officer wanted to know where they were living four months earlier. The court does not know, but it suspects that the couple answered the pretrial services officer's questions honestly in July, not realizing that their answers might have an impact on whether the defendant was detained pending trial. Now that Ms. Maclin realizes that the defendant's stable living situation is one of the factors the court considers, her version of events has changed somewhat.

Despite this concern, the evidence indicates that the defendant has strong family ties. Even the facts in the bond study show that the defendant was with his children every day, and when he left at night, he spent nights with his in-laws. Even in July, the defendant's wife told pretrial services that she wanted him nearby (whether living with her or not).

4.    Employment

At the time of the bond study interview, the defendant reported having been unemployed for almost four months—since he stopped working at Community Warehouse. He said that he often did odd jobs to earn money to support his family. Prior to that time, the defendant—unlike many the court sees—had a verified, ten-year history of stable employment. The parties argue

the semantic question of whether some occasional work as a security guard at a beauty supply store can be considered an "odd job." While defense counsel's argument is a bit strained, the court does not know that the semantics matter. The defendant has shown a history of steady, reliable, productive work, and has provided three options for work (paid or volunteered) if the court releases him.

5.    Financial resources

Between Ms. Maclin's work, public assistance and the defendant's money from odd jobs, it appears that the family is able to support itself (albeit not lavishly).

6.    Length of residence in the community

The defendant has lived in Milwaukee for twenty-two years.

7.    Community ties

The defendant's work at Community Warehouse demonstrates strong community ties, as does the support of Mr. Rinnger.

8.    Past conduct

The court has no information on this factor, other than the defendant's criminal history, which is a separate factor.

9.    History relating to drug or alcohol abuse

The defendant reports being an occasional drinker, but has admitted that he uses marijuana regularly to cope with his back pain. He has had drug treatment in the past, although it was while he was in custody and may not have been in response to a particular issue. He told the pretrial services officer

that he did not believe he needed drug treatment, and that he believed he could stop using on his own. He provided a urine screen on the day of the interview, which was presumptively positive for marijuana. That is an indication that he was using marijuana while he was on state release.

### 10. Criminal history

The defendant has a 1999 felony conviction for strong arm robbery, robbery with the use of force and criminal damage to property; he was eighteen at the time. The defendant asserts that this conviction resulted from his stealing a bike. The conviction is quite old, happened when he was young and, the defendant says, was not violent. It is concerning that one of the charges, however, was robbery with the use of force.

At age twenty-one, he picked up the 2003 drug/gun conviction that resulted in his spending five years in custody. The defendant argues that the amount of cocaine he had at the time was minimal, but admits that it was drug dealing activity. He also had a gun at the time, despite being a felon.

In the ten years following his release from prison, the defendant had one conviction—the 2014 gun/body armor charge in Michigan. The defendant has provided the court with his version of the facts. Pretrial services verified that all but one of the charges were dropped, and the count of conviction was a misdemeanor. This seems to support the defendant's version of the facts. On the negative side, however, this is the second time that the defendant had a gun in his possession despite his felony conviction. It does not show that he is violent, or dangerous; it does show lamentable judgment.

The defendant otherwise has no notable criminal history.

11.     Record concerning appearance at court proceedings

The court has no evidence that the defendant ever failed to appear for court proceedings. As noted, he turned himself in when he learned of the federal charges, and appeared for his initial appearance.

12.     Whether the defendant was on bond at the time of this offense

The defendant was not on any kind of supervision at the time of his arrest. He was on supervision from the time of his arrest until he appeared in federal court in July; while there is no record that he violated the conditions of that supervision, he was using marijuana during that time.

d.     *The nature and seriousness of the danger to any person or the community that would be posed by the defendant's release (§ 3142(g)(4))*

This final factor requires the court to look at all the previous ones, and try to determine whether any of them indicate that the defendant is likely to pose a danger to anyone in the future, and if so, to identify that danger.

Sifting through all this information, the court sees two areas of possible danger to the community. First, the defendant has demonstrated on three occasions that he cannot, or will not, abide by the law that prohibits him from possessing guns. Second, the defendant twice has been arrested with illegal drugs—cocaine fifteen years ago, and marijuana in this case. He also admits to using marijuana to self-medicate for pain.

What is the nature and seriousness of the danger these areas pose to the community? He does not follow the law; that is a risk that every person who

commits a crime poses. He appears to have trouble staying away from guns, which poses a danger to the community if he is inclined to use them. His judgment is less than ideal, particularly for someone who worked for many years to help others trying to recover from their own bad judgment calls. He appears to have been using marijuana while driving, may have been selling it and used it although he was on bail for state charges. This kind of behavior can endanger others through impaired driving, and provides some evidence that he does not comply with conditions of bond.

Balanced against these dangers is the fact that the court has no evidence that the defendant ever has used a gun. While the 1999 conviction involved robbery with the use of force, the court does not know what that force was, and it took place almost twenty years ago, when the defendant was a teenager. The court has no evidence that the defendant uses, or sells, heroin or cocaine or methamphetamine or more dangerous drugs. The defendant has family ties, a long history in the community, a history of positive community engagement and work. While it is a close determination, the court comes to the conclusion that there are conditions that can *reasonably* assure the safety of the community if the court releases the defendant pending trial.

The court concludes that requiring the defendant to submit to drug testing and to participate in out-patient drug treatment will assist in ensuring that his drug use does not pose a danger to the community. Requiring the defendant to work, and to submit to GPS monitoring, will reduce the likelihood that he will obtain firearms while on release. Requiring the defendant to work

will give him less time to engage in illegal activity. The court cannot guarantee that the defendant will not violate the conditions of his release. Only the defendant can make that guarantee. But these conditions are, the court believes, reasonably likely to assure that he is not a danger.

4.    Conclusion

The court **ORDERS** that the Marshals Service shall release the defendant on the following conditions:

The defendant shall not violate federal, state or local law while on release.

The defendant shall advise his pretrial services officer before making any change of residence or telephone number.

The defendant shall appear in court as required and, if convicted, shall surrender as directed to serve a sentence that the court may impose.

The defendant shall not illegally possess or use any controlled substances (including marijuana) while on release.

The defendant shall submit to drug testing at the direction of his pretrial services officer, as frequently as that officer requires him to do so.

The Marshals Service shall not release the defendant until the pretrial services office has approved the residence of one of his two cousins. If the pretrial services office approves one of the cousins, the defendant shall reside with that cousin pending trial, or until further order of the court.

The defendant shall obtain employment as directed by his pretrial services officer. Verified volunteer work at Community Warehouse shall count

as employment for the purposes of this order, as long as the defendant also obtains some paid employment. If pretrial services believes that it is appropriate, verifiable child care time may also count toward work.

The defendant shall submit to GPS monitoring, at the direction and under the supervision of his pretrial services officer. The Marshals Service shall not release the defendant until arrangements have been made for that monitoring to begin.

The defendant shall not leave the Eastern District of Wisconsin without the permission of his pretrial services officer or the court.

The defendant shall participate in a program of out-patient drug treatment, as directed by his supervising pretrial services officer.

Dated in Milwaukee, Wisconsin this 22nd day of August, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**