UNITED STATES OF AMERICA,

        *Plaintiff,*

    *vs.*                            Case No. 18-CR-122

JACOB MACLIN,

        *Defendant.*

## MACLIN'S MOTION FOR DISCOVERY ON
## SELECTIVE PROSECUTION AND SELECTIVE ENFORCEMENT

> *"Federal prosecutors are respected members of a respected profession. Despite an occasional misstep, the excellence of their work abundantly justifies the presumption that they have properly discharged their official duties. Nevertheless, the possibility that political or racial animosity may infect a decision to institute criminal proceedings cannot be ignored."*
>
> *United States v. Armstrong*, 517 U.S. 456, 476 (1996) (Stevens, J., dissenting) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)).

### <u>Introduction</u>

The population of the Eastern District of Wisconsin is 84 percent white.[1] But between January 2017 and June 2018, not a single white person was charged with violating 18 U.S.C. § 924(c) for possessing a firearm during a marijuana trafficking crime. Conversely, the district is only 9.6 percent black. Yet in that same time span,

---

[1] All demographic information is taken from information publicly provided by the United States Census. The raw numbers and a summary of them are attached as Exhibit 1.

Federal Defender Services
of Wisconsin, Inc.

black people have constituted ninety percent of the defendants charged with marijuana related § 924(c) violations. Despite there being 28 counties and hundreds of municipalities and local law enforcement agencies in the district,[2] the United States Attorney has only charged minority—and largely black—defendants from the City of Milwaukee with possessing a firearm in furtherance of a marijuana trafficking crime.

This disparity raises serious questions about whether local, state, and federal law enforcement agencies engage in racial discrimination in determining which individuals to refer to the United States Attorney's Office for federal prosecution or whether the Department of Justice engages in racial discrimination in its charging decisions. Discriminatory police investigations and the selective prosecution of individuals based on race violate the equal protection component of the Due Process Clause. *Oyler v. Boles*, 368 U.S. 448, 456 (1962). This motion seeks an order directing the government to produce discovery relevant to the referral practices of law enforcement agencies in the district and the charging practices of the Department of Justice. Moreover, this motion seeks an order granting Maclin leave to file a motion to dismiss the indictment against him for depriving him of equal protection and due

---

[2] Brian Reaves, Department of Justice Bureau of Justice Statistics, *Census of State and Local Law Enforcement Agencies*, 2008 at 15 (July 2011) *available at:* https://www.bjs.gov/content/pub/pdf/csllea08.pdf

Federal Defender Services
of Wisconsin, Inc.

process after he receives and reviews the relevant information sought from the government herein.

## Overview

Jacob Maclin is African-American. On March 31, 2018, Milwaukee police officers arrested him after searching his vehicle following a traffic stop, finding a firearm and about fifty grams of marijuana.[3] Maclin told the police officers who arrested him that he was taking the marijuana to a party to share it with his friends. He denied knowing the gun was in the vehicle until he was pulled over by the police. Maclin was charged in Milwaukee County Circuit Court with possessing a firearm as a convicted felon and possessing marijuana with the intent to distribute it while using a dangerous weapon. Nothing about these facts is unique or extraordinary.

But on June 5, 2018, the same case was presented to a federal grand jury in this district. That grand jury returned an indictment charging Maclin with illegally possessing the firearm as a convicted felon (Count 1), possessing marijuana with the intent to distribute it (Count 2), and possessing a firearm in furtherance of the drug trafficking crime charged in Count 2 (Count 3). Docket No. 1. Notably, Count 3 carries a five-year mandatory minimum penalty that must be imposed to run consecutively to any other sentence.

---

[3] The facts recited here are gleaned from the police reports, but not conceded by Maclin.

Federal Defender Services
of Wisconsin, Inc.

1. **The equal protection provision of the Due Process Clause prohibits the selective enforcement and prosecution of individuals based on race.**

The Bill of Rights guarantees people equal protection under the Fifth Amendment's Due Process Clause. *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954). Those protections prohibit a criminal prosecution based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler*, 368 U.S. at 456. Nonetheless, the government has broad discretion to enforce the laws and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926). Thus, in order to prevail on a selective prosecution motion, a defendant must demonstrate that a prosecution policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985).

On the other hand, selective enforcement claims are directed at wrongful and discriminatory conduct by law enforcement agents. *United States v. Brown*, 299 F. Supp. 3d 976, 994-95 (N.D. Ill., 2018). Nonetheless, a "claim of selective enforcement is generally governed by the same standards" as a claim of selective prosecution. *Id.* at 994 (citing *United States v. Barlow*, 310 F. 3d 1007, 1010 (7th Cir. 2002)).

Meeting the burden of establishing a discriminatory effect and discriminatory purpose "generally requires evidence that similarly situated individuals of a different race or classification were not prosecuted, arrested, or otherwise investigated." *United*

Federal Defender Services
of Wisconsin, Inc.

*States v. Washington*, 869 F. 3d 193, 214 (3rd Cir. 2017). Ordinarily, this is a difficult burden for a defendant to meet, as defendants will often not have access to the information to meet it. *Id.* As a result, the Supreme Court created a "less rigorous standard for criminal defendants seeking discovery on an anticipated selective prosecution claim." *Id.* To obtain discovery on an anticipated selective prosecution claim, a defendant only needs to present "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *United States v. Armstrong*, 517 U.S. 456, 468 (1996) (quoting *United States v. Berrios*, 501 F. 2d 1207, 1211 (2nd Cir. 1974) (internal citations omitted)). An even lesser showing is required to obtain discovery on an anticipated claim of selective enforcement. *United States v. Sellers*, 906 F. 3d 848, 850 (9th Cir. 2018).

This motion seeks discovery as to both selective prosecution and selective enforcement.

### a. The *Armstrong* Test – Selective Prosecution Claims

In *Armstrong*, a group of black defendants were charged with conspiring to distribute crack cocaine. *Armstrong*, 517 U.S. at 458-59. They moved for discovery or dismissal, "alleging that they were selected for federal prosecution because they are black." *Id.* at 459. In support of their motion, they offered "*only*" an affidavit of a federal defender paralegal swearing that all 24 defendants the office represented on

5

Federal Defender Services
of Wisconsin, Inc.

cocaine and crack cocaine cases in 1991 were black. *Id*. The issue in *Armstrong* was whether the defendants made the showing necessary to obtain discovery. *Id*. at 469. Ultimately, the Supreme Court concluded that they did not, because the showing "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." *Id*. at 470.

*Armstrong* recognized how difficult it is for a defendant to establish "that the administration of a criminal law is 'directed so exclusively against a particular class of persons ... with a mind so unequal and oppressive' that the system of prosecution amounts to 'a practical denial' of equal protection of the law." *Id*. at 464-65 (quoting *Yick Wo v. Hopkins,* 118 U.S. 356, 373 (1886)). Recognizing the difficulty of meeting this burden, *Armstrong* created a "less rigorous standard for criminal defendants seeking discovery on an anticipated selective prosecution claim." *Washington*, 869 F. 3d at 214. Though less onerous on defendants than a substantive selective prosecution claim, the Supreme Court nonetheless concluded that the standard for obtaining discovery for an anticipated selective prosecution claim should still be "rigorous." *Armstrong*, 517 U.S. at 468.

That rigorous standard requires defendants to present "some evidence tending to show the existence of the essential elements of the [selective prosecution] defense,

6

Federal Defender Services
of Wisconsin, Inc.

discriminatory effect and discriminatory intent." *Id.* at 468. A defendant does so by making "a credible showing of different treatment of similarly situated persons." *Id.* at 470. The defendants in *Armstrong* failed to make the requisite showing because they "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not." *Id.*

While *Armstrong* imposes a less rigorous burden on defendants seeking discovery to pursue a selective prosecution claim than on those making a substantive selective prosecution claim, both burdens are difficult. *See Washington*, 869 F. 3d at 215 (recognizing that *Armstrong* "has proven to be a demanding gatekeeper" that "has resembled less a challenge and more a rout, as practical and logistical hurdles abound—especially to proving a negative."). One reason for this difficulty is that courts are "hesitant to examine the decision whether to prosecute." *Wayte*, 470 U.S. at 608 (1985).

For that reason, "the presumption of regularity supports" their prosecutorial decisions and, "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *Armstrong*, 517 U.S. at 464 (quoting *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15 (1926)). The Court was also concerned that wading too deep into the examination of prosecutorial decisions might run afoul of the separation of powers. *Id.* at 465 (quoting *Wayte*, 470

Federal Defender Services
of Wisconsin, Inc.

U.S. at 607) ("It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. 'Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.'").

### b. A lesser showing is required for discovery in anticipated selective enforcement claims

While federal prosecutors enjoy this presumption of regularity, law enforcement officials do not. *Davis*, 793 F. 3d at 721. They are not "protected by a powerful privilege or covered by a presumption of constitutional behavior." *Id.* at 720. Federal agents and police officers "testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel." *Id.* They can also be personally liable for *Brady* violations. *Id.* Therefore, "the sort of considerations that led to the outcome in *Armstrong* do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets . . . or when deciding which suspects to refer for prosecution." *Id.* at 721. *See also Washington*, 869 F. 3d at 219 ("the special solicitude shown to prosecutorial discretion … does not inevitably flow to the actions of law enforcement."); *Sellers*, 906 F. 3d at 853 ("Because the same presumption of regularity and deference to prosecutorial decision-making policy concerns do not apply in the selective enforcement context, we need not apply as rigorous a standard here.").

8

Federal Defender Services
of Wisconsin, Inc.

As a result, defendants seeking to obtain discovery relating to an anticipated selective enforcement claim do not have to contend with *Armstrong's* onerous hurdles. Rather, the district court should permit discovery to "determine whether forbidden selectivity occurred or plausibly could have occurred." *Davis*, 793 F. 3d at 722-23. While *Davis* advocated for conducting discovery in "measured steps," exactly how discovery should be conducted is within the broad discretion of the court. *Washington*, 869 F. 3d at 220. In *Sellers*, the Ninth Circuit concluded that the "district court should use its discretion—as it does for all discovery matters—to allow limited or broad discovery based on the reliability and strength of the defendant's showing." *Sellers*, 906 F.3d at 856.

### 2. Maclin meets both the *Armstrong* and *Davis* thresholds for discovery

*Armstrong* mandates that to obtain discovery on a potential claim of selective prosecution, a defendant must identify white individuals who the United States Attorney could have prosecuted for the same crime Maclin was charged with, but did not. Courts have recognized that this showing is more "rigorous" than that required to obtain discovery on a potential claim of selective enforcement. *Sellers*, 906 F.3d at 855. It goes without saying then, that if a defendant makes the showing required for discovery on a claim of selective prosecution, he also makes the less onerous showing required for discovery on a claim of selective enforcement.

Federal Defender Services
of Wisconsin, Inc.

### a. Charging practices of the United States Attorney

Between January 2017 and June 2018, the United States Attorney charged 176 people with drug trafficking crimes in the Eastern District of Wisconsin. *See* Exhibit 2. Of those, 90 were black, 41 were white, 30 were Hispanic, and 15 were of another race (Native American, Asian, and Arab). Of those 176 defendants, 35 were also charged with violating 18 U.S.C. § 924(c) for possessing a firearm in furtherance of that drug trafficking crime. Section 924(c) carries an increased penalty, a five-year mandatory minimum that must be run consecutive to any other sentence, including other counts in the same case. It applies to any drug trafficking offense, regardless of the substance. Of the 35 defendants charged with violating § 924(c) in a drug prosecution, 28 are black (80%), 3 are white (9%), 2 are Hispanic (6%), 1 is Arabic (3%), and 1 is Native American (3%).

What's more, since the beginning of 2017, there has been a stark increase in the number of defendants charged with violating § 924(c) for possessing a firearm in furtherance of a marijuana offense. Between January 2014 and December 2016 (a 36-month period), there were only six marijuana-related § 924(c) charges filed (see chart below).[4] Four were black and two were white.

---

[4] While these 6 individuals were charged with violating § 924(c), none were convicted of it. Current policies within the United States Attorney's Office result in significantly fewer dismissals of charges that carry mandatory minimum penalties.

Federal Defender Services
of Wisconsin, Inc.

| Case # | Defendant | Race | Law Enforcement Agency |
|--------|-----------|------|------------------------|
| 14cr51 | Robert Dent | Black | Milwaukee Police |
| 14cr249 | Willie Wilkerson | Black | Milwaukee Police |
| 15cr77 | Daniel Voight | White | D.E.A. |
| 15cr91 | Richard Clark | White | D.E.A. |
| 15cr233 | Jarret Roberts | Black | Milwaukee Police |
| 16cr53 | Dominique Hope | Black | Manitowoc County |

Between January 2017 and June 2018 (an 18-month period), the district saw ten marijuana-related § 924(c) charges (see chart below). So the rate of prosecutions has more than tripled. Relevant here, not one of the defendants in those cases was white. Nine are black. One is Arab.

| Case # | Defendant | Race | Law Enforcement Agency |
|--------|-----------|------|------------------------|
| 17cr68 | Mark Thomas | Black | Milwaukee Police |
| 17cr97 | Terry Robinson | Black | Milwaukee Police |
| 17cr138 | Rakim Burns | Black | Milwaukee Police |
| 17cr156 | Jerry Scott | Black | Milwaukee Police |
| 17cr168 | Romell Lewis | Black | Milwaukee Police |
| 17cr189 | Dominique Carr | Black | Milwaukee Police |
| 18cr16 | Josef Habib | Arab | D.E.A. |
| 18cr74 | Marquon Jackson | Black | Milwaukee Police |
| 18cr122 | Jacob Maclin | Black | Milwaukee Police |
| 18cr138 | Deshon Smith | Black | Milwaukee Police |

In looking more closely at these ten cases, only one of the defendants, Habib, was the target of a federal investigation. The rest were black defendants arrested by the Milwaukee Police Department. Most were, like Maclin, originally charged in state court with gun and drug offenses before being charged in federal court. Only Habib

Federal Defender Services
of Wisconsin, Inc.

and Robinson were not.[5] The eight cases originally prosecuted in state court are generally similar. Police either search a residence or conduct a traffic stop that leads to a search of the vehicle, during which marijuana and a firearm are recovered. While some of the cases involved larger amounts of marijuana, most did not.

Maclin's offense involved about 50 grams of marijuana. Dominique Carr had 15 grams of marijuana in his vehicle. In Rakim Burns' home, police found less than 5 grams of marijuana. Jerry Scott possessed about 265 grams of marijuana. Police found 438 grams of marijuana in Marquon Jackson's home. Mark Thomas (1700 grams and a grow operation), Deshon Scott (2018 grams), and Romell Lewis (5300 grams) had larger amounts.

In some instances, the cases may have been referred by the ATF or another agency for prosecution. The defense has reason to believe that most referrals come not from outside law enforcement agencies, but from United States Attorney staff. In its investigation, the defense has learned that paralegals from the United States Attorney regularly go to the Milwaukee County District Attorney and review active gun cases and select cases for the United States Attorney's Office to prosecute. Having agents or staff of the United States Attorney's Office visit the district attorneys' offices within the district to review cases for potential federal prosecution isn't improper. But

---

[5] Robinson has a prior federal conviction and was on federal supervised release at the time of his offense.

Federal Defender Services
of Wisconsin, Inc.

the United States Attorney is not reviewing cases or accepting referrals outside of Milwaukee County. A review of the district's § 922(g)(1) prosecutions, which will be addressed in more detail below under Section 4, starkly bear this out.

### b. White people could have been prosecuted by the United States Attorney in this district for possessing a firearm in furtherance of a marijuana trafficking crime, but were not.

Both *Armstrong* and, to a lesser extent, *Davis,* require defendants seeking discovery for an anticipated selective prosecution or enforcement claim to show that others who could have been charged or referred for federal charges weren't. Maclin can identify at least 42 white individuals who could have been charged with possessing a firearm in furtherance of a marijuana trafficking crime but were not. *See* Exhibit 3. Each was arrested and charged between January 2017 and June 2018. One was charged in federal court. The rest were charged in state court, where their charges have remained. Of those 41 individuals, each was charged, like Maclin was originally charged, in state courts within the Eastern District of Wisconsin. Each of these individuals apparently could have been prosecuted by the United States Attorney. None of them were. Each of these individuals could have been referred to the United States Attorney for prosecution. It does not appear that any of them were.

Exhibit 3 summarizes each of these 42 cases. It includes the name, case number, jurisdiction, and brief fact pattern (where available) of each case. The majority of these

Federal Defender Services
of Wisconsin, Inc.

individuals were accused of involvement in actual drug trafficking—not sharing a bag of pot with his friends like Maclin is alleged to have done. Most had larger amounts of marijuana. Some were trafficking in other drugs in addition to marijuana. Many had multiple firearms. Many have lengthy criminal records. All of them are white. All 43 of the individuals identified above could have been charged with violating § 924(c). None were. In fact, since May 2015, not one white person has been charged in this district with possessing a firearm in furtherance of a marijuana trafficking crime in violation of § 924(c).

This list demonstrates that when it comes to marijuana-related § 924(c) charges, the United States has disparately subjected minorities to the power of the executive branch, while shielding white citizens from exposure to the harsh penalties of § 924(c). This asymmetry clearly meets the showing required for discovery under *Armstrong* and *Davis*. In other words, Exhibit 3 tends to show that the United States has engaged in practices that manifest a discriminatory intent and carry a discriminatory effect by exclusively prosecuting minorities for violating §924(c) in marijuana related crimes, while declining to charge any number of similarly situated white citizens.

### 3. The ATF has a history of racially disparate enforcement.

To the extent the ATF is responsible for determining who is federally prosecuted for marijuana-related § 924(c) violations, it would appear that during the

14

Federal Defender Services
of Wisconsin, Inc.

time frame examined here, the ATF has referred only black men from the city of Milwaukee for federal prosecution. On its own, this fact may not reflect an institutional culture of racism. But the ATF's practices in this district must be evaluated in the context of its practices around the country. And those practices reflect a pattern of targeting minorities and referring them for federal prosecution at a rate significantly higher than whites.

*Davis*, *Washington*, and *Sellers* were all cases born out of the ATF's fake stash house stings. In those stings, the ATF used confidential informants to recruit would-be robbers to rob stash houses purportedly full of drugs. *Davis*, 793 F. 3d at 714. The would-be robbers would meet and strategize. When the time came to conduct the robberies, the participants were arrested and charged. One of the problems with these stings is that the ATF and their informants targeted minority defendants. For example, in the Northern District of Illinois, where *Davis* originated, the district is 18 percent black, 11 percent Hispanic, and 63 percent white. *United States v. Brown*, 299 F. Supp. 3d 976, 983 (N.D. Ill. 2018). Yet the defendants the ATF targeted in the district were 78 percent black and 11 percent white. In the Central District of California, 55 of the 60 individuals indicted in the fake stash house stings were people of color. *Sellers*, 906 F. 3d at 851.

Federal Defender Services
of Wisconsin, Inc.

Judges have resoundingly frowned upon the stings. One called them "questionable schemes" that "adversely impact the poor [and] minorities." *United States v. Flowers*, 712 F. App'x 492, 511 (6th Cir. 2017) (Stranch, concurring). That same judge concluded that the stings are "at odds with the pride we take in presenting American criminal justice as a system that treats defendants fairly and equally under the law." *Id*. Concurring in *Sellers*, Judge Jacqueline Nguyen proclaimed, "[l]ike many of my colleagues across the country, I am greatly disturbed by the government's practice and, in particular, its disproportionate impact on people of color." *Sellers*, 906 F. 3d at 861 (Nguyen, concurring). Judge Easterbrook called the disparity "troubling." *Davis*, 793 F. 3d at 722. Judge Castillo in the Northern District of Illinois found that the disparities "generate great disrespect for law enforcement efforts" and "have served to undermine legitimate law enforcement efforts in this country." *Brown*, 299 F. Supp. 3d at 983. Judge Castillo noted that the problems with the stash house cases "must be seen through the lens of our country's sad history of racism. Every time our country's law enforcement system can be perceived as contributing to that sad history, our justice system suffers and needlessly alienates minority communities." *Id*. at 985.

ATF operations in this district have been plagued with similar problems. In 2012, the ATF opened a fake clothing store in Milwaukee and used it as a sting to have

16

Federal Defender Services
of Wisconsin, Inc.

people sell drugs and guns.[6] The ATF conducted similar operations in Boston, Pensacola, St. Louis, Portland, and Wichita. All were the subject of criticism and ultimately shuttered. The Department of Justice Office of the Inspector General released a report criticizing the operations.[7] While the report addressed a number of the sting's shortcomings, it didn't address the racial makeup of those targeted. Like the fake stash house cases, the storefront sting operations allowed the ATF to pick and choose the people and places to whom it marketed the storefront. To Maclin's knowledge, all sixteen defendants federally indicted for selling drugs and guns to the agents were black.

### 4. The singular focus on Milwaukee County, and the City of Milwaukee in particular, reflects a discriminatory intent.

The fake stash house cases often targeted minority neighborhoods. In *Sellers*, the Court indicated that targeting minority neighborhoods, to the exclusion of non-minority neighborhoods, was potentially indicative of discriminatory purpose. *Sellers*, 906 F. 3d at 861. Turning back to this case, Milwaukee County is far and away the largest county in the district. *See* Exhibit 1. It's also the county with the largest

---

[6] John Dietrich and Raquel Rutledge, *ATF's Milwaukee sting operation marred by mistakes, failures,* Milwaukee Journal Sentinel (January 29, 2013) *available at*: http://archive.jsonline.com/watchdog/watchdogreports /atfs-milwaukee-sting-operation-marred-by-mistakes-failures-mu8akpj-188952581.html/

[7] Office of the Inspector General, *A Review of ATF's Undercover Storefront Operations.* September 2016, available at: https://oig.justice.gov/reports/2016/o1606.pdf

Federal Defender Services
of Wisconsin, Inc.

minority population. *Id.* The majority of Milwaukee County's Hispanic and African Americans live within the City of Milwaukee. *Id.*

Whether the marijuana-related § 924(c) defendants identified above were hand-picked by a United States Attorney's Office paralegal or referred by a law enforcement agency is relevant insofar as it relates to whether to apply a selective enforcement or selective prosecution analysis. But regardless of which analysis one applies, the singular focus on Milwaukee is indicative of discriminatory intent.

In this regard, it's not just marijuana-related § 924(c) prosecutions that exclusively come from the city of Milwaukee. Maclin has examined the charging practices of the United States Attorney with respect to violations of § 922(g)(1). That examination reveals that in the same 18-month period, the United States Attorney charged 88 people with possessing a firearm after being convicted of a crime punishable by more than a year in prison. Of those 88 people, 37 were targets in other federal criminal investigations, such as bank robbery, Hobbs Act robbery or large-scale drug investigations, and had gun charges included amongst the charges from those investigations. Three of the 88 (two of whom were on supervised release at the time of their arrests) had prior federal convictions. One was arrested by the United States Forest Service (a federal law enforcement agency). One was arrested by Milwaukee police but never charged in state court before being federally charged.

Federal Defender Services
of Wisconsin, Inc.

The remaining 46 § 922(g)(1) defendants in the district were originally charged in state court with gun charges, and their cases were ultimately either referred or selected for federal prosecution. Of these 46 cases, every single one was originally charged in Milwaukee County. So regardless of whether a case originally charged in state court comes federal from a law enforcement agency referral or because the United States Attorney's Office chooses to prosecute that case federally, all these cases come from Milwaukee County.

Based on these numbers, whether it's for simple § 922(g)(1) prosecutions or more punitive § 924(c) prosecutions, the statistics show that the government does not seek out defendants or accept referrals from the district's other 27 counties. Those other counties have much smaller minority populations. The government therefore knows that a state court defendant in Milwaukee is more likely to be a minority, and specifically African-American. In the context of equal protection challenges (like selective prosecution and enforcement challenges), "actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact," that is, a "forbidden purpose." *Columbus Bd. Of Ed. v. Penick*, 443 U.S. 449, 464 (1979). The United States Attorney's singular focus on Milwaukee, to the exclusion of other counties, is evidence "tending to show" such a purpose. *Armstrong*, 517 U.S. at 469.

Federal Defender Services
of Wisconsin, Inc.

## 5. The increase in marijuana-related § 924(c) prosecutions is especially significant given the rise of legal marijuana distribution.

The dramatic increase in marijuana-related § 924(c) prosecutions occurred contemporaneously to changes at the top of the Department of Justice. Importantly, it also occurred at a time when numerous states began legalizing marijuana. This hasn't occurred in a vacuum, and must be understood in the historical context of America's disparate enforcement of gun and marijuana laws against African Americans. *See Brown*, 299 F. Supp. 3d at 985 (noting the equal protection challenge "must be seen through the lens of our country's sad history of racism.")

While the Second Amendment guarantees citizens the right to bear arms, the United States has a long history of barring or limiting firearms possession by blacks. Though laws restricting gun possession by blacks existed as far back a 1640,[8] their prevalence grew in the 1800's, especially after the Civil War. Southern states enacted Black Codes that restricted the rights of freed slaves in many areas, including gun possession. *See, e.g., State v. Newsom*, 27 N.C. 250 (1844) (upholding a law prohibiting free blacks from carrying firearms and other weapons without a license); *Cooper v. City of Savannah*, 4 Ga. 68 (1848) (noting in dicta that "[f]ree persons of color" are not citizens and have no right to bear arms); Act of March 15, 1852, ch. 206, 1852 Laws of

---

[8] 7 STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 95 (W.W. Henning ed. 1823) (1640 Virginia statute provided that "all such free Mulattoes, Negroes and Indians . . . shall appear without arms.")

Federal Defender Services
of Wisconsin, Inc.

Mississippi 328 (forbidding ownership of firearms by free blacks and slaves); The Reconstruction Amendments' Debates 209 (Alfred Avins ed. 1967) (Black Code of Alabama, January 1866, prohibited blacks from owning or carrying firearms and proscribed selling, giving or lending firearms or ammunition to blacks); *see generally* Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo. Mason U. Civ. Rts. L.J. 67, 69-79 (1991); Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 Kan. J.L & Pub. Pol'y 17, 20 (1995).

The architect of marijuana's prohibition in the 1930s was Harry Anslinger, the Commissioner of what was then called the Federal Bureau of Narcotics.[9] Without any empirical basis, Anslinger pushed the notion that marijuana was a violence-inducing drug, and connected it to blacks and Hispanics.[10] In 1969, President Richard Nixon began the "war on drugs." The public explanation for the increased enforcement of drug laws was the need to protect young people.[11] But one of Nixon's top advisors, John Ehrichman, recently explained that the war on drugs was really a means of destabilizing the black and left-leaning anti-Vietnam communities.[12] The "war on drugs" has failed miserably in its purported goal of combatting drug use and drug

---

[9] Alyssa Pagano, *The racist origins of marijuana prohibition*. Business Insider (March 2, 2018) *available at:* https://www.businessinsider.com/racist-origins-marijuana-prohibition-legalization-2018-2
[10] *Id.*
[11] Dan Baum, *Legalize It All: How to win the war on drugs*, Harpers (April 2016) *available at:* https://harpers.org/archive/2016/04/legalize-it-all/
[12] *Id.*

Federal Defender Services
of Wisconsin, Inc.

trafficking. *See United States v. Gregg*, 435 Fed. Appx. 209, 219 (4th Cir. 2011). It has, however, achieved the purpose noted by Ehrichman: the "war on drugs" is largely responsible for America's epidemic of black mass incarceration. *United States v. Brewer*, 624 F. 3d 900, 912 n. 14 (8th Cir. 2010).

In the last ten years, public opinion on marijuana has shifted dramatically. As of this writing, marijuana is legal for medicinal purposes in 33 states and recreational use in ten of them plus the District of Columbia.[13] A recent Gallup poll showed that 66% of Americans favor legalization.[14] More significantly, cannabis is big business. It's traded on the NASDAQ.[15] Legal marijuana sales hit $10 billion in 2017.[16] As the Speaker of the House in 2011, Republican Congressman John Boehner was "unalterably opposed" to the legalization of marijuana.[17] Now out of politics, Boehner is on the board of advisors for Acreage Holdings, a cannabis corporation that operates in 11 states.[18] He wrote earlier this year that his "thinking on cannabis has evolved"

---

[13] Bill Chappell, *Voters relax marijuana laws in 3 more states: Michigan, Utah, Missouri*, NPR (November 7, 2018) *available at*: https://www.npr.org/2018/11/07/665161814/3-more-states-ok-easing-their-marijuana-laws-michigan-utah-missouri.

[14] Justin McCarthy, *Two in Three Americans Now Support Legalizing Marijuana*, Gallup (October 22, 2018) *available at*: https://news.gallup.com/poll/243908/two-three-americans-support-legalizing-marijuana.aspx

[15] Karl Kaufman, *A Canadian Marijuana Company is Now Trading on the Nasdaq*, Forbes (February 28, 2018) *available at*: https://www.forbes.com/sites/karlkaufman/2018/02/28/a-canadian-marijuana-company-is-now-trading-on-the-nasdaq/#6ba371c37558

[16] Chris Morris, *Legal Marijuana Sales Are Expected to Hit $10 Billion This Year*, Fortune (December 6, 2017).

[17] Daniel Victor, *John Boehner's Marijuana Reversal: 'My Thinking on Cannabis Has Evolved'*, NY Times (April 11, 2008) *available at:* https://www.nytimes.com/2018/04/11/us/politics/boehner-cannabis-marijuana.html

[18] *Id*.

Federal Defender Services
of Wisconsin, Inc.

and that "the time has come for serious consideration of a shift in federal marijuana policy."[19] Wisconsinites agree. In the November 2018 general election, sixteen counties and two cities had advisory referendums on legalizing marijuana for medicinal or recreational purposes.[20] Each passed with solid majorities.[21]

This backdrop provides an important context to Maclin's challenge. Despite the changing landscape of America's marijuana laws, the racial disparity in the enforcement of marijuana laws is growing wider.[22] Even in places where marijuana is legal, black people remain four times more likely to be arrested for a marijuana crime than white people.[23] This prosecution, and the others like it, appear to be a sad reflection of this growing disparity. Despite the overwhelming public support at both the national and local levels for legalizing marijuana, the Department of Justice appears to have doubled down on policies that spawned America's epidemic of black mass incarceration. And while the government has the authority to enforce the laws

---

[19] *Id.*

[20] Don Behm, *Pro pot: Voters support all marijuana advisory referendums on Tuesday's ballots*, Milwaukee Journal Sentinel (November 6, 2018) *available at*: https://www.jsonline.com/story/news/politics/elections/ 2018/11/06/marijuana-legalization-milwaukee-county-voters-favor-ending-ban/1811494002/

[21] *Id.*

[22] American Civil Liberties Union, *The War on Marijuana in Black and White*, June 2013, *available at*: https://www.aclu.org/sites/default/files/field_document/1114413-mj-report-rfs-rel1.pdf).

[23] German Lopez, *After Legalization, black people are still arrested at higher rates for marijuana than white people*, Vox (January 29, 2018) *available at*: https://www.vox.com/policy-and-politics/2018/1/29/ 16936908/ marijuana-legalization-racial-disparities-arrests.

Federal Defender Services
of Wisconsin, Inc.

on the books, it doesn't have the authority to pick and choose who they target, prosecute, and imprison based on race.

## 6. The United States and the law enforcement agencies it works with use algorithms to determine whom to prosecute.

In December 2017, the Milwaukee Journal Sentinel published a story that detailed an arrangement between the United States Attorney's Office and local and federal law enforcement agencies to reduce crime in a 2.3 square mile area in Milwaukee.[24] According to this account, Milwaukee Police, the FBI, DEA, and ATF teamed up with the United States Attorney's Office and used an algorithm to try to identify "who is involved in shootings, robberies and other violence in the area and targeting those people for arrest and prosecution."[25]

This begs the question, what role does this (or any other) algorithm play in the enforcement and prosecutorial administration of certain types of offenses in the district? Equally important, how does the algorithm work? The use of algorithms in the criminal justice system is not new, but it is cause for concern.[26] A 2016 ProPublica report found that algorithms such as the one apparently used in Milwaukee are biased

---

[24] Ashley Luthern, Milwaukee police did something different to tackle crime in the city—they focused on just 2.3 square miles of it, Milwaukee Journal Sentinel (December 1, 2017) available at: https://www.jsonline.com/story/news/crime/2017/12/01/milwaukee-police-did-something-different-tackle-crime-city-they-focused-just-2-3-square-miles/914219001/
[25] *Id.*
[26] Julia Angwin, Jeff Larson, Surya Maau, Lauren Kirchner, *Maching Bias: There's software used across the country to predict future criminals. And it's biased against blacks.* ProPublica (May 23, 2016), *available at*: https://www.propublica.org/article/machine-bias-risk-assessments-in-criminal-sentencing

24

Federal Defender Services
of Wisconsin, Inc.

against black people.[27] The role these algorithms play in the administration of justice in the district raises some serious questions. Not all individuals arrested for trafficking marijuana while armed in the Eastern District are federally indicted.

### 7. Maclin's Discovery Demand

For the reasons outlined above, Maclin seeks an order granting discovery relevant to the pursuit of a selective prosecution or selective enforcement defense. Specifically, he seeks an order directing the government to provide the materials described below. As is required by Criminal L.R. 16(b), Maclin has conferred with counsel for the government, Assistant United States Attorney Lisa Wesley, and specifically requested each item listed below. Attorney Wesley indicated that the government will not agree to provide the requested materials. Maclin requests that the Court order the government to disclose the following:

A.     A list of all cases prosecuted in the Eastern District since January 2016, charging violations of 18 U.S.C. § 924(c) where the defendant was accused of possessing a firearm in furtherance of a drug trafficking crime, the drug the defendants were accused of trafficking, and the race of each defendant charged in those cases.

---

[27] *Id.*

25

Federal Defender Services
of Wisconsin, Inc.

B.      A list of all persons who were considered or referred for prosecution under 18 U.S.C. § 924(c) (for possessing a firearm during a drug trafficking crime) since January 1, 2016, but for whom prosecution was declined, and the race of those persons.[28]

C.      The officer or agent and agency who made the referral of each person identified in paragraphs A and B.

D.      A list of all persons prosecuted or considered for prosecution under 18 U.S.C. § 922(g)(1) since January 1, 2016, the race of said persons, and the agency or agent who made the referral, or the employee of the United States Attorney's Office who identified the case for consideration of federal prosecution.

E.      All writings, records, and/or memorialization setting out the real-time reasons the referring agency gave for pursuing or not pursuing federal charges against the individuals identified in paragraphs A, B, and D above.

F.      A list of all persons who were considered or referred for prosecution of a drug trafficking offense between January 1, 2016 and the present, and their race.

G.      For the individuals identified in paragraph F, whether their offense also involved the use or possession of a firearm.

---

[28] To the extent any request herein might include ongoing investigations or as yet uncharged referrals, Maclin does not oppose the government redacting the names or using initials, so long as the race of the person is included.

Federal Defender Services
of Wisconsin, Inc.

H.  Any formal charging criteria the United States Attorney employs in determining whether to charge or not charge firearm and/or drug cases referred for prosecution.

I.  A list of any staff in the United States Attorney's Office involved in selecting pending state court cases for federal prosecution.

J.  Any instructions, directions, or guidance given to United States Attorney's Office staff involved in selecting pending state court proceedings for federal prosecution.

K.  A list of all persons, who at the time had pending firearms charges pending in state court, that either the United States Attorney's Office staff has identified since January 1, 2016, as a potential target for federal prosecution, or was referred for federal prosecution by a law enforcement agency, whether those people were ultimately charged or not.

L.  The race of any person identified in paragraph K.

M.  A list of all persons the ATF has referred for federal prosecution to the United States Attorney in this district for any offense since January 1, 2016, and the charges, if any, requested.

N.  The race of each person identified in the list requested in paragraph M.

27

Federal Defender Services
of Wisconsin, Inc.

O.  All writings, correspondence, and memoranda between the United States Attorney's Office and district attorney's offices or law enforcement agencies within the district, including the ATF, FBI, and DEA, referencing factors or criteria for referring cases for federal prosecution.

P.  All documents containing instructions given by the United States Attorney's Office about the responsibilities of Assistant United States Attorneys to ensure that defendants in cases it charges have not been targeted or referred for prosecution based on their race, ancestry, or national origin.

Q.  The personnel files for all ATF agents, Milwaukee Police Officers, United States Attorney staff, or other law enforcement officers responsible for referring or selecting charges for federal prosecution under § 924(c) and § 922(g)(1).

R.  A list of all persons arrested by any law enforcement agency within the Eastern District of Wisconsin for marijuana trafficking (i.e., manufacture/delivery of THC, possession with intent to deliver THC, maintaining a drug trafficking place, etc.) while possessing a firearm since January 1, 2016.

S.  The race of each person identified in paragraph R.

T.  The name and developer of any algorithm or other computer program used by local or federal law enforcement and/or the United States Attorney's Office in

Federal Defender Services
of Wisconsin, Inc.

determining who to arrest, interview, investigate, prosecute, or otherwise subject to any form of law enforcement intervention.

U.     To the extent any program or algorithm identified in paragraph T is the product of a federal grant, any requirements imposed on the recipient or beneficiary of the grant or program for the use of such program.

V.     Any evaluations or audits conducted by either the operator or developer of any algorithm or program identified in paragraph T.

W.     A list of all law enforcement officers who have access to or use any such program or algorithm.

X.     Any and all manuals, memoranda, instructions, or other written material on how the algorithm or program operates.

Y.     All documents containing instructions given by the developer of any program or algorithm identified above or those who use such programs about the responsibility to ensure that racial biases do not influence the program or algorithm's operation or its results.

Z.     A list of all individuals recommended for some type of law enforcement intervention or prosecution by any algorithm program since January 2016.

AA.    A list of all individuals, including their race, who, since January 2016, were actually prosecuted by either the United States Attorney or the Milwaukee

29

Federal Defender Services
of Wisconsin, Inc.

District Attorney, who came to the attention of law enforcement or prosecutors from any computer program or algorithm.

BB.    A list of all individuals, including their race, not recommended for federal prosecution by any algorithm program.

CC.    Any internal policies at the Department of Justice, United States Attorney's Office, or ATF on the charging or enforcement of marijuana offenses.

**8.  Conclusion**

Maclin has made the showing required to obtain discovery as to both selective enforcement and selective prosecution. For that reason, he asks the Court to grant his motion, and order the government to produce the discovery requested herein. Moreover, Maclin asks that the Court allow him leave to file a motion to dismiss the indictment against him once discovery is complete.

Dated at Milwaukee, Wisconsin, this 11th day of January, 2019.

Respectfully submitted,

*/s/  Joshua D. Uller*
Joshua D. Uller, WI Bar #1055173
Craig W. Albee, WI Bar # 1015752
Federal Defender Services of Wisconsin, Inc.
517 E. Wisconsin Avenue – Room 182
Milwaukee, WI  53202
Tel.  (414) 221-9900
Email:  joshua_uller@fd.org

*Counsel for Defendant, Jacob Maclin*

30

Federal Defender Services
of Wisconsin, Inc.