# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                              Case No. 18-CR-122

JACOB L. MACLIN,

     Defendant.

---

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION TO SUPPRESS

---

On June 5, 2018, a grand jury returned a three-count indictment charging Jacob Maclin with possession of a firearm by a felon, possession with intent to distribute a mixture and substance containing marijuana, and possession of a firearm in furtherance of a drug trafficking offense. (Docket # 1.) The charges stem from a traffic stop conducted by Milwaukee Police on March 31, 2018. (Docket # 33 at 1.) Maclin pled not guilty. (Docket # 3.) Trial is adjourned pending the resolution of pretrial motions. (Docket # 22.)

Maclin moves to suppress all evidence obtained as a result of the traffic stop by Milwaukee Police. (Docket # 33.) He argues that the traffic stop was unreasonable in violation of his rights under the Fourth Amendment, as the police had neither probable cause nor reasonable suspicion to stop him. (*Id.*) I held an evidentiary hearing on the motion on October 23 and 24, 2018. For the reasons I explain below, I recommend that the motion to suppress be denied.

## EVIDENTIARY HEARING TESTIMONY

Milwaukee Police Officers Michael Braunreiter, Eric Rom, James Filsinger, and Detective Thomas Obregon testified at the evidentiary hearing. Angela Kvidera, a private investigator hired by Maclin, also testified, as did Maclin himself. At the close of the hearing, the Court heard oral argument on the motion.

*Officer Braunreiter*

Braunreiter testified that he has been a Milwaukee police officer for over five years. He had been assigned to the anti-gang unit for approximately three and a half years (Tr. 5–6), in which his responsibilities included conducting short and mid-term narcotics and firearm investigations, specifically targeting "hot spot" areas in his district, areas plagued with violent crime, shootings, drug complaints, and citizen complaints. (Tr. 6.) Braunreiter identified the 2600 block of North 34th Street as such a "hot spot." (Tr. 6–7.) He stated that he has conducted numerous traffic stops resulting in firearm and narcotics arrests, and used the unit's drug car to investigate narcotics distribution complaints and to conduct surveillance in the area. (Tr. 7.) He stated that he and Rom responded to drug complaints that came from citizen calls to the Milwaukee Police Department as well as other sources, including data from "shot spotters," i.e. a gunshot location system, and from other officers conducting traffic stops. (Tr. 30–31.) He stated that drug complaints were sent to the Fusion Center, located at the Police Administration Building, where they were sent to the appropriate officers in the appropriate districts. (Tr. 36.) He stated that there was no briefing at the beginning of each shift telling him which areas to specifically target. (*Id.*) Rather, he and Rom conducted their own investigations without direct supervision or direction. (*Id.*)

2

Braunreiter testified that drug trafficking crimes are "pretty common" in the entire city of Milwaukee. (Tr. 7–8.) He testified that recently the police had observed and witnessed an increase in "mobile to mobile" drug dealing, in which individuals use vehicles as "rolling drug houses," due to recent policy changes forbidding police to pursue vehicles for anything except violent crimes. (Tr. 8.) He testified that individuals would distribute narcotics around the entire city of Milwaukee, and especially in that area, via vehicle. (Tr. 8.)

Braunreiter testified that on March 31, 2018, he was assigned to District No. 3's anti-gang unit drug car, and was conducting a drug investigation and surveillance in the 2600 block of North 34th Street. (Tr. 6–7, 8.) He stated that he had been in the area conducting surveillance for four or five days. (Tr. 8.) He was in an undercover vehicle with no recording devices mounted on it, and was wearing street clothes rather than a police uniform. (Tr. 8–9.) Inside his vehicle were binoculars and a radio. (Tr. 9.) Braunreiter testified that sometimes there is a camera for taking pictures or video in the car, but on March 31, 2018, he did not have a camera in the vehicle, or if there was one, it was in the trunk and not readily available. (Tr. 11.) He is not equipped with a body camera when he works undercover because of the need to exit the vehicle quickly without arousing suspicion, because he has been told by supervisors not to use the body camera when in plain clothes, and because it could endanger other undercover officers to capture them on camera. (Tr. 9–12.)

Braunreiter testified that he works from 11 am to 7 pm. (Tr. 30.) He could not recall when he arrived in the area on March 31, but said if he had to approximate he would say 30 to 45 minutes before the incident. (Tr. 30, 52.) He positioned his vehicle on the east side of the 2500 block of North 34th Street. (Tr. 12.) He testified that he conducts surveillance on his regular duty hours, but in particular on March 31 he was also investigating a drug complaint

3

further up the 2600 block of North 34th Street, at what he believed was 2646 North 34th Street. (Tr. 12, 31.) Braunreiter averred that he had seen recent activity in or received complaints about the 2400 and 2500 blocks of North 34th Street. (Tr. 50–51, 54.) The complaints about the 2500 block were not on that day, and he could not remember their exact dates. (Tr. 33–34.) He stated that while they were conducting surveillance on 2656 North 31st Street, they had noticed an uptick in activity at other residences in the 2600 block as well, but had not received drug complaints for those residences. (Tr. 53–54.) He averred that there had been a number of complaints in that area on March 31, 2018. (Tr. 13.)

Braunreiter stated that he came to that area on March 31, 2018 because there had been recent drug tips and an increase in "shot spotter," as well as his previous knowledge from patrolling that the area is a "very high-traffic area." (Tr. 31.) Braunreiter testified that when there were multiple locations with complaints, he and his partner, Rom, would often park on the block together to watch as many different residences as possible at one time. (*Id.*) On this day, both he and Rom were in an undercover vehicle, with Rom driving and Braunreiter in the passenger seat. (Tr. 13–14.)

At approximately 6:00 pm, Braunreiter observed a white Toyota Camry with the license plate AAF1007 stop on the west side of the street in front of about 2607 North 34th Street. (Tr. 16–17.) He testified that after the vehicle had parked, it stayed running there for four or five minutes without anyone approaching or leaving the vehicle. (Tr. 17.) During that time, Braunreiter and Rom notified a take-down vehicle containing Detective Obregon, Officer Filsinger, and Lieutenant Yaghnam that the car had been parked with no one coming or going. (*Id.*) They gave the license plate number to the take-down vehicle, and the take-down vehicle notified them that the vehicle listed to the area of 29th and Burleigh, about a

half-mile to three-quarters of a mile away. (Tr. 17–18.) Braunreiter also testified that as they watched the vehicle, they could see the driver looking around as though waiting for someone, and concluded that he was parked there waiting. (Tr. 18.) Braunreiter explained that it did not strike him as unusual for a vehicle to pull up and park, but it was a little bit unusual that it did not list to the area and that it was sitting there waiting. (*Id.*)

Braunreiter testified that after four or five minutes, a red Dodge Magnum pulled up and parked in front of 2602 North 34th Street on the opposite side of the street from the Camry, about ten or fifteen feet behind it. (Tr. 18–19.) Almost immediately after the Magnum stopped, the driver of the Camry exited his vehicle, walked to the front of the Magnum, and entered the front passenger seat. (Tr. 19.) Both officers had binoculars at the time. (*Id.*) Braunreiter observed that the Magnum had excessive window tint, but they were nevertheless able to see a silhouette of two individuals turned toward each other, speaking with each other. (Tr. 19–20.) He stated, "You could tell the bodies had moved as if they were trying to face each other a little bit more. As if they were trying to interact together maybe hand each other items or something of that nature." (*Id.*) He could not see anything exchanged between the individuals. (Tr. 20.) Later, Braunreiter saw pictures of the front windshield, in which it appeared that the front windshield was tinted at the top, but not below the manufacturer's line. (Tr. 21.) Braunreiter testified that he has experience stopping vehicles for excessive tint previously, and that in his experience, when windows are excessively tinted, then any amount of extra light coming into the vehicle makes it easier to see inside the vehicle. (Tr. 22.) He estimated that the individual who entered the Magnum stayed in the vehicle for between one and two minutes, then returned to his own vehicle. (*Id.*)

Braunreiter stated that the Magnum then began driving northbound on North 34th Street at a high rate of speed. (*Id.*) He testified that he determined the car was departing at a high rate of speed based on the distance it covered in a short time, as well as his observation that he personally would not have driven so fast on a residential side street. (*Id.*) Braunreiter stated that the speed limit in that area was 25 miles per hour, and that he estimated the car was going around 40 miles per hour. (Tr. 23, 25.) At that time, Braunreiter and Rom notified the take-down vehicle that the Magnum was leaving. (Tr. 32.) Braunreiter and Rom followed the vehicle after it had gained some distance from them, at 30 or 35 miles per hour; their vehicle was older and was working as hard as it could to keep up with the Magnum. (Tr. 23.) Braunreiter and Rom observed the vehicle stop at the stop sign at North 34th Street and West Center Street before turning westbound toward North 35th Street. When the officers reached the stop sign at North 34th Street and West Center Street, they observed the vehicle turn northbound on North 35th Street. (Tr. 22–23.) Braunreiter stated that this was a very short block, and when the car turned northbound on 35th Street, he could hear the engine as if it were working harder, trying to increase speed. (Tr. 23–24.) While this was occurring, Braunreiter and Rom were broadcasting to the take-down vehicle their observations and the location of the vehicle. (Tr. 23.) Braunreiter stated that because North 35th Street is a thoroughfare as opposed to a residential area, the speed limit is 30 or 35 miles per hour. (Tr. 24.)

Braunreiter testified that the legal limits for tinting on vehicles in Milwaukee are that the driver's and passenger's windows must admit 60% of light, while the rear windows and the rear windshield must admit 35% of light. (Tr. 27–28.) He stated that with the door open, the window is exposed to more light from both inside and outside, so it should appear lighter

6

than it really is, whereas if the door is closed, the tint would appear darker. (Tr. 28–29.) He was not aware of any testing on the windows on the Magnum, and admitted that that was not the purpose of his investigation. (Tr. 29.) Braunreiter did not follow the take-down unit or assist with the arrest of Maclin. (Tr. 29.) When shown the CAD report from Maclin's arrest (Ex. 20), he admitted that it did not contain any of his observations before the vehicle was stopped. (Tr. 34–35.)

Braunreiter was also shown a CAD report showing that a 911 call came in at about 5:26 pm concerning an incident at 2646 North 34th Street (Ex. 22). Braunreiter explained that officers can see such calls on their computers inside squad cars, but he is not assigned to a squad car and does not respond to 911 calls or generate CADs. (Tr. 39, 43.) Examining the CAD report, he acknowledged that it showed that officers were on scene at 2646 North 34th Street at 5:35 pm and 5:39 pm. (Tr. 41–42.) Braunreiter admitted that the CAD report indicated that squads were responding while he was conducting surveillance, but testified that he did not personally observe any squad cars from the spot he was parked in. (Tr. 43–44.) Braunreiter admitted that none of the license plate numbers run by the officers on the scene matched the license plate numbers Braunreiter had responded to or looked up that day. (Tr. 42.) He explained that neither his car nor the take-down car had a computer on which to run license plate numbers. (Tr. 42–43.) When he requested that the take-down car run a license plate number, they would have had to call someone at Fusion Center or a police aid to run the license plates for them, so there would be no CAD report for running that plate. (Tr. 43.)

Braunreiter was also presented with several CAD reports for calls about 2646 North 34th Street on four separate days between March 13th and March 26th complaining of in-progress drug dealing at that location (Exs. 23–26), as well as a suspicious person report

indicating drug dealing at that location (Ex. 27). (Tr. 44–50.) The reports described a man with a blond mohawk coming out of the house and going up to different cars as they pulled up and pulled off. (*Id.*) The reports indicated that multiple vehicle license plates were run, including AAF1700, which matched the white Camry from the incident with Maclin. (Tr. 48–49.) Braunreiter averred that he had no personal knowledge of the activities described in the CAD reports. (Tr. 52.) He acknowledged that on March 31, 2018, he and his partner were conducting surveillance to assist in obtaining a search warrant on the 2646 North 34th Street location, which they did after the incident with Maclin. (Tr. 53.) They were also confidential informants on that location, and had previously called one vehicle out when there had been a take-down vehicle available. (*Id.*)

*Officer Rom*

Rom testified that he was in his seventeenth year with the Milwaukee Police Department. (Tr. 55.) He is currently assigned to the metropolitan drug enforcement group at HITDA. (*Id.*) On March 31, 2018, he was assigned to the District 3 neighborhood task force or anti-gang unit drug car. (Tr. 55–56.) His duties included investigating complaints about drug dealing and gang activity. He stated that complaints from many sources, including citizen complaints, captain or sergeant complaints, email complaints, walk-ins, and "anything that came into the City of Milwaukee," would get filtered into the ASIS email system or through a district liaison officer and then some would be forwarded to him. (Tr. 56, 79–80.) It was his job to investigate whether complaints were valid in order to "take care of things in the neighborhoods for the people living in the community." (*Id.*) He stated that a lot of his work was search warrants, controlled drug buys with CIs, surveillance, execution of search

8

warrants, reports regarding execution of search warrants, and interviewing arrestees and informants. (*Id.*)

Rom stated that he had been assigned to this particular drug car for approximately six years. (Tr. 60.) He testified that there was a way of doing business in terms of drug trafficking in that neighborhood. (*Id.*) He described people selling drugs from houses or at least storing drugs at houses. (*Id.*) He also testified that "mobile-to-mobile," or vehicle, drug trafficking was another very big one. (Tr. 60–61.) Rom explained that due to policy changes in the city of Milwaukee that did not allow police to chase vehicles, criminals started using "mobile drug houses" where they would keep their drugs, money, and guns with them in their cars. (Tr. 61.) They would go from place to place, do their deals, and then move on. (*Id.*) In this way, they could just flee if police attempted to stop them. (*Id.*) Rom averred that this was a pretty common way to sell drugs in the city of Milwaukee now. (*Id.*) He testified that he observed mobile to mobile drug dealing transactions on almost a daily basis while at work, and when he could get a squad car to conduct a traffic stop they would frequently recover drugs. (Tr. 61.) He described a typical transaction as very quick, involving one person meeting another person on the street in an area where the people don't necessarily live, doing the deal at the car, and then moving out of the area. (Tr. 61–62.) Usually the buyer goes to the seller's car, but not always; "it is all about being quick and try [sic] to be unnoticed." (Tr. 62.) He stated that sometimes they do deals at windows, sometimes in cars, depending on the relationship between the buyer and the seller. (Tr. 62.)

In the four or five days prior to Maclin's arrest, Rom and Braunreiter had been doing surveillance in the area. (Tr. 78.) Rom testified that there were three to four houses in the 2600 block of North 34th Street that were the subjects of complaints for drug dealing, the 2500 block

had two to three houses, and the 2400 block had another three to four houses that at one point or another he had watched or was currently watching for drug activity. (Tr. 57.) Rom testified that this block and the blocks surrounding it were a high crime area with a lot of drug and gang activity and drug violence. (Tr. 58.) He averred that in the four to five days prior, there had been three different drug trafficking arrests from mobile to mobile trafficking and about five different drug arrests in total from vehicles connected with the 2600 block alone. (Tr. 86.) When shown a document marked Exhibit 21, Rom identified it as a copy of a report that he wrote. (*Id.*) He confirmed that the report stated that the officers had been conducting surveillance on one particular house at which there had been numerous complaints of drug dealing, which he believed was 2664. (Tr. 59–60, 78.) A traffic stop of a male and a female who left the house, or who came to the house and met with someone from the house, had recovered weed and crack cocaine and resulted in arrests by a squad, though he could not remember if that was a couple days before or after Maclin's arrest. (Tr. 80–81.) He stated that there had been stops of three to four different cars connected to the investigation on that house and activity on that block. (Tr. 81–82.) He stated that there were some controlled buys at that location, and that in the week after March 31, 2018 they executed a search warrant recovering two different narcotics and arresting several people. (Tr. 60.) When shown Exhibits 22–27, Rom identified them as CAD reports for drug dealing complaints at 2646 North 34th Street, including one on March 31, 2018. (Tr. 79–80.) When shown a map of the area (Ex. 29), Rom identified the house in question as 2646 North 34th Street. (Tr. 82.)

Rom stated that he was working a "split shift" at the time, which was technically 11 am to 7 pm, but on March 31, 2018, he likely started working at 9 or 9:30 am. (Tr. 72.) Rom stated that at approximately 6:00 pm, he was parked in the 2500 block of North 34th Street

watching a house in the 2600 block that was the subject of a complaint. (Tr. 56–57.) He could not remember if they had parked on the east or west side of North 34th Street because they had been to this block numerous times that day. (Tr. 74.) He stated that he arrived at the location on the 2500 block of North 34th Street one to two minutes before he noticed a gray vehicle parked and running at the curb on the west side of the street, approximately sixty-five or seventy feet in front of them. (Tr. 63, 65.) When shown a map of the area (Ex. 1), he identified the approximate address where the vehicle parked as 2607 North 34th Street. (Tr. 63–64.)

Rom testified that there was a subject inside who looked antsy, looking around like he was waiting for someone. (Tr. 64, 65.) He stated that he could see the individual using the naked eye as well as binoculars. (Tr. 64.) Rom observed the vehicle stay at that location for four to five minutes without making contact with anyone. (Tr. 65.) As the car was sitting there, they ran the license plate on the vehicle and found that it did not belong in the area, which is not uncommon if someone is meeting with someone else for a drug deal. (Tr. 70.) Rom stated that he and Braunreiter were not able to run the vehicle in their car. (*Id.*) They often call an operator or use a side channel to call another squad to run it, whatever was easier. (Tr. 70–71.) Rom explained that he got assistance that day from their SID unit, Detective Obregon and Officer Filsinger. (Tr. 71.) He also believed there were other squad cars that would be nearby that could possibly stop vehicles for them. (Tr. 71.) Rom reiterated that he was focused on the one house, but if he saw something that he thought warranted investigation, he would let the other officers know. (Tr. 71.)

After four to five minutes, a red Dodge Magnum came around the corner and parked across the street at approximately 2602 North 34th Street. (*Id.*) Rom could not remember for

certain which corner the Magnum came around, but thought he remembered it coming from the west on Clarke before turning north. (Tr. 77.) The subject in the gray vehicle exited the vehicle, walked across the street, and entered the front passenger side of the red vehicle. (*Id.*) Rom testified that the subject stayed in the car for less than a minute. (Tr. 66.) He stated that the rear window was tinted, but because of the light coming through the untinted front window he could see two figures inside. (*Id.*) He stated that they appeared to be turning toward one another as though conversing. (*Id.*) He stated that they could have been engaged hand-to-hand; it was hard to tell, but there was some sort of interaction. (*Id.*) He stated that at one point it looked like both of them were turned inward toward the vehicle to face each other or exchange something. (Tr. 67.) Then the passenger got out and walked back to his own vehicle to enter it. (Tr. 66.) At that point, the Magnum took off at a high rate of speed going north toward Center Street. (*Id.*)

Rom stated that he had seen similar behavior in controlled buys before and it looked like a drug deal to him. (Tr. 68.) He stated that in the four or five days prior, he had observed another vehicle in almost the exact same area meet with someone in a car; a traffic stop by a different squad recovered marijuana and resulted in an arrest and a confession to drug dealing. (Tr. 68–69.) He stated that there were also two other vehicles stopped in those four to five days that ended up having drugs in them. (Tr. 69.)

Rom stated that the tint on the Magnum appeared to be illegal on the front side windows. (Tr. 69–70.) He stated that he is not trained on the tint meter; he has a general idea of what is legal and then he calls for someone else to actually do the tint testing. (Tr. 70.)

Rom testified that the Magnum pulled away from the curb at a high rate of speed and turned west on Center Street. (Tr. 68.) Rom stated that the area was residential and the speed

limit was 25 miles per hour. (*Id.*) Rom stated that he did not have a radar since he was in an unmarked car, but he would guess the vehicle got up to 35 or 50 miles per hour by the time it got to Center Street, as it was very quick. (*Id.*)

Rom stated that either he or Braunreiter was in contact with the squad car that actually took down Maclin's car via a radio side channel called "narc 1" or the SID. (Tr. 73.) Rom explained that a "side channel" is not a district channel. (*Id.*) He did not know if "narc 1" had dispatch on it or if it would show up in a dispatch log, but they rarely go out with dispatch to avoid the information becoming public record. (Tr. 73, 85.) Rom did not know where the take-down squad or the other squads in the area were located at the time. (Tr. 73.) When the vehicle drove away, either he or his partner relayed the information and the vehicle was later stopped. (Tr. 83.) Rom stated that he did not think they followed the vehicle; he believed they probably stayed there and didn't take off immediately, although at some point they ended up seeing it after it was stopped. (Tr. 83–84.) Rom stated that he could not see what the vehicle did after it turned onto Center. (Tr. 84.)

Rom stated that they had been in and out of that area numerous times that day. (Tr. 72, 74.) For this particular incident, they were there for maybe ten minutes total. (Tr. 72.) He stated that they were there for a minute before they noticed the other car, left briefly after the incident, and then probably came back. (*Id.*)

Rom explained that the undercover car does not have a dash cam. (Tr. 74.) He stated that he had a body camera assigned to him, but he has probably only used it three or four times and he was told it is only to be used when in uniform. (Tr. 74–75.) Rom explained further that using a body cam while he was wearing plain clothes and undercover would cause a problem because it could give away the officers, their vehicle, and their investigation. (Tr.

86.) He stated that he has a camera for taking pictures but he did not know if he had it with him that day. (Tr. 75.) He also stated that they have a video recorder, but he normally does not take it out and does not know where it was. (*Id.*) There were no recording devices activated in the undercover car. (Tr. 84.)

When shown his report of the incident, Rom confirmed it was written on March 31, 2018 at 7:50 pm. (Tr. 76.) Rom confirmed that it stated that officers observed a black male subject sitting waiting in a gray Toyota Camry. (*Id.*) Rom explained that when he said "officers" he was referring to himself and his partner. (*Id.*)

*Officer Filsinger*

Filsinger testified that he has been employed as a Milwaukee police officer for seventeen and a half years (Tr. 88), and he regularly patrols the area in which this incident occurred (Tr. 95). On March 31, 2018 he was working with Obregon and Lieutenant Yaghnam. (*Id.*) They were following up on a weapons violation case and also checking the area for another individual. (Tr. 88–89.) The three were in an unmarked Ford four-door squad car, with Yaghnam driving, Obregon in the front passenger seat, and Filsinger in the back passenger seat. (Tr. 89–90, 103.) This was not a deliberate choice of seating, but "just how it ended up that day." (Tr. 106.) All three were in plain clothes and did not have body cameras because they were not allowed to wear body cameras while in plain clothes. (Tr. 89.) Filsinger stated that he did not wear a uniform because he was assigned to a plain clothes position, but despite being in plain clothes, he was not hiding the fact that he was a police officer and wore a jacket with a badge on it. (Tr. 102–103, 109.) Obregon wore a bullet-proof vest that indicated "police" on it. (Tr. 103.) The unmarked squad car did not have a dash cam. (Tr. 109.)

Filsinger stated that at approximately 6:00 pm, their vehicle was on North 35th Street, perhaps south of Center Street a block or two, in the 2500 or 2400 block, although he could not recall exactly. (Tr. 90–92.) He stated he believed they were south of Clarke Street. (Tr. 104.) He was relatively certain they were stationary but he could not recall which way the vehicle was facing. (Tr. 104.) At the time, their car was communicating with Braunreiter and Rom via radio. (*Id.*) Braunreiter and Rom asked where the car Filsinger was driving was; it was close by, so the officers in that car agreed to do a stop for Braunreiter and Rom if they saw something. (Tr. 103.)

Not long after 6:00 pm, Braunreiter and Rom informed them that they had just seen what they thought was a hand-to-hand drug transaction. (Tr. 92, 105.) They said to look for a red Dodge Magnum, which they reported traveled northbound on 34th Street to Center Street at a high rate of speed, turned west, and then went north on 35th Street. (Tr. 92–94, 105.) Filsinger explained that 35th Street and Center Street is a relatively busy intersection, 35th Street is one of the major north-south thoroughfares through Milwaukee, and there is generally a lot of traffic at that intersection at 6:00 pm. (Tr. 106.) Filsinger remembered that there was traffic that day, but he did not remember the volume. (*Id.*)

Filsinger testified that the he attempted to locate the vehicle as the driver of the take-down car moved north on 35th Street. (Tr. 94, 95.) He did not recall seeing the Magnum as it turned north onto 35th Street and did not know if that intersection's light was red or green when the vehicle turned. (Tr. 107–08.) He could not recall if the squad car stopped at the light at 35th and Center, only that the squad car was going pretty fast when it got north of Center. (Tr. 108.) Filsinger confirmed that there is also a light at the intersection of 35th Street and Locust, but he could not recall whether he saw the Magnum stopped at that light. He could

not remember exactly where he first saw the vehicle, but he believed it was just south or just north of Locust, which is two blocks north of Center Street on 35th Street. (Tr. 94, 95.) By the time he was able to observe the Magnum, the squad car was already behind it. (Tr. 109–110.) Filsinger testified that the Magnum was traveling over the speed limit and the window tint appeared to be illegal. (Tr. 95.) He testified that the speed limit on 35th Street is 35 miles per hour. (*Id.*) He concluded that the vehicle was traveling above the speed limit because their vehicle had to travel much faster than 35 miles per hour to follow it, and because of the amount of time it took to catch up with the car from the time he saw it. (Tr. 96, 108.) Although he was not the driver, he based this assessment of the speed on his experience driving or riding in a squad car and catching up to or pursuing vehicles on a daily basis. (Tr. 97.)

Filsinger stated that at some point, the lights on the front dash of the unmarked vehicle were activated. (*Id.*) Their vehicle was behind the Magnum for half a block or three quarters of a block before the Magnum pulled over, somewhere mid-block between Locust and Chambers. (Tr. 97–98, 109.) When presented with a map showing 2970 North 35th Street (Ex. 2), Filsinger stated that that address sounded appropriate. (*Id.*) He stated that the traffic stop occurred around 6:02 pm.

Once the Magnum stopped, the officers exited their car and Filsinger acted as a "cover officer." (Tr. 98.) He approached the passenger side of the vehicle, with Obregon staying by the rear of the vehicle and Yaghnam approaching the driver's side. (*Id.*) He stated that he had a view of the back of the vehicle and that in his estimation, the tint was more than Milwaukee allows. (Tr. 99.) He stated that he had been involved in testing or observed testing of vehicles for illegal tint previously, and based on that experience, he believed the tint exceeded the legal limits. (Tr. 99–100.) As he approached the vehicle, he stated that he couldn't see much as far

16

as movement. (Tr. 100.) He ordered the driver to roll down the passenger side window, which he did, and he saw the individual inside. (*Id.*) At the hearing, he identified Maclin as the individual he had seen that day. (Tr. 100–01.) Filsinger testified that when the window was rolled down, he could smell fresh marijuana from the vehicle. (Tr. 101.) Filsinger testified that in his seventeen years as a Milwaukee police officer, he has been involved in drug investigations involving marijuana, so he knows it when he smells it. (Tr. 102.)

When presented with a transcript of his testimony in this matter in a previous state court proceeding, Filsinger admitted that he had indicated a suspected tint violation and a possible hand-to-hand drug transaction, and had not mentioned speeding. (Tr. 111.)

*Detective Obregon*

Obregon testified that he has been employed by the Milwaukee Police Department for twenty-four years. (Tr. 112–13.) At 6:00 pm on March 31, 2018, he was assigned to the special investigations division, in which his duties included investigating high crime areas, shootings, homicides, and drug dealing and trafficking. (*Id.*) On that day, they were assisting another unit to locate and take down a different vehicle. (Tr. 113–14.) He stated that he was a passenger in a new, unmarked black Ford Taurus driven by Yaghnam that was equipped with lights, a siren, and a squad radio but no camera. (Tr. 114, 116.) The vehicle was parked in the 2599 block of North 35th Street, roughly, mid-block closer to Clarke, facing northbound. (Tr. 114, 128.) When shown a map of 34th and 35th Streets at West Clarke Street (Ex. 1), Obregon confirmed that his vehicle would have been in the area of two homes at the intersection of Clarke and North 35th Street, but a little farther south. (Tr. 115–16.)

At approximately 6:00 pm, Braunreiter and Rom made contact via text and asked if the officers in the unmarked car were able to do take-downs, which they agreed to do. (Tr.

17

114, 129.) The officers had been moving around prior to getting a call from Braunreiter and Rom. (Tr. 129–130.) As they were waiting in the 2500 block, Obregon received a radio transmission from Braunreiter on a side channel that there was a Dodge Magnum that they believed had done a hand-to-hand transaction with a Toyota. (Tr. 117, 130.) He did not know if that side channel was recorded. (Tr. 131.) Braunreiter and Rom asked them to stop the Magnum, indicating that it was leaving at a high rate of speed northbound on 34th Street toward Center Street. (*Id.*) They then indicated that it turned westbound on Center Street. (Tr. 117–18.) When shown a map of the area (Ex. 2), Obregon confirmed that this was the flight path of the Magnum. (Tr. 118.)

Obregon testified that as they traveled northbound on 35th Street, he saw the Magnum for the first time when it pulled into the intersection at 35th Street and Center. (*Id.*) He did not remember whether the Magnum had a green light or a red light. (Tr. 132.) He noted that the vehicle was swaying as it was going at a higher rate of speed than normal, and it continued to increase speed as it was going northbound on 35th Street. (Tr. 119.) Obregon testified that he did not remember whether the light was red or green, but that they stopped briefly because they always stop briefly to cross intersections safely and at least slowed down in this case due to oncoming traffic. (Tr. 119, 133.) He stated that after the Magnum went north on 35th Street there were cars behind it, but he could not say how many. (Tr. 133–34.) The lieutenant turned the red and blue lights on one block north of the 2600 block, probably at the intersection of 35th Street and Hadley. (Tr. 120.) Obregon testified that at that point, the Magnum was probably half a block ahead of them, going pretty fast. (*Id.*) He explained that he could tell their vehicle was speeding up because he could hear the engine revving to catch up to the Magnum. (*Id.*) Obregon confirmed that the speed limit on North 35th Street is 35 miles per

hour, and stated that the red Magnum was probably going closer to 50 or 55 miles per hour. (Tr. 121–22.) He explained that he would estimate their vehicle was going about 50 or 65 miles per hour to catch up. (Tr. 122.) He stated that he was able to distinguish between traveling 30 to 35 miles per hour and 50 to 60 miles per hour, especially in vehicles with V8 engines because the engines rev. (*Id.*) He admitted that he did not know the exact speed the Magnum was travelling, he had no radar on the Magnum, and he did not pace the Magnum. (Tr. 134.) He stated there was heavy traffic at the time, as it was rush hour, and vehicles moved over to the sides in order to allow them to get behind the Magnum. (*Id.*) He stated that they probably got behind the Magnum between the 2800 and 2900 block, just before they hit Locust Street. (Tr. 122–23.) He could not recall whether Maclin's vehicle was stopped at the intersection of 35th Street and Locust. (Tr. 140.) Obregon stated that they did not pull over on the side in the turn lane or curb lane, and at no point were they parallel to the Magnum, always behind it. (Tr. 134, 135.)

Obregon testified that the Magnum finally pulled over in the 2900 block shortly after 6:00 pm, maybe 6:02 pm. (Tr. 121, 123.) He averred that the reports would have reflected the time of the stop. (Tr. 123.) There was an industrial park to the east of 35th Street in the 2900 block, and they "guesstimated" that 2970 was the address. (Tr. 123.)

Obregon stated that their car stopped approximately 20 to 25 feet behind the Magnum. (*Id.*) He exited the passenger side but stayed at the right front of the unmarked police vehicle. (*Id.*) He stood there watching the driver, while Yaghnam and Filsinger approached the vehicle, covering the officers. (Tr. 124.) He testified that he could see movement inside the Magnum but it was not clear how many people were inside it or whether they were male or female. (Tr. 124, 135.) Obregon stated that Yaghnam and Fislinger made contact with the

Case 2:18-cr-00122-PP   Filed 03/22/19   Page 19 of 35   Document 48

driver of the Magnum. (*Id.*) When the windows came down, within seconds he could smell fresh marijuana. (Tr. 125.) Yaghnam made eye contact with Obregon, and the driver exited the vehicle through the driver's side door. (Tr 126.) Yaghnam walked him back toward the rear of the vehicle, toward Obregon. (*Id.*) Officer Filsinger began to pat him down while Obregon detained him. (*Id.*)

Obregon testified that he observed the vehicle being searched and he did some of the searching. (*Id.*) He testified that marijuana was recovered from the vehicle. (*Id.*) When shown a photograph of a glass jar with several corner cuts of marijuana and a firearm (Ex. 4), Obregon identified it as a photograph of the marijuana recovered during the traffic stop. (Tr. 127). Obregon stated that additional marijuana was recovered from the rear passenger side floorboard, and that approximately 46 grams of marijuana was recovered in total. (*Id.*)

When presented with a report of the incident (Ex. 31), Obregon testified that he authored the report and reviewed it prior to testifying. (Tr. 131.) He stated that the report included his observations, but he was not involved in any of the surveillance. (Tr. 131–32.) In court, Obregon identified Maclin as the individual who was stopped. (Tr. 125.) Obregon admitted that he did not issue Maclin a speeding ticket. (Tr. 134.) He also confirmed that neither he, Filsinger, nor Yaghnam did a tint read on any of the Magnum's windows, and Maclin was not issued a citation for a tint violation. (Tr. 135.)

When shown a video DVD (Ex. 33), Obregon confirmed that it showed the traffic stop of Maclin (Tr. 138). He explained that the video was from a marked squad car that his unit had called to convey Maclin downtown, which was the squad car shown in the video. (Tr. 140.) He confirmed that the video showed the stop only "after the fact." (Tr. 141.) He admitted that the video showed Maclin pulled over just north of a driveway on the east side

of the street, south of Chambers Street. (Tr. 139.) Obregon reiterated that they just "guesstimated" the address of the stop because they did not see an actual address on the east side of the street. (*Id.*)

*Private Investigator Kvidera*

Kvidera testified that she was a private investigator hired to assist the defense in investigating this case. (Day 2 Tr. 9.) She was asked to request records or CAD reports of drug dealing complaints from citizens to the Milwaukee Police Department in Districts 3, 5, and 7 during March 2018. She explained that she requested Districts 5 and 7 because they abut District 3, where the arrest of Maclin occurred. (Day 2 Tr. 10.) Kvidera affirmed that the full response to her open records request for a complete record of drug complaints in the area was contained in Exhibit 36. (Day 2 Tr. 9–10.) She admitted that the records only contain CADs generated from 911 calls; that was the only source of the information contained in the records. (Day 2 Tr. 12–13.)

Kvidera testified that there were five complaints for drug dealing in the 2600 block of North 34th Street in March 2018, all for 2646 North 34th Street. (Day 2 Tr. 10–11.) She did not find any records of drug dealing complaints in the 2400 or 2500 blocks of North 34th Street, or for any other location in the 2600 block. (Day 2 Tr. 11–12.)

*Jacob Maclin*

Maclin testified that he is 37 years old and has lived in Milwaukee since 1986. (Day 2 Tr. 13.) He acknowledged that he has two felony convictions, one for manufacturing and delivering cocaine and another for being a felon in possession of a firearm. (Day 2 Tr. 31.)

Maclin stated that he was in the area of 34th and Clarke to receive repayment from a friend to whom he had loaned some money to have his lights turned back on. (Day 2 Tr. 14.)

He stated that his friend's name was Edward Burgess, who was approximately 24 or 25 years old and lived on Fifth Street. (Day 2 Tr. 26.) In response to a request for Burgess' phone number, Maclin stated that he had it on his phone, which was with him at the hearing. (Day 2 Tr. 27.) He agreed to check his phone and provide the number, but the line of questioning continued and he did not do so. (*Id.*) Maclin stated that he had known Burgess for about a year. (*Id.*) The two had worked security for Cosmo Beauty, a beauty supply store at 4055 North Teutonia. (*Id.*) He stated that they started in April or May of 2017, although Maclin had been working there a little longer than Burgess. (*Id.*) Maclin averred that Burgess was still working there. (*Id.*) He testified that Burgess had borrowed $200 from him. (Day 2 Tr. 27–28.)

Maclin stated that he drove the red Dodge Magnum identified in Exhibit 4. (Day 2 Tr. 14.) Maclin testified that the Magnum belonged to his wife, who had owned it for between two and three years. (Day 2 Tr. 14–15.) He testified that his wife usually drives the car to work, but he drives it occasionally and when there's a problem with it to figure out what the problem is. (Day 2 Tr. 15.) He stated that neither he nor his wife nor anyone else has ever been stopped for a tint violation when using the car. (Day 2 Tr. 15–16.) He stated that they purchased the car used and never had any tint put on it, and he believes the windows are tinted legally. (Day 2 Tr. 16.)

Maclin confirmed that he stopped just north of Clarke on the east side of 34th Street. (Day 2 Tr. 17.) He testified that he met with Burgess, who got in his car, gave him a brotherly hug, and gave him the money. (Day 2 Tr. 17–18, 31–32.) Maclin testified that Burgess was in his car for five to seven minutes, during which time they talked about his friend starting a tow truck company and why Burgess wasn't working at the store anymore. (Day 2 Tr. 18.) He

stated that they would have turned toward one another in the vehicle. (Day 2 Tr. 32.) After five to six minutes, Burgess exited the car and began to walk toward his own car. (*Id.*) As he was walking toward his car, Maclin pulled off. (*Id.*)

Maclin stated that he went north on 34th Street, turned westbound on Center Street, and then stopped at a red light at the intersection of 35th and Center for five or six seconds before it turned green. (Day 2 Tr. 19–20.) Maclin turned right on 35th Street. (*Id.*) Maclin stated that there was other traffic in the area, including two cars turning right off Center Street, two cars behind him turning right off Center Street, and some cars headed north from the south end of 35th Street. (Day 2 Tr. 20.) There was also a car in front of him that sped up and made it through the light on Locust Street. (*Id.*) Maclin stated that he first noticed the police car that pulled him over when he was at Locust Street. (Day 2 Tr. 21.) He stated that while he was at the light, and the police car came up on the side to get around the cars behind him. (*Id.*) Maclin looked in his rearview mirror and kept his eye on the car to make sure it didn't ram into him. (*Id.*)

Maclin stated that he was stopped at the light for about twenty seconds. (*Id.*) When the light turned green, as they proceeded past the light, the squad car turned on its lights. (*Id.*) He thought the squad car was trying to get past him because of the way they pulled up behind him, so he started pulling over to the right and noticed that the car was following him. (*Id.*) He pulled over a little past the exit for the bus terminal because he did not want to block the buses from getting in or out. (Day 2 Tr. 21–22.)

Maclin stated that he was not speeding on 34th Street or 35th Street. (Day 2 Tr. 22, 25.) Maclin explained he was positive he was not speeding because his car had a problem with the drive shaft that caused a big clunking sound every time he pressed the gas. (Day 2 Tr. 23, 24.)

If he had pressed the gas too hard to "take off," he would have risked the part snapping. (Day 2 Tr. 23.) He stated that in order to accelerate, he had to have a clear lane and take his time, and the last time he tried to do it too fast the car ended up stopping on the highway. (Day 2 Tr. 24–25.) He testified that he works on cars, but he took the Magnum to a mechanic to get it fixed subsequent to these events. (*Id.*) Maclin testified that his wife came to the scene after he was arrested, claimed the vehicle, and drove it away. (Day 2 Tr. 30.) He also testified that they had not driven the car after April 2nd, because a cable had snapped and the car would not come out of park, so they had to have it towed to the auto parts store in mid-July 2018. (Day 2 Tr. 30.) When presented with Exhibit 34, Maclin identified it as an invoice from Trans Auto, which replaced the drive shaft and gear shaft on the car in July 2018. (Day 2 Tr. 24, 25.) Maclin stated that he had lost his job when he was arrested, so he didn't have enough money to get the car fixed sooner, and had to save up the money to have it fixed. (Day 2 Tr. 25.)

When Maclin was arrested, he had $2,440 on his person in small bills, consisting of $20s, $10s, and a $100 bill. (Day 2 Tr. 28.) He testified that at the time he was stopped, he was working at the community warehouse. (*Id.*) He admitted that he told pretrial services that he was unemployed as of April 2018, and explained that he was unemployed as of March 25, 2018 and did not receive income from his employment after that point, but it did not become "official" until April 1st. (Day 2 Tr. 28–29.) He explained that he told law enforcement at the time of his arrest that he was employed, but he hadn't actually been to work since March 25th because of a back problem. (Day 2 Tr. 29.)

Maclin testified that he saw another police car stopped on Center Street going westbound that day. (Day 2 Tr. 22.) When presented with a map of the area north of Locust

on 35th Street (Ex. 30), Maclin confirmed that it depicted the location he was arrested. (Day 2 Tr. 16.)

## ANALYSIS

1. *Motion to Strike Testimony of Officer Rom*

On the second day of the evidentiary hearing, after Rom had already testified, the government moved to strike his testimony. (Day 2 Tr. 1–7.) The basis for this motion is not disputed. In sum, after the first day of testimony, an attorney from the Federal Defenders' Office unknown to the officers rode on a courthouse elevator with Rom and Braunreiter. The attorney reported that the two officers were venting about what occurred in the courtroom, specifically Braunreiter having to answer a question during cross-examination about the type of undercover car he was driving. During the elevator conversation, Rom indicated that Braunreiter should have been vaguer in answering the question or perhaps testified that he didn't recall or didn't know the make of the undercover car. The government moved to have Rom's testimony stricken to avoid a mini-trial on the elevator conversation. The defense argued that the proper remedy is not to strike Rom's testimony but to consider this event in evaluating both officers' credibility, as "it reflects a belief that they can say whatever they want to say even if it's not true to obstruct justice." (Day 2 Tr. 5.)

As I indicated at the evidentiary hearing, although the defense brought the motion to suppress, the government carries the burden of proving the legality of the stop. Accordingly, the government can present its case as it deems fit. However, once the evidence has been presented, the government, or any party for that matter, cannot simply withdraw the evidence because it is not favorable to their case. On this basis, I will not strike Rom's testimony, but I will consider Rom's statement on the elevator in assessing his credibility. I will not consider

Rom's statement as bearing on the credibility of Braunreiter or the other officers who testified. There is no evidence that Braunreiter or the other officers made similar statements, or agreed with or adopted Rom's view.

Before turning to the merits, I must remark on the gravity of Rom's statement. Maclin is correct that Rom's statement reflects a willingness to testify falsely, or to "testilie," as some commentators call this practice. *See* Joseph Goldstein, *'Testilying' by Police: A Stubborn Problem*, N.Y. Times, Mar. 18, 2018, https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html; *Police Perjury: It's Called 'testilying'*, Chicago Tribune, Jul. 5, 2015, https://www.chicagotribune.com/news/opinion/editorials/ct-police-false-testimony-edit-20150702-story.html. "Testilying" does great harm, not only to individual defendants, but to the public's confidence in law enforcement and the courts, and I am obliged to call it out. Rom should know that the court does not countenance this attitude or conduct, and I will accordingly order that the government share this Report and Recommendation with Rom and his superiors. I note that the government, which also has an obligation not to condone such an attitude or behavior, has assured that Rom will not testify in any future hearings.

> 2.    *Merits*

> 2.1.    Reasonable Suspicion or Probable Cause?

The parties propose two different standards for determining whether a traffic stop is reasonable under the Fourth Amendment. In his motion to suppress, Maclin asserts that police had neither probable cause nor reasonable suspicion to stop him. (Docket # 33 at 3.) In oral argument, the government argued that the stop and search of Maclin's car were supported by reasonable suspicion. (Day 2 Tr. 33–39.) Maclin clarified that he was not challenging the search of his car after the stop, which was reasonable after the officers smelled

marijuana. (Day 2 Tr. 39.) However, Maclin argued that the traffic stop itself was unconstitutional under any of the theories proffered by the government: a drug violation, speeding, or excessive window tint. (Day 2 Tr. 39–51.) In particular, Maclin argued that the officers did not have "probable cause" to justify a traffic stop. (Day 2 Tr. 46, 50.) In response, counsel for the government pointed to *Heien v. North Carolina*, 574 U.S. ——, 135 S. Ct. 530, 536 (2014) and *United States v. Rodriguez-Escalera*, 884 F.3d 661, 667–68 (7th Cir. 2018) for the proposition that the correct standard for traffic stops is not "probable cause" but "reasonable suspicion." (Day 2 Tr. 54.)

A traffic stop is reasonable under the Fourth Amendment when a reasonable officer would suspect that criminal activity is afoot. *See United States v. Uribe*, 709 F.3d 646, 649–50 (7th Cir. 2013), citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968); *see also Rodriguez v. United States*, 575 U.S. ——, 135 S.Ct. 1609, 1614 (2015) (routine traffic stop is more analogous to *Terry* stop than to formal arrest); *Rodriguez-Escalera*, 884 F.3d at 667–68 (quoting *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)) ("To pull a car over for a brief investigatory stop, a police officer must have '*at least* [an] articulable and reasonable suspicion' that the particular person stopped is breaking the law.") (emphasis added). The Supreme Court succinctly explains the standard for a brief investigative traffic stop as follows:

> The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity. The "reasonable suspicion" necessary to justify such a stop is dependent upon both the content of information possessed by police and its degree of reliability. The standard takes into account the totality of the circumstances—the whole picture. Although a mere "hunch" does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.

*Navarette v. California*, 572 U.S. 393, 396–97 (2014) (internal quotations and citations omitted). In *Navarette*, a 911 caller reported that a vehicle had run her off the road, and gave a detailed description of the vehicle and its direction of travel. *Id.* at 395. Officers located a truck matching the description and pulled it over. *Id.* As officers approached the vehicle, they smelled fresh marijuana. A subsequent search of the vehicle revealed 30 pounds of marijuana, and the occupants of the vehicle were charged with transporting marijuana. *Id.* The Court held that reasonable suspicion supported the stop because the 911 caller gave specific, reliable information that would lead a reasonable police officer to suspect drunk driving. *Id.* at 398–404. The Court emphasized that "reasonable suspicion" is a "commonsense," fact-bound inquiry based on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 402. It also rejected the defendants' argument that the reported behavior might also be explained by innocent behavior, for example, a driver responding to an unruly child or other distraction. The Court emphasized that "reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Id.* at 403 (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

There are a number of cases in which courts refer to the higher, "probable cause" standard for traffic stops, most notably *Whren v. United States*, 517 U.S. 806, 810 (1996) (traffic stop supported by probable cause did not violate the Fourth Amendment regardless of the officer's actual motivations). *See also Tapley v. Chambers*, 840 F.3d 370, 377 (7th Cir. 2016) (citing *Whren*, 517 U.S. at 810) (traffic stops "are reasonable so long as 'the police have probable cause to believe that a traffic violation has occurred'"); *United States v. Blair*, 524 F.3d 740 (6th Cir. 2008) (analyzing traffic stop under both standards). However, in *Whren*, the Court appears to have used the language of probable cause because petitioners conceded that

28

the officers did in fact have probable cause, not because probable cause was necessary. 517 U.S. at 810 ("Petitioners accept that [the officer] had probable cause.") Similarly, other courts sometimes use the language of probable cause because the facts admit a finding of either reasonable suspicion or probable cause. *See, e.g., Tapley*, 840 F.3d at 377 (finding probable cause for speeding violation when officer observed vehicle traveling at what appeared to be a very high rate of speed, officer could hear the engine rev as the vehicle drove away, the officer had difficulty catching the vehicle, and when the vehicle was finally stopped the officer and the driver discussed the vehicle's excessive speed). The Seventh Circuit appears to allow either reasonable suspicion or probable cause to justify a traffic stop. *See, e.g., United States v. Paniagu-Garcia*, 813 F.3d 1013 (7th Cir. 2016) ("The government failed to establish that the officer had probable cause or a reasonable suspicion that Paniagua was violating the no-texting law."). At least three circuit courts of appeals have directly confronted the ambiguity and concluded that while probable cause may justify a traffic stop, as in *Whren*, reasonable suspicion is sufficient. *United States v. Stewart*, 551 F.3d 187, 192 (2nd Cir. 2009) ("[W]e identify nothing in *Whren* that casts doubt on our understanding that either probable cause or reasonable suspicion of a traffic violation can support a traffic stop."); *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000) ("We do not believe that the Court in *Whren* intended to change [the] settled rule. The passage on which Lopez–Soto relies tells us only that probable cause is sufficient to support a traffic stop, not that it is necessary."); *United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003) ("[A] traffic stop is a constitutional detention if it is justified by reasonable suspicion under *Terry* or probable cause to believe a traffic violation has occurred under *Whren*."). Thus, I conclude that either reasonable suspicion or probable cause may justify a traffic stop.

### 2.2. Drug Violation

The government argued that the police had reasonable suspicion that Maclin had engaged in a mobile-to-mobile drug transaction. (Day 2 Tr. 34.) Looking at the totality of the circumstances as they appeared to the police at the time, I agree. Braunreiter testified that he observed the Camry idling with no one entering or leaving the car. Additionally, the Camry did not register to the block. The occupant of the Camry was looking around as if waiting for someone. Braunreiter testified that after four or five minutes, a red Magnum pulled up and parked on the opposite side of the street about ten or fifteen feet behind it. Almost immediately after the Magnum stopped, the driver of the Camry exited his vehicle, walked to the front of the Magnum, and entered the front passenger seat. Braunreiter, with the aid of binoculars, observed that the Magnum had what appeared to be excessive window tint, but he was nevertheless able to see silhouettes of two individuals turned toward each other. After one to two minutes, the driver of the Camry exited the Magnum and left. Although Braunreiter could not see the car occupants' hands to see an actual transaction occur, it was reasonable for Braunreiter to suspect that drug activity was afoot given his experience with mobile-to-mobile drug transactions, the conduct of the occupant of the Camry in waiting and looking around for several minutes, the fact that at least one of the cars did not list to the block, the motion of the Magnum's occupants turning toward each other, and the brevity of the interaction between the two.

Maclin's arguments to the contrary are not persuasive. First, Maclin argued that it offends the Fourth Amendment for the police to infer that any time two people meet in a car it is for a drug deal. (Day 2 Tr. 43.) Maclin is undoubtedly correct. But as summarized above, Braunreiter articulated his suspicion on more than just two people meeting in a car. Even if I

were to credit Maclin's testimony that this was just a case of two friends meeting in a car, I am to look at the evidence from the perspective of how the evidence looked to police at the time. Here, Maclin's own testimony corroborated many of Braunreiter's observations. Maclin corroborated that the driver of the Camry entered the front of Maclin's car and sat in the front passenger seat, and that the two turned toward each other, as Braunreiter described. Maclin testified that the interaction in the car took five to seven minutes—longer than the one to two minutes Braunreiter estimated, but still relatively brief. These events, admitted to by Maclin, combined with the reportedly high rate of drug trafficking in the area generally and the nature of mobile-to-mobile drug transactions about which Braunreiter testified, were sufficient to give rise to reasonable suspicion that a drug transaction had occurred.

Maclin also protested that there was not particularized suspicion because the CAD reports do not reflect mobile-to-mobile drug dealing on the block. (Day 2 Tr. 40–41.) Instead, the caller in the CAD reports described a male subject with a blond mohawk exiting the residence at 2646 North 34th Street and delivering suspected drugs to vehicles that pulled up in front of the residence. (Day 2 Tr. 41.) Maclin argued that Kvidera's research revealed no complaints in the 2400 or 2500 block or to any other location in the 2600 block besides 2646, and Maclin was not parked in front of 2646. (Day 2 Tr. 43–44.) Maclin argued that there was nothing about the conduct that these officers saw Maclin engage in that should have led them to connect Maclin to what they were in the area to investigate. These arguments also fail. Braunreiter testified that the CAD reports only show complaints from 911 calls, not all complaints received by the police, so the CAD reports do not undermine the testimony that other complaints in those blocks had been received. Furthermore, the fact that the officers

31

were there surveilling one location for one type of drug activity by one suspect did not require them to overlook other suspicious behavior by others in the area.

### 2.3.    Speeding Violation

Next, the government argued that the stop was justified by a traffic violation: Maclin's speeding. Maclin pointed out that no citations were issued for speeding. (Day 2 Tr. 44.) Maclin suggested that it was not plausible that the officers could have discerned the speed of a car sixty to seventy-five feet in front of them that was driving away from them, at least not to the level of "probable cause." (Day 2 Tr. 46.) Maclin also pointed to multiple inconsistencies in the officers' testimony: Braunreiter testified that the officers followed the vehicle, while Rom testified that they did not (Day 2 Tr. 45–46); Filsinger testified that he saw the car first at Locust, not far from where it was pulled over, while Obregon testified that they followed the car for several blocks before it pulled over (Day 2 Tr. 46–48); and testimonies differed about when the squad car's lights were activated (Day 2 Tr. 48). Additionally, Maclin pointed out that Obregon testified that this was rush hour and there was a lot of traffic in the area, including vehicles behind Maclin's vehicle, and suggested that Maclin would not be speeding at the rates the officers were testifying to if there were vehicles right behind his car. (Day 2 Tr. 48–49.) Maclin suggested that as the driver, he was better able to tell how fast his car was going and to know the capabilities of his car. (Day 2 Tr. 49.) Maclin submitted that perhaps the car was indeed loud, based on Maclin's testimony about its mechanical problems and Braunreiter's testimony that he heard the engine, but that wasn't enough to demonstrate "probable cause" for a traffic violation. (Day 2 Tr. 50.)

Although I agree with Maclin that there were discrepancies in the testimony on the alleged speeding, a fact-finder can accept or reject in part or in whole witnesses' testimonies.

I find credible Braunreiter's testimony that Maclin's car appeared to him to speed away. This was corroborated by the two take-down officers, who testified that they were told that that the car had just sped away. Additionally, Braunreiter testified that while following Maclin's car he could hear Maclin's engine as if it were "working harder, trying to increase speed." Maclin testified that his car had a problem with the drive shaft that caused a big clunking sound every time he pressed the gas. In my view, this corroborates Braunreiter's testimony about the engine noise. Whether Braunreiter was correct that the noise was due to speeding or whether it was actually due to mechanical problems is not dispositive. It only matters that Braunreiter reasonably believed that the car was speeding, in part because of the noise.

I do not put much weight on the officers' testimony regarding how high over the speed limit Maclin was going. The police were not clocking Maclin and therefore could not credibly testify to the precise rate of his speed. I do, however, find it credible that they were able to tell that he was going faster than the posted limit or the flow of traffic. I also note that there were discrepancies regarding the exact location where Maclin's vehicle was stopped, and I reject as not credible Officer Rom's testimony that they did not immediately follow Maclin's car. But on the record before me, the government has shown that Braunreiter reasonably believed that Maclin's car took off at a high right of speed, as the take-down officers were informed of Maclin's speeding away and Braunreiter heard what he believed to be Maclin's car working hard to gain speed. Accordingly, the government has shown that the police had reasonable suspicion that the car was speeding that justified the stop.

### 2.4. Tint Violation

Finally, the government argued that the stop was justified by the police officers' reasonable suspicion that Maclin's car windows were unlawfully tinted. (Day 2 Tr. 38.)

Maclin countered that Rom and Braunreiter were on the same side of the street behind Maclin's vehicle, and the only window they could have seen was the rear window. (Day 2 Tr. 45.) Likewise, the take-down vehicle was behind Maclin's vehicle, so they weren't in a position to see the tint until the stop had been completed. (*Id.*) Maclin pointed out that there was still no proof that the window tint was at an illegal level, as it had never been tested. (*Id.*)

I find that the government has shown that the police had reasonable suspicion that Maclin's car windows were excessively tinted. The officers testified consistently that the windows appeared excessively tinted. Specifically, Braunreiter testified that they were parked on the opposite side of the street as Maclin's car, the same side of the street as the Camry. From this position, Braunreiter would have seen multiple windows of Maclin's car. Likewise, the take-down officers testified that they were able to observe that the car windows appeared excessively tinted. Exhibit 3, a photograph of the car, shows what appear to be unusually dark windows, corroborating the officers' impression that the windows were excessively tinted. Again, the government need not prove beyond a reasonable doubt that the windows were excessively tinted; it need only show that the police officers' suspicion that the windows were excessively tinted was reasonable. The government has done so.

## CONCLUSION

Because reasonable suspicion of a drug violation, a speed violation, or a tint violation justified the officers' stop of Maclin, I conclude that the stop did not violate the Fourth Amendment. Accordingly, I recommend that Maclin's motion to suppress be denied.

## RECOMMENDATION AND ORDER

**NOW, THEREFORE, IT IS RECOMMENDED** that Maclin's Motion to Suppress (Docket # 33) be denied.

**IT IS ORDERED** that the government share this Report and Recommendation with Officer Rom and his superiors.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 22nd day of March, 2019.

BY THE COURT

_s/Nancy Joseph_____
NANCY JOSEPH
United States Magistrate Judge

35