UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA ,

                Plaintiff,

     v.                                  Case No. 18-cr-122-pp

JACOB L. MACLIN,

                Defendant.

**ORDER OVERRULING DEFENDANT'S OBJECTIONS (DKT. NO. 54) AND AFFIRMING JUDGE JOSEPH'S ORDER ON DEFENDANT'S MOTION FOR DISCOVERY ON SELECTIVE PROSECUTION AND SELECTIVE ENFORCEMENT (DKT. NO. 47)**

The defendant alleges that there are "serious questions about whether local, state, and federal law enforcement agencies engage in racial discrimination in determining which individuals to refer to the United States Attorney's Office for federal prosecution or whether the Department of Justice engages in racial discrimination in its charging decisions." Dkt. No. 41 at 2. He has asked the court to direct the government to produce discovery "relevant to the referral practice of law enforcement agencies in the district and the charging practices of the Department of Justice." Id. at 2. He also asks that, after he receives that discovery, the court allow him to file a motion to dismiss the indictment. Id. at 2-3. The court agrees with the magistrate judge that the defendant has not made the required threshold showing to obtain discovery on claims of selective prosecution or selection enforcement.

1

## I. Facts

The defendant is African-American. Dkt. No. 41 at 3. He says that police reports indicate that on March 31, 2018, officers of the Milwaukee Police Department conducted a traffic stop, during which they found a gun and "about fifty grams of marijuana."[1] Id. According to the reports, the defendant told the officers that he was taking the marijuana to a party to share with friends, and that he didn't know the gun was in the car until they pulled him over. Id. The defendant was charged in Milwaukee County Circuit Court with being a felon in possession of a firearm and possession of marijuana with intent to distribute while armed. Id.

On June 5, 2018, the U.S. Attorney's Office presented the evidence of the March 31, 2018 arrest to a federal grand jury. Id. The grand jury returned a three-count indictment. Dkt. No. 1. Count One charged the defendant with being a felon in possession of a firearm in violation of 18 U.S.C. §§922(g)(1) and 924(a)(2). Id. at 1. Count Two charged him with knowingly and intentionally possessing marijuana with the intent to distribute it in violation of federal drug laws. Id. at 2. Count Three alleged that the defendant knowingly possessed a gun in furtherance of the drug-trafficking offense alleged in Count Two, in violation of 18 U.S.C. §924(c)(1)(A)(i). Id. at 3. Significantly, the charge in Count Three carries a mandatory minimum sentence of five years, to run consecutively to any other sentence a court might impose.

---

[1] The defendant does not admit the allegations in the police reports, and the court does not consider his recitation of the facts to be admissions.

## II.    Procedural History

The defendant's motion asserts that the population of this district—the Eastern District of Wisconsin—is 84 percent white, a fact he drew from the U.S. Census. Dkt. No. 41 at 1. It asserts that "between January 2017 and June 2018, not a single white person was charged with violating 18 U.S.C. § 924(c) for possessing a firearm during a marijuana trafficking crime." Id. In contrast, the defendant asserts that during the same period, "ninety percent" of the people charged with "marijuana-related § 924(c) violations" were black, although only 9.6 percent of the district's population is black.[2] The motion asserted that although there are twenty-eight counties in the Eastern District of Wisconsin, and "hundreds of municipalities and local law enforcement agencies in the district, the United States Attorney has only charged minority—and largely black—defendants from the City of Milwaukee with possessing a firearm in furtherance of a marijuana trafficking crime." Id. at 2.

Specifically, the defendant asserts that between January 2017 and June 2018—an eighteen-month period—the United States Attorney's Office charged 176 people with "drug trafficking crimes" in the district. Id. at 10. He asserts that of those 176 people, ninety were black, forty-one were white, thirty were Hispanic and fifteen were of other races. Id. The motion asserts that in thirty-five of the 176 cases, the defendants were charged with possessing a firearm in furtherance of the drug trafficking offense, in violation of 18 U.S.C. §924(c). Id.

---

[2] The motion uses both "African-American" and "black" in referring to certain minority members of the community.

The defendant indicates that of those thirty-five defendants, twenty-eight were black, three were white, two were Hispanic and the remaining two were of other descent. Id.

Next, the defendant turns to cases in which a defendant has been charged with using a firearm in furtherance of a specific drug offenses—a marijuana offense. Id.at 10-11. The defendant asserts that during the eighteen-month period between January 2017 and June 2018, ten defendants in the Eastern District were charged with possessing a gun in furtherance of a marijuana offense. Id. at 11. The defendant says that all but one of these defendants was black; the tenth defendant was of Arab descent. Id. He contrasts that statistic with the preceding three-year period—January 2014 through December 2016—during which he says only six defendants were charged with possessing a gun in furtherance of a marijuana offense, four of whom were black and two of whom were white. Id. at 10.

The defendant alleges that of the ten defendants charged between January 2017 and June 2018 with possessing guns during marijuana offenses, "only of one of the defendants, [the defendant of Arab descent], was the target of a federal investigation." Id. at 11. The rest, he argues—all of whom were black—were arrested by the Milwaukee Police Department, and all but one of them were first charged in state court before being indicted in federal court. Id. at 11-12. He says that the facts of the eight cases originally prosecuted in state court were similar—police conducted searches of homes or searched a vehicle after a traffic stop, recovering marijuana and a gun. Id.

4

The defendant also asserts that for some of the nine black Milwaukee County defendants charged with possessing a gun during a marijuana offense, the amount of marijuana they possessed was minimal. He, himself, is alleged to have possessed only fifty grams. Id. Another defendant had only fifteen grams of marijuana in his car, and another had less than five grams in his home. Id. Others possessed anywhere from a quarter of a kilogram to over five kilograms. Id.

The motion then addresses the question of how these cases got to federal court. It states that

> [i]n some instances, the cases may have been referred by the ATF or another agency for prosecution. The defense has reason to believe that most referrals come not from outside law enforcement agencies, but from United States Attorney staff. In its investigation, the defense has learned that paralegals from the United States Attorney regularly go to the Milwaukee County District Attorney and review active gun cases and select cases for the United States Attorney's Office to prosecute. Having agents or staff of the United States Attorney's Office visit the district attorneys' offices within the district to review cases for potential federal cases isn't improper But the United States Attorney is not reviewing cases or accepting referrals outside of Milwaukee County. A review of the district's § 922(g)(1) prosecutions . . . starkly bear this out.

Id. at 12-13.

In that regard, the defendant asserts that during the eighteen-month period between January 2017 and June 2018, eighty-eight people were charged in the Eastern District with being felons in possession of firearms. Id. at 18. Excluding those defendants charged with other federal crimes, those who had prior convictions or were on release at the time of their offenses, those charged by federal agencies (one) and those charged only in federal court (one), the

defendant asserts that forty-six of the eighty-eight defendants—over half—were charged in Milwaukee County Circuit Court before being charged federally. Id. at 19. This fact, says the defendant, means that "regardless of whether a case originally charged in state court comes federal from a law enforcement agency referral or because the United States Attorney's Office chooses to prosecute that case federally, all these cases come from Milwaukee County." Id. The defendant also maintains that these statistics show that "the government does not seek out defendants or accept referrals from the district's other 27 counties," that those counties have "much smaller minority populations" and that "[t]he government therefore knows that a state court defendant in Milwaukee is more likely to be a minority, and specifically African-American." Id.

Returning to defendants federally charged with possessing a gun in furtherance of a marijuana offense, the defendant asserts that he "can identify at least 42 white individuals who could have been charged with possessing a firearm in furtherance of a marijuana trafficking crime but were not." Id. at 13. He says that each of these forty-two individuals—represented on an attached charge—was "arrested and charged between January 2017 and June 2018." Id. He says only one was charged in federal court, while the remaining forty-one were charged in state court, and had their charges prosecuted in state court. He indicates that "[e]ach of these individuals apparently could have been prosecuted by the United States Attorney," and that "[e]ach . . . could have been referred to the United States Attorney for prosecution," but that it "does

not appear that any of them were." Id. He argues that some of these defendants had more drugs than the defendants the government has chosen to prosecute, that some were trafficking other drugs, that some had more than one gun and that some had lengthy records. Id. at 14. Yet, the defendant argues, "since May 2015, not one white person has been charged in this district with possessing a firearm in furtherance of a marijuana trafficking crime in violation of § 924(c)." Id.

The defendant says that "to the extent that the ATF is responsible for determining who is federally prosecuted for marijuana-related § 924(c) violations, it would appear that during the time frame examined here, the ATF has referred only black men from the city of Milwaukee for federal prosecution." Id. at 14-15. While the defendant concedes that this fact, standing alone, "may not reflect an institutional culture of racism," the ATF's "practices around the country . . . reflect a pattern of targeting minorities and referring them for federal prosecution at a rate significantly higher than whites." Id. at 15.

The defendant supplements his arguments with citations to cases and state laws prohibiting persons of color from having guns, and with media articles asserting that the prohibition against marijuana—and the so-called "war on drugs" that began in the late sixties—were rooted in racism. Id. at 20-21. He asserts that "[i]n the last ten years, public opinion on marijuana has shifted dramatically," noting that marijuana is legal for medical purposes in many states, and recreational purposes in several. Id. at 22. He references articles indicating that even in states where marijuana is legal, black people

are arrested for marijuana offenses at a disproportionately higher rate than white people. Id. at 22-23.

At the end of the motion, the plaintiff cites to a December 2017 article from the Milwaukee Journal Sentinel, describing a federal program called the Public Safety Partnership. Id. at 24 (citing Ashley Luthern, *Milwaukee Police Did Something Different to Tackle Crime in the City—They Focused on Just 2.3 Square Miles of It*, MILWAUKEE JOURNAL SENTINEL, Dec. 1, 2017, *available at* https://www.jsonline.com/story/news/crime/2017/12/01/milwaukee-police-did-something-different-tackle-crime-city-they-focused-just-2-3-square-miles/914219001/. The article, which described a team effort by federal and state law enforcement agencies to "help lower crime," referenced a statement by then-chief of the Milwaukee Police Department Edward Flynn that "investigators use[d] an algorithm that examine[d] the amount of violence and how recently it ha[d] occurred." Id. The defendant asserts that "[t]his begs the question, what role does this (or any other) algorithm play in the enforcement and prosecutorial administration of certain types of offenses in the district?" Id. The defendant wonders how such an algorithm works, pointing to a 2016 report from ProPublica indicating that, in the defendant's words, "algorithms such as the one apparently used in Milwaukee are biased against black people." Id. at 24-25, citing Julia Angwin, Jeff Larson, Surya Maau, Lauren Kirchner, *Machine Bias: There's software used across the country to predict future criminals. And it's biased against blacks*. PROPUBLICA (May 23, 2016,

*available at*: https://www.propublica.org/article/machien-bias-risk-assessments-in-criminal-sentencing. Id.

Troubled by these statistics, the defendant has asked the court to order the government to produce discovery responsive to twenty-six requests relating to the referral practices of law enforcement agencies in the district, the charging practices of the Department of Justice and the internal policies and staffing of the United States Attorney's Office. Id. at 2, 26-29.

The government's opposition to the motion provided additional details surrounding the defendant's arrest. Dkt. No. 44. It alleged that the Milwaukee police officers were in the area on March 31, 2018 because of complaints about drug dealing, that they saw the defendant engaged in what they thought was a drug transaction and that the defendant drove away from the transaction at "speeds of up to fifty miles per hour in the residential neighborhood." Id. at 4. The government asserts that the gun in the defendant's car was loaded, and that he had $2,440 in small bills in his pocket. Id. at 4-5. While the defendant's wife denied that the gun was hers when the officers interviewed her, the defendant told officers that the gun belonged to his wife; when confronted with the fact that his wife had denied ownership, the defendant told officers that his wife was lying. Id. at 5. The government alleges that the defendant admitted to knowing the gun was in the car, because he'd moved it in order to put the marijuana (which he conceded was his) in the console. Id.

The government does not dispute the defendant's assertion that nine of out of the ten §924(c)/marijuana cases charged in the eighteen months

between January 2017 and June 2018 involved African-American defendants, although it says it does not keep records tracking the race of defendants and could verify the race of the defendants only by looking at databases such as the Wisconsin Circuit Court Access Program, or "CCAP." Id. at 9.

As to the nine cases upon which the defendant's argument relies, however, the government argues that all nine were not "straight" §924(c)/marijuana cases—one involved a defendant charged with dog-fighting who also was charged with the §924(c), and the other involved a defendant charged with possessing not only marijuana but methamphetamine. Id.

Next, the government asserts that the defendant appears to have arbitrarily selected the eighteen-month period between January 2017 and June 2018, without explaining why. Id. at 9-10. The government asserts that the defendant selected January 2017 for political purposes, implying that the defendant selected that date because it was in January 2017 that the current administration took over the White House. Id. at 10.

The government explains that this arbitrary period—January 2017 through June 2018—excludes defendants who fit the description of individuals whom the defendant says the government declines to charge. In addition to the two white individuals the defendant himself acknowledged as having been charged between January 2014 and December 2016, the government identifies a white male charged in December 2018 for possession a gun in furtherance of heroin and marijuana trafficking. Id. at 10, n.2. That defendant, the

government asserts, came from Fond du Lac County, not Milwaukee County.
Id.

The government questions the defendant's logic—if, the government argues, its charging decisions were guided by racial animus, why would it reflect that animus only in its charging decisions regarding marijuana? Why would it not exhibit that same animus in other drug cases, or in gun cases? Id. at 11.

The bulk of the government's arguments relate to its assertion that the defendant's statistics are not sufficient to satisfy the defendant's burden for obtaining discovery in an attempt to prove selective prosecution or selective enforcement. The government argues that simply alleging that someone had a gun and some marijuana is not enough to prove that he or she possessed that gun "in furtherance" of a drug crime; other facts include where the gun was located, the kind of gun, whether it was stolen, whether it was loaded and the circumstances under which it was found. Id. at 12. Thus, the government argues, the defendant's assertion that the information the defendant provided about the forty-two individuals the defendant says could have been charged under §924(c) is not sufficient to allow the court (or the government) to make that determination. Id.

The government also argues that the information the defendant has provided does not show whether the individuals he identified were similarly situated to the defendant. The information does not show the other individuals'

criminal histories, their prior involvement in violence or drug trafficking, whether they have gang affiliation. Id. at 12-13.

The government explains that, while it is willing to take referrals from district attorneys, it can't just go pull whatever cases it chooses, because it must respect the sovereignty of state courts. Id. at 13. It also asserts that the defendant has not demonstrated that federal authorities, including the U.S. Attorney's Office, knew about any of the forty-two individuals whom the defendant has identified. Id.

The government identifies three defendants charged in May 2018 who originally were charged in counties other than Milwaukee—two in Winnebago County and one on the Menominee reservation. Id. at 14. The government also says that if the defendant had expanded his time frame a bit, he'd have discovered another defendant originally charged in Winnebago County, and one originally charged in Sheboygan County. Id. at 14-15.

The government accuses the defendant of ignoring one possible reason for the large number of referrals from Milwaukee County—the fact that there is significant violent crime in Milwaukee County. Id. at 15. While the government disputes the defendant's characterization of paralegals from the U.S. Attorney's Office visiting the Milwaukee County District Attorney's Office and picking out cases to prosecute, it agrees that it has had a working relationship with the gun unit in the Milwaukee County District Attorney's Office for some time (for "many years and multiple administrations"), and that it collaborates with other law enforcement agencies in Milwaukee on Project Safe Neighborhoods. Id. at

16. The government asserts that "Milwaukee County is by far the most populous county in the district, with close to a million residents" and that it "also has the most crime, the most violent crime, and the most gun-related crime of any county in the district." Id. It points to data indicating that Milwaukee County was responsible for 91 percent of the homicides in the Eastern District in 2017, and that 80 percent of the victims of those homicides were African-American men. Id. at 17. The government provides data indicating that Milwaukee County had 84 percent of the robberies in the Eastern District in 2017. Id. at 17-18. Finally, the government relates data indicating that Milwaukee County has the largest minority population of any county in the Eastern District. Id. at 18. The government argues that the defendant inappropriately has characterized an effort to "allocate law-enforcement and especially prosecutorial resources where the gun violence is at its worst" as evidence of discriminatory intent. Id.

The government says the defendant's allegation that the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has some role in deciding which cases get prosecuted is speculation. Id. at 19. It contends that this allegation contradicts the defendant's other allegation—that it is the U.S. Attorney's Office that is using paralegals to select cases for federal indictment. Id. The government also asserts that the facts in the cases it has charged show that it is local law enforcement arresting the defendants, not federal agents who are targeting them. Id.

Finally, the government maintains that even if the court thinks some discovery is warranted, the defendant's requests are "laughably over-broad and intrusive." Id. at 20. It argues that the defendant has not confined his demands to the period he identified in his motion, and that he has asked for irrelevant information. It also questions the relationship between the algorithm mentioned in the Journal Sentinel article the defendant cited and the statistics in the defendant's motion. Id.

The defendant's reply says that the reason he's asking for discovery on selective enforcement and prosecution is because his lawyers had a question: "why does it seem like all our clients in § 924(c) marijuana cases are African-American when this district is majority white?" Dkt. No. 46 at 1. He says that this question, "combined with some frustration over the government seeking harsh consecutive mandatory minimums in relatively small marijuana cases," caused counsel to wonder and to investigate. Id. The defendant argues that "[t]he undeniable truth is that there is a problem of racial disparity in the prosecution and incarceration rates in this country," and asserts that "[t]hose problems are even greater locally." Id. at 3. He says the government shouldn't be offended at the suggestion that it might play a role in these problems, but instead should "engage in a bit of self-reflection." Id. He advises the government to be "open to evaluating the role its policies (and those of the law enforcement agencies it works with) play in contributing to the overwhelming racial disparities within the criminal justice system." Id.

The defendant concedes that right now, he doesn't have enough to bring a motion for selective enforcement or selective prosecution. Id. He says that's why he's asking for discovery—to find out if there's enough evidence to support such a motion. Id. He argues that for the purposes of obtaining discovery, he needs only to present some evidence that tends to show an equal protection violation, and asserts that he's done that. Id.

Specifically addressing some of the government's arguments, the defendant's counsel says he picked the January, 2017-to-June, 2018 period because that's when counsel started working in the Federal Defender's office, and because once he got started, it became more difficult and burdensome to expand the time frame. Id. at 4. He concedes that he picked the time frame because it coincided with a change in administrations. Id. He disagrees with the government's assertion that some of the nine cases he identified involved more than just guns and marijuana. Id. at 5. He disagrees with the government's inclusion of a case involving a white defendant. Id. He says that he could have included eight other defendants whose case involved other drugs besides marijuana, and that seven of those eight defendants were black. Id. at 5-6. He says that he focused on §924(c)/marijuana cases precisely because "[i]t is the less serious crimes, like the low-level marijuana offense charged in [this] case, where discretion is exercised more often." Id. at 7. He argues that the government has provided no reason why the eighteen months the defendant chose is an insufficient sample size. Id. He furthers his point by providing more statistics, asserting that in roughly the past thirteen years, the government has

charged twenty-nine §924(c)/marijuana cases, which the majority of defendants were black, and alleges that the government is charging those cases more frequently, and against people accused of being "low-level marijuana dealers." Id. at 7-8. Finally, he disagrees that the forty-two white individuals he identified were not similarly situated to him. Id. at 10-11. He urges the court to allow him to explore "the problem of racial disparity in this district and the reasons for it." Id. at 11.

Judge Joseph denied the motion. Dkt. No. 47. After discussing each of defendant's exhibits, she concluded that the defendant had not met the threshold burden to conduct discovery on either the selective prosecution or the selection enforcement claim. She explained that a defendant seeking discovery for a selective prosecution claim must present "some evidence tending to show the existence of" discriminatory effect and discriminatory intent. Id. at 3 (quoting United States v. Armstrong, 517 U.S. 456, 468-469 (1985)). She emphasized that to show a racially discriminatory effect, the defendant must present "some evidence that similarly situated defendants of other races could have been prosecuted but were not." Id.

Judge Joseph focused on defendant's Exhibit Three, the list of forty-two white individuals whom the defendant asserts are similarly situated to the defendant. Dkt. No. 41-3. Judge Joseph did not find it to be credible evidence of similarly situated individuals:

> The facts of the subset of white individuals who were traffic-stopped appear closest to the facts of [the defendant]'s case, but even in those cases [the defendant] does not demonstrate that any individual was similarly situated to him. For example, the firearm in [the

defendant]'s case was reportedly loaded. Did the comparators also possess loaded guns? [The defendant] is charged with being a felon in possession of firearm, meaning he allegedly illegally possessed the firearm that is the basis of the §924(c) count. Were the firearms of the comparators also illegally possessed? The government submits that [the defendant] has prior convictions for firearms, drug trafficking and violence. Did any of the comparators have similar criminal histories and/or other background characteristics to show that they were in fact similar to [the defendant] for prosecution purposes?

Dkt. No. 47 at 9. Judge Joseph pointed out that, except for Corianne Markowski, the defendant had offered no evidence that any of the comparators were presented to the U.S. Attorney for prosecution and the U.S. Attorney declined to prosecute them (or was even aware of them). Id. at 9. She concluded that the defendant had not demonstrated that Markowski was a valid comparator. Id. Judge Joseph found that even if the defendant had made a showing of discriminatory effect, he'd made no showing of discriminatory intent. Id. at 10.

With respect to the request for discovery on the selective enforcement claim, Judge Joseph acknowledged that the standard is more relaxed. Id. at 12. Nevertheless, she found the defendant's allegation "extraordinary" because it was directed at the ATF rather than any law enforcement agency or officer involved in this case. Id. at 13. She concluded that, even if the defendant's allegations about racially biased conduct and practices by ATF were true, the defendant had not made a showing relevant to *this* case. Id. She observed that Milwaukee police officers arrested the defendant after a stop based on the officers' observations of what they believed were drug dealing and traffic violations—without input from the ATF. Id.

17

### III. Standard of Review

The defendant acknowledges that when reviewing an order resolving a non-dispositive motion, this court applies the clearly erroneous standard under Rule 59(a). Dkt. No. 55 at 2. The government, however, asserts that the district court applies a *de novo* standard to the portions of the recommendation to which the defendant objects. Dkt. No. 59. The government is mistaken. The court applies a *de novo* standard only when it reviews objections to a magistrate judge's recommendation on *dispositive* motions, such as motions to dismiss or suppress. Fed. R. Crim. P. 59(b). It applies a "contrary to law," or clearly erroneous, standard when reviewing objections to a magistrate judge's order on non-dispositive motions, such as those seeking discovery or disclosure. Fed. R. Crim. P. 59(a). The court will review Judge Joseph's order under the clearly erroneous standard.

### IV. Analysis

While the defendant incorporates into his objection to Judge Joseph's order his original arguments by reference, the objection specifies the portions of the order which the defendant believes constitute error. Dkt. No. 55 at 2, n.1. Generally, the defendant argues that he has made a threshold showing sufficient to warrant the court allowing discovery on selective prosecution and selective enforcement. Dkt. No. 55 at 2-7.

#### A. Selective Prosecution

The defendant first challenges Judge Joseph's conclusion that he failed to show that the forty-two white people he identified as people whom the

government could have charged with §924(c)/marijuana but didn't were similarly situated to him. He says that he has shown that several of the individuals "were alleged to have possessed" loaded weapons; several had criminal records that involved drug-trafficking convictions or crimes of violence; and one defendant had a gang affiliation. Id. at 2. He also argues that the law does not require the comparators be identical in all respects. Id. at 3. According to the defendant, he had to produce only "some evidence" that similarly situated defendants of other races could have been prosecuted but were not. Id. Finally, while Judge Joseph found that the defendant failed to offer evidence that the comparators were presented to the U.S. Attorney for prosecution and the U.S. Attorney declined to prosecute, the defendant points to Corianne Markowksi as an example of just that circumstance. Id. at 4. He asserts that Markowski was alleged to have been involved in a multi-million dollar marijuana trafficking organization and kept a loaded gun under her pillow. Id.

The court begins with the standard governing a request for discovery on a selective prosecution claim. Judge Joseph properly cited to the seminal case on this issue, Armstrong, where the Supreme Court explained that the standard for a selective prosecution claim is a demanding one and that the standard for discovery on a selective prosecution claim is "correspondingly rigorous." Armstrong, 517 U.S. at 464. A "presumption of regularity" attaches to prosecutorial decisions, and "in the absence of clear evidence to the contrary, courts assume that [prosecutors] have properly discharged their

duties." Id. But prosecutors exercise that discretion subject to the mandates of the Constitution, including the Due Process Clause of the Fifth Amendment. United States v. Brown, 299 F. Supp. 3d 976, 994 (C.D. Ill. 2018).

While a defendant must present clear evidence in support of a selective prosecution claim, he or she may obtain discovery in support of that claim by showing "'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent." Armstrong, 517 U.S. at 468 (quoting United States v. Berrios, 501 F.2d 1207, 1211 (2d Cir. 1974)).

### 1. *Discriminatory Effect*

To show "some evidence" of racially discriminatory effect, a plaintiff must "produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not . . . ." Id. at 469.

### a. "Similarly Situated"

Judge Joseph determined that to be similarly situated, a comparator must be "*prima facie* identical in all relevant respects." Dkt. No. 47 at 3 (citing Purze v. Vill. of Winthrop Harbor, 286 F.3d 452, 455 (7th Cir. 2002) and United States v. Skiljevic, 2012 WL 2050861, *10 (E.D. Wis. June 7, 2012). The Purze case discussed "similarly situated" in the context of an equal protection analysis and used the words "*prima facie* identical." Purze, 286 F.3d at 455. This is consistent with the Supreme Court's language in Armstrong explaining that the requirements for a selective-prosecution claim draw on "ordinary equal protection standards." Armstrong, 517 U.S. at 465.

Six years after the Supreme Court decided <u>Armstrong</u>, the Court reversed a Sixth Circuit decision affirming a district court's discovery order. <u>United States v. Bass</u>, 536 U.S. 862, 863 (2002). The Court emphasized that a defendant seeking discovery on a selective prosecution claim must make a credible showing that "similarly situated individuals of a different race were not prosecuted." <u>Id.</u> (quoting <u>Armstrong</u>, 517 U.S. at 465). The Court concluded that "raw statistics" showing that black individuals were charged with a death-eligible offense twice as often as white individuals said "nothing about charges brought against *similarly situated defendants.*" <u>Id.</u> at 864 (emphasis in the original). The Court concluded the Sixth Circuit's decision affirming the district court's order granting discovery was contrary to <u>Armstrong</u> and threatened the "'performance of a core executive constitutional function.'" <u>Id.</u> (quoting <u>Armstrong</u>, 517 U.S. at 465).

Other circuits have tried to further define "similarly situated" for purposes of a selective prosecution claim. For example, the Tenth Circuit finds a comparator similarly situated when "there are no legitimate distinguishing factors that could justify a difference in the enforcement decisions." <u>United States v. DeChristopher</u>, 695 F.3d 1092, 1097 (10th Cir. 2012). The Fourth Circuit looks to make sure the "circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." <u>United States v. Hastings</u>, 126 F.3d 310, 315 (4th Cir. 1997). More recently, the Eleventh Circuit looked to the Title VII context, finding that a comparator must be "nearly identical" (having

committed the same basic crime in substantially the same manner). United States v. Brantley, 803 F.3d 1265, 1272 (11th Cir. 2015).

In his objection to Judge Joseph's order, the defendant did not discuss, or cite, any of these cases. He quoted the Supreme Court's language in Armstrong, arguing that "the *Armstrong* court didn't say that similarly situated means identical," and asserted that "holding [him] to such a higher standard was clearly erroneous." Dkt. No. 55 at 3. He says that he needed "only to demonstrate that individuals of a different race could have been prosecuted, but were not," and that he has done that. Id.

Judge Joseph did not commit clear error in concluding that the defendant had not presented sufficient evidence of discriminatory effect because he had not shown that similarly situated defendants of different races could have been prosecuted but were not. The court begins with the "similarly situated" standard. Contrary to the defendant's arguments, Judge Joseph did not commit clear error in finding that "similarly situated" meant "*prima facie* identical in all relevant respects." That is the Seventh Circuit's equal protection language from Purze, and it resembles the standards the Tenth, Fourth and Eleventh Circuits have articulated. Under any of these standards, the defendant must present some evidence that the defendants of other races who weren't charged were so similarly situated to the defendant that race stood out as the distinguishing factor for the failure to charge them. Judge Joseph did not, contrary to what the defendant argues, hold that "similarly situated" means "identical." She held that it meant "*prima facie*"—at first impression and

22

until proven otherwise—identical "in all relevant respects"—in the ways that would matter in making a prosecution determination.

Not only does the court disagree with the defendant that Judge Joseph erred in defining the "similarly situated" standard, but the court notes that the defendant's statement of the standard is incorrect. He asserts that he needed only to demonstrate that individuals of a different race could have been prosecuted but were not. That is not a remotely accurate statement of the Armstrong holding; it omits entirely the "similarly situated" requirement.

Even if Judge Joseph had erred in articulating the standard (which the court has found that she did not), the defendant has presented the court with *information*, not *evidence.* The defendant asserted in his motion that he could identify at least forty-two white individuals who could have been federally charged with §924(c)/marijuana but were not. Dkt. No. 41 at 13. He cites to his Exhibit 3. Dkt. No. 41-3. That exhibit is a chart comprised of four columns: "Jurisdiction," "Case #," "Name" and "Facts." Id. The defendant does not explain, in his pleadings or in the chart, where he obtained the information in the chart. The court was able, by accessing CCAP, to determine that individuals whose names appear on the chart were charged in the counties listed. CCAP shows a category for race (although CCAP itself advises a user that the designation listed in that field is subjective, and is provided by the agency that filed the case). CCAP identifies the offenses with which the defendant was charged in state court. So perhaps the defendant obtained the information for the jurisdiction, case number and name columns from CCAP.

But the defendant does not provide the source for the information in the "facts" column. Defense counsel obtained this information from somewhere—perhaps he obtained police reports, or charging documents, or transcripts. Counsel may have "evidence" of the facts that gave rise to the prosecutions of each of the forty-two people listed on the chart. But counsel's representations or summaries don't constitute that "evidence."

Assuming for discussion's sake that the defendant could provide evidence other than counsel's proffer supporting the information in the "facts" section of the chart, the court concedes that the information he recounts for some of the defendants on the chart resembles the facts that gave rise to the defendant's prosecution. For example, the chart lists Shawn Abear, who was charged in Brown County after police recovered 454 grams of marijuana, $1,104 and a handgun during a traffic stop. Dkt. No. 41-3 at 1. It lists Drew Thebo, who was charged in Marinette County after a traffic stop revealed 475 grams of marijuana and a handgun under the driver's seat. Id. at 2. It lists Robert Chambliss, found after a traffic stop with a loaded .45, over 130 grams of marijuana, a digital scale and two cell phones. Id. at 3. In all, the chart lists fourteen cases involving traffic stops that resulted in law enforcement finding marijuana and guns in the defendant's car. In some cases, defense counsel indicated that the gun was loaded. In some, he indicated the amount of marijuana found in the car. In some, he described where the officers found the gun, or the type of gun. In some, he described certain aggravating circumstances—the fact that law enforcement subsequently searched one

defendant's home and found more marijuana, scales and a large amount of cash, or the fact that officers found drug trafficking paraphernalia along with the marijuana and the gun. The chart does not reference prior criminal history for any of these individuals. In his reply brief, defense counsel asserted that "many of the people" he identified "have serious criminal histories with drug trafficking convictions and crimes of violence," and named five of the forty-two individuals on the chart whom he asserted had such histories. Dkt. No. 46 at 10-11. The defendant did not provide any evidence supporting these assertions, or his assertions that some of the defendants on the chart "appear[ed] to have gang involvement." Id. at 11.

Judge Joseph did not err in concluding that the defendant "has not sufficiently shown that any of the 42 white individuals are similarly situated to him to the extent necessary to obtain discovery on selective prosecution." Dkt. No. 47 at 9.

The chart listing the forty-two alleged similarly situated defendants was not the only information the defendant provided to argue discriminatory effect. He began his brief by asserting that while the population of the entire Eastern District of Wisconsin is 84 percent white and only 9.6 percent black, 90 percent of the defendants charged with marijuana/§924(c) cases between January 2017 and June 2018 were black. Dkt. No. 41 at 1. He attached to the brief Exhibit 1, a chart titled "Racial Makeup Eastern District of Wisconsin," which cites as the source the United States Census Bureau statistics. Dkt. No. 41-1. The chart does show that 84 percent of the district's population is white

and 9.6 percent is black, as well as showing that in Milwaukee County, 64.6 percent of the population is white and 27.2 percent is black. Id.

The defendant is correct that the charging statistics he states in his brief, assuming they are correct, indicate that black defendants are being charged with §924(c)/marijuana charges in federal court far out of proportion to their representation in the general population, and as compared to white defendants. But as the Supreme Court has held, raw statistics "say nothing about charges brought against similarly situated defendants." Bass, 536 U.S. at 863. Census data includes everyone from new-born babies to octogenarians. It represents race as reported by the person being counted, not race as reported by the law enforcement agency filing a case. Comparing percentages of the total population as recorded by the census to percentages of defendants charged, or even arrested, as recorded by the arresting or referring agencies is not an apples-to-apples comparison. Had the defendant compared the percentage of men reflected in the census with the percentage of men charged during the same eighteen-month period, he likely would have found that the government has charged men far out of proportion to their representation in the general population.

The defendant asserted that the out of all the defendants charged between January 2017 and June 2018 with possessing a gun in connection with *any* kind of drug offense, the significant majority were black. The defendant attached to his brief Exhibit 2, a chart that purports to list the case number, name and race of "[d]efendants charged with drug trafficking crimes

in the Eastern District of Wisconsin (January 1, 2017 to June 30, 2018)." Dkt. No. 41-2. Like Exhibit 3, this exhibit does not cite the source of the data it contains. The chart asserts that of those charged with federal drug trafficking crimes in the eighteen-month period, ninety were black, forty-one were white, thirty were Hispanic and fifteen were of another race. Dkt. No. 41 at 10. The defendant says that a sub-group of thirty-five were charged with possessing a firearm in furtherance of a drug trafficking crime in violation of §924(c), and that twenty-eight of those thirty-five (80 percent) were black. Id. (The chart does not contain information about which defendants allegedly were charged with §924(c).)

Assuming its conclusions are supported by evidence, the data in this chart is more relevant than Exhibit 1, because it compares people charged with a crime to other people charged with that same crime, rather than comparing them to the general population. Because there is no evidence of the facts surrounding the defendants in these cases, however, there is no way to determine whether there were similarly situated defendants of other races.

In his motion, the defendant argued that government had charged only six marijuana-related §924(c) offenses in the three years between January 2014 and December 2016 but charged ten marijuana-related §924 offenses in the eighteen months between January 2017 and June 2018. Dkt. No. 41 at 11. According to the defendant, while four of the six defendants charged between 2014 and 2016 were black, nine of the ten §924(c)/marijuana charges brought in 2017-2018 involved black defendants. Dkt. No. 44 at 8. The defendant

27

argues that of the ten charged with §924(c) offenses during this period, eight originally were prosecuted in state court, all generally were similar and "some of the cases involved larger amounts of marijuana, most did not." Id. The defendant asserts that five of the ten defendants possessed less than 438 grams of marijuana, but three had more than 1700 grams. There is no chart or exhibit supporting these assertions, and the defendant does not provide the source of the information.[3]

The defendant characterizes this information as circumstantial evidence that the current administration has directed the U.S. Attorney to charge more marijuana/§924(c) cases ("enforcement is up, and more people are being charged with marijuana § 924(c)'s," dkt. no. 46 at 8). There is direct evidence that under the current administration, United States Attorneys have been tasked with charging offenses carrying significant penalties, such as §924(c), more frequently. On May 10, 2017, then Attorney General Jeff Sessions issued a memorandum directing prosecutors to "charge and pursue the most serious, readily provable offense."

https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&cad=r

ja&uact=8&ved=2ahUKEwjSkK6t3LzjAhUHnOAKHaZbCGYQFjAAegQIABAC&ur

---

[3] The court is very familiar with the facts of two of the cases the defendant cites—United States v. Robinson, 17-cr-97 and United States v. Burns, 17-cr-138—because the court sentenced those defendants. Four of the cases—United States v. Lewis, 17-cr-168, United States v. Carr, 17-cr-189, United States v. Smith, 18-cr-138, and the defendant's case—also are assigned to this court, but because the defendants have not yet been sentenced, the court does not have detailed information about the defendants and, for some, the facts that gave rise to their being charged.

l=https%3A%2F%2Fwww.justice.gov%2Fopa%2Fpress-release%2Ffile%2F965896%2Fdownload&usg=AOvVaw3XrKeJRypHAsu8IMLAvDbj. The Attorney General anticipated that there would be circumstances that would warrant a prosecutor in concluding that "a strict application of the above charging policy is not warranted," and directed that under those circumstances, "prosecutors should carefully consider whether an exception may be justified." Id. He ordered, however, that "any decision to vary from the policy must be approved by a United States Attorney or Assistant Attorney General . . . and the reasons must be documented in the file." Id. This policy appears to require that a U.S. Attorney considering facts that would support a charge under §924(c)—a "serious" offense carrying a mandatory minimum penalty—must "charge and pursue" that offense.

The defendant also argues that these statistics support the proposition "that during this period of increased enforcement, the government has only charged minorities, and largely blacks." Dkt. No. 46 at 8. Without evidence, there is no way to know if there were similarly situated defendants of other races during that period.

Finally, the defendant attached to his reply brief Exhibit 4, a chart entitled "Defendants charged with marijuana-only § 924(c)'s, 2004-2013." Dkt. No. 46-1. This chart represents that of the twenty-three defendants listed on it, eleven are black. Id. The chart does not reference the source of this information.

b.     "Could Have Been Prosecuted, But Were Not"

That brings the court to the second part of the discriminatory effect definition. It is not enough for a defendant to show that there were similarly situated defendants of other races. He also must produce some evidence that those similarly situated defendants could have been prosecuted, but were not.

The defendant points to his Exhibit 3—the list of forty-two individuals whom he says were white, committed crimes that made them eligible for marijuana-based §924(c) charges and were not so charged—as evidence that there were white defendants who could have been prosecuted but were not. Even assuming some of these individuals were similarly situated to the defendant, the defendant has not presented evidence that the U.S. Attorney's office could have prosecuted them but didn't. Judge Joseph found that, "with the exception of Corianne Markowski, [the defendant did] not offer evidence that the comparators were presented to the U.S. Attorney for prosecution and that the U.S. Attorney declined to prosecute them, or that the U.S. Attorney was even aware of them." Dkt. No. 47 at 9.

Corianne Markowski is the first person listed in Exhibit 3. Dkt. No. 41-3 at 1. The charts shows that she has a federal case number—18-cr-16. Id. The summary of facts indicates that a search of the defendant's residence found twenty-one pounds of marijuana and a loaded ".40 handgun." Id. The summary indicates that the government charged Markowski with conspiracy to commit drug trafficking and money laundering, but did not charge her under §924(c). Id.

Judge Joseph questioned whether Markowski was "similarly situated" to the defendant—the facts in the chart do not indicate whether Markowski possessed the gun, whether she possessed it illegally, whether she had a criminal history and where the gun was located relative to the marijuana. If this court assumes that Markowski was white, and was similarly situated to the defendant, the defendant has identified a single comparator whom the government could have charged under §924(c) but did not.

Of the other forty-one defendants listed in the chart, the chart indicates that ten were from Milwaukee County. Assuming for the sake of argument that these ten individuals were "similarly situated" to the defendant, the defendant has provided no evidence that the U.S. Attorney's Office knew of these ten individuals. The chart does not indicate whether the arresting agency or the Milwaukee County District Attorney's Office referred these individuals to the U.S. Attorney's Office for prosecution.

The defendant states in his brief that "each of these individuals could have been referred to the United States Attorney for prosecution," but that "it does not appear that any of them were." Dkt. No. 41 at 13. If the reason that the U.S. Attorney's Office did not charge these ten individuals under §924(c) was because the arresting agency or the Milwaukee County District Attorney's Office chose not to refer them for federal prosecution, that is not evidence that the U.S. Attorney's office could have prosecuted them but didn't. It is evidence that the arresting agency or the Milwaukee County District Attorney's Office could have referred them but didn't. Such evidence would not warrant

discovery regarding a claim of selective prosecution against the federal prosecutor.

The defendant also states in the motion that "[e]ach of these individuals apparently could have been prosecuted by the United States Attorney," and that "[n]one of them were." Dkt. No. 41 at 13. This statement more closely tracks the second part of the discriminatory effect definition. But as with the "similarly situated" portion of the definition, the defendant has not presented evidence to support it.

The defendant stated in his motion that "the defense has learned that paralegals from the United States Attorney regularly go to the Milwaukee County District Attorney's Office and review active gun cases and select cases for the United States Attorney's Office to prosecute." Dkt. No. 41 at 12. Elsewhere in the motion he refers to the defendants who were charged under §924(c) as being "hand-picked by a United States Attorney's Office paralegal." Id. at 18. The government responded that the defendant had not accurately described "how the intake process works," but it acknowledged that it has "long worked closely with the Gun Unit in the Milwaukee County District Attorney'[s] Office"—a relationship that the government says long predates the current presidential administration. Dkt. No. 44 at 16. The government also indicated that it was "no secret that the Project Safe Neighborhoods . . . program in this district focuses its efforts on Milwaukee," citing https://www.justice.gov/usao-edwi/project-safe-neighborhoods. In his objection to Judge Joseph's order, the defendant responds that "if the U.S. Attorney reviews Milwaukee gun cases as

part of the Project Safe Neighborhoods initiative, then it obviously knew of the ten white people [the defendant's] motion identified as having been charged with marijuana-trafficking crimes while armed in Milwaukee." Dkt. No. 55 at 4.

The above does not constitute evidence that the U.S. Attorney's Office knew of the ten Milwaukee County individuals listed in Exhibit 3 but declined to prosecute them. The defendant has presented no evidence supporting his claim that paralegals from the U.S. Attorney's Office regularly go to Milwaukee County and pick out cases for federal prosecution. He does not provide a source for this information, although defense counsel's statement that he learned it during his investigation implies that he has some sort of evidence to support the claim.

The defendant says that "if the U.S. Attorney reviews Milwaukee gun cases as part of the Project Safe Neighborhoods initiative, then it obviously knew of the ten white people [the defendant's] motion identified as having been charged with marijuana-trafficking crimes while armed in Milwaukee." Dkt. No. 55 at 4. "If" is the operative word in this sentence; there is no evidence before the court that the U.S. Attorney's Office "reviews Milwaukee gun cases as part of the Project Safe Neighborhoods initiative." As best the court can tell, the defendant has combined the fact that the U.S. Attorney's Office runs the Project Safe Neighborhood initiative with his belief that paralegals from the U.S. Attorney's Office select cases from Milwaukee County for prosecution to come up with a theory that the U.S. Attorney's Office must review gun cases as part of Project Safe Neighborhoods.

The defendant also asserts that "the United States Attorney is not reviewing cases or accepting referrals outside of Milwaukee County." Dkt. No. 41 at 12-13. He argues that "the singular focus on Milwaukee is indicative of discriminatory intent." Id. at 18. He asserts—without providing evidence—that during the January 2017-June 2018 period, out of eighty-eight people the government charged with being felons in possession of firearms, forty-six originally were charged in Milwaukee County. Id. at 18-19. Considering these statistics along with his exhibits, the defendant concludes that

> [b]ased on these numbers, whether it's for simple § 922(g)(1) prosecutions or more punitive § 924(c) prosecutions, the statistics show that the government does not seek out defendants or accept referrals from the district's other 27 counties. Those other counties have much smaller minority populations. The government therefore knows that a state court defendant in Milwaukee is more likely to be a minority, and specifically African-American. In the context of equal protection challenges (like selective prosecution and enforcement challenges), "actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact," that is, a "forbidden purpose." *Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 464 (1979). The United States Attorney's singular focus on Milwaukee, to the exclusion of all other counties, is evidence "tending to show" such a purpose. *Armstrong*, 517 U.S. at 469.

Id. at 19.

The government identified a white defendant from outside Milwaukee County charged after the January 2017-June 2018 period, dkt. no. 44 at 10, and defendants of other races from other counties charged with being felons in possession, dkt. no. 44 at 14-15. But the government also discusses statistics indicating that Milwaukee County experiences more violent crime, more homicides and more robberies than the other counties in the district. Dkt. No.

34

44 at 16-18. The government asserts that its focus on Milwaukee "reflects—not discriminatory intent—but a rational decision to allocate law-enforcement and especially prosecutorial resources where the gun violence problem is at its worst." <u>Id.</u> at 18.

The government's response steers the analysis to the second element of a selective prosecution defense—discriminatory intent. Assuming that there were similarly situated people of other races in Milwaukee and other counties, and assuming that the government's focus on Milwaukee constitutes a decision not to charge those similarly situated people, those assumptions indicate discriminatory *effect*. The defendant must also provide evidence of discriminatory *intent* in order to meet his burden justifying discovery. The defendant has not provided that evidence.

### 2. *Discriminatory Intent*

In addition to the charging disparities discussed above, the defendant's motion cited cases and law review articles for the proposition that there is a history of racially motivated, biased application of gun control laws in the United States. Dkt. No. 41 at 20-21. The motion cited an article attributing the origins of marijuana prohibition to an unproven notion that the substance was "connected . . . to blacks and Hispanics." <u>Id.</u> at 21. The defendant cited an article positing that the purpose of the war on drugs was to "destabliz[e] the black and left-leaning anti-Vietnam communities" in the late sixties, and an Eighth Circuit case (<u>U.S. v. Brewer</u>, 624 F.3d 900, 912 n.14 (8th Cir. 2010)

citing a law review article attributing high rates of incarceration of young, African-American men to the war on drugs. Id. at 21-22. The defendant contended that American attitudes toward marijuana were changing, but referenced articles and statistics supporting his statement that "[d]espite the changing landscape of America's marijuana laws, the racial disparity in the enforcement of marijuana laws is growing wider." Id. at 23. Finally, citing to a newspaper article and an article from ProPublica's web site, the defendant asserted that the government and the law enforcement agencies with whom it works "use algorithms to determine whom to prosecute," and argued that the ProPublica report found such algorithms "biased against black people."[4] Id. at 24. He contended that the "role these algorithms play in the administration of justice in the district raises some serious concerns." Id. at 24-25.

Judge Joseph addressed these arguments:

> [The defendant's] motion certainly raises important policy concerns. However, to be entitled to discovery on his selective prosecution claim, [the defendant] must make some showing of discriminatory intent beyond disparate racial impact; he must show racially discriminatory motive or purpose. *Hunter v. Underwood*, 471 U.S. 222 (1985) (invalidating facially neutral law that had a disparate racial impact where direct, convincing evidence showed it was enacted for the purpose of disenfranchising blacks); *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) (citing *Personnel*

---

[4] Neither source indicated that prosecutors or law enforcement use algorithms to decide who to prosecute. The Journal Sentinel article discussed an algorithm that, according to the then-chief of police, "examines the amount of violence [in a particular area] and how recently it has occurred." https://www.jsonline.com/story/news/crime/2017/12/01/milwaukee-police-did-something-different-tackle-crime-city-they-focused-just-2-3-square-miles/914219001/. The ProPublica article critiques an algorithm that purports to predict the risk that an individual will commit a crime in the future. https://www.propublica.org/article/machien-bias-risk-assessments-in-criminal-sentencing.

> *Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979))
> ("[The] strong presumption of honest and constitutional behavior [by
> federal prosecutors] cannot be overcome simply by a racial
> disproportion in the outcome, for disparate impact differs from
> discriminatory intent."); *United States v. Monsoor*, 77 F.3d 1031,
> 1034-35 (7th Cir. 2996) (selective prosecution claim required a
> showing that "(1) the prosecutor harbored genuine animus; and (2)
> absent this motive, defendant would not have been prosecuted");
> *David K. v. Lane*, 839 F.2d 1265, 1271 (7th Cir. 1988) ("Even if the
> administration's policies have a disparate impact on a suspect class,
> plaintiffs failed to show that the administration harbored a
> discriminatory motive in implementing those policies."); *Shango v.
> Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982) (discriminatory purpose
> implies that "the decisionmaker singled out a particular group for
> disparate treatment and selected his course of action at least in part
> for the purpose of causing its adverse effects on the identifiable
> group"). [The defendant] has not made the required showing of any
> racially discriminatory purpose or motive. Without some such
> showing, [the defendant] is not entitled to discovery on a claim of
> selective prosecution.

Dkt. No. 47 at 11-12.

There is no error—clear or otherwise—in Judge Joseph's reasoning or her

conclusion. Judge Joseph correctly concluded that the law requires evidence of

more—it requires that the defendant present evidence of the discriminatory

intent on the part of the prosecutor. The defendant has not presented that

evidence.

B.    <u>Selective Enforcement</u>

In his motion, the defendant devotes almost three pages to allegations

that the ATF has a history of "racially disparate enforcement." Dkt. No. 41 at

14-17. This is the basis of his request that the court compel the government to

produce discovery relating to selective prosecution. The list of discovery

demands at the end of the motion, however, asks for, among other things,

information about the identities of the agencies referring cases to the U.S. Attorney's Office, a list of everyone the ATF had referred for charges since January 1, 2016 and personnel files for ATF agents, Milwaukee Police Officers, U.S. Attorney staff and "other law enforcement officers responsible for referring . . . charges for federal prosecution under § 924(c) and § 922(g)(1)." Id. at 27-28. The government responded that the defendant had done nothing more than speculate that the ATF was involved in referring the cases the government chose to prosecute. Dkt. No. 44 at 19-20.

In declining to compel the government to produce discovery regarding selective enforcement, Judge Joseph stated that a motion for discovery on selective enforcement "is generally governed by the same standards as one on selective prosecution." Dkt. No. 47 at 12 (citing United States v. Barlow, 310 F.3d 1007, 1012 (7th Cir. 2002)). But she indicated that the standard "may be more relaxed in some selective enforcement cases because the same presumption of propriety given to prosecutors does not apply to law enforcement officers." Id. (citing Davis, 793 F.3d at 720). She cited cases observing that statistics may suffice in selective enforcement cases even though they are insufficient in selective prosecution cases, due to the difficulty in identifying similarly situated individuals who were not stopped or not arrested. Id. (citing Chavez v. Ill. State Police, 251 F.3d 612, 640 (7th Cir. 2001); U.S. v. Paxton, Case No. 13-cr-103, 2014 WL 1648746, at *5 (N.D. Ill. Apr. 17, 2014)).

Judge Joseph did not decide whether the defendant's case was one of those in which the standard might be more relaxed, because she found that the

defendant hadn't directed the motion to any officer or agency involved in his case. Id. at 13. She observed that the defendant "was arrested by Milwaukee police officers after a traffic stop based on officers' observations of what they believed were drug dealing and traffic violations, with apparently no input from ATF." Id. Because the defendant had not alleged that he was the subject "of any ATF investigation or sting operation, or that ATF referred him to the U.S. Attorney's Office for prosecution," Judge Joseph found that the defendant had not met his burden to obtain discovery on selective enforcement. Id.

For the first time in his objection to Judge Joseph's ruling, the defendant argued that the ATF "play[ed] a role" in his case, even though it was "clearly not involved in the arrest." Dkt. No. 55 at 6. In support of this claim, he referenced Dkt. No. 1-1, the information sheet filed by the prosecution when it filed the indictment. Id. at 5-6. The form information sheet has a field labeled "Agency/Agent." The information sheet for the defendant's case lists "ATF" in that field. Dkt. No. 1-1.

Judge Joseph did not commit clear error in deciding that the defendant had not met his burden for discovery regarding selective enforcement. Whether Judge Joseph had applied the Armstrong standard or something less rigorous, the defendant did not provide Judge Joseph with *any* evidence—statistical or otherwise—that the ATF was involved in the defendant's case or in any of the other marijuana/§924(c) cases charged between January 2017 and June 2018. The defendant did not present any evidence about the ATF until he filed his objection with this court, and even then, the only evidence he has presented is

a single reference to the ATF on an indictment information sheet. Even if that sheet proves that the ATF referred the defendant to the U.S. Attorney's Office, Judge Joseph did not have that evidence; she could not commit error by failing to consider evidence the defendant did not present. If the defendant had provided her with the sheet, Judge Joseph would have had before her exactly what this court has—evidence that the ATF referred a single, African-American defendant for prosecution. Under any standard, that is not enough to warrant compelling discovery on whether the ATF engaged in selective enforcement.[5]

## IV.    Conclusion

The court **OVERRULES** the objections to Judge Joseph's order denying defendant's motion for discovery. Dkt. No. 54.

The court **AFFIRMS** Judge Joseph's order denying defendant's motion for discovery. Dkt. No. 47.

Dated in Milwaukee, Wisconsin this 18th day of July, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**

---

[5] Had the defendant presented sufficient evidence to obtain discovery on either a selective prosecution or selective enforcement claim, the court would not have ordered the government to comply with the defendant's discovery demands as stated. Like the selective enforcement demands the Seventh Circuit found "vastly overbroad" in <u>Davis</u>, 793 F.3d at 722, the defendant's demands range far afield from the concerns he raises; some would run afoul of <u>Armstrong</u>, while others are not tailored to their stated target—the ATF.