UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                        Case No. 18-cr-122-pp

JACOB L. MACLIN,

        Defendant.

**ORDER OVERRULING DEFENDANT'S OBJECTIONS (DKT. NO. 54), ADOPTING JUDGE JOSEPH'S REPORT AND RECOMMENDATION (DKT. NO. 48) AND DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. NO. 33)**

On September 7, 2018, the defendant filed a motion to suppress all evidence obtained as the result of a traffic stop and requested an evidentiary hearing. Dkt. No. 33. Magistrate Judge Joseph conducted an evidentiary hearing on October 23 and October 24, 2018. Dkt. No. 35. Four officers testified, along with the defendant and the defendant's private investigator. Id. Judge Joseph issued a report and recommendation, dkt. no. 48, and this court granted the defendant an extension of time to file any objections, dkt. no. 50. The defendant objected, dkt. no. 54, and this court scheduled an evidentiary hearing, because the defendant's objections challenged the credibility of the government witnesses. The court started the evidentiary hearing on July 23, 2019, dkt. nos. 63-65, and concluded the hearing on August 8, 2019, dkt. nos. 66-70. The court overrules the defendant's objections, adopts the magistrate judge's recommendation and denies the motion to suppress.

# I.    Standard of Review

The court reviews *de novo* those portions of the magistrate judge's recommendation to which the defendant objects. 28 U.S.C. §636(b)(1)(C).

# II.    The Motion to Suppress

The defendant asserted that, according to the police reports, officers were "conducting surveillance in the 2600 block [of North 34th Street] regarding several drug dealing complaints." Dkt. No. 33 at 1. They saw a Camry parked at 2607 N. 34th Street with a black male inside. Id. at 2. The Camry remained there for four to five minutes until the defendant's Dodge Magnum pulled up and parked across the street at 2602 N. 34th Street. Id. The man exited the Camry and entered the passenger door of the Magnum. Id. The officers saw "physical contact" between the two but could not see the exact actions because of the heavily tinted windows. The defendant then drove north on 34th, left on Center, and right on 35th Street. Id. The officers said that the defendant was driving "at about fifty miles per hour" and that it took several blocks to catch up. Id. The defendant stated that the officers pulled the defendant over at 2970 N. 35th Street. Id. He asserted that there was no video or audio recording of the stop, and that no officer activated a body camera or squad camera until the defendant had been taking into custody. Id.

The defendant asserted that on these facts, the officers had neither reasonable suspicion nor probable cause to stop him. Id. at 3. He argued that his car had legal factory tints. Id. He also asserted that he was not speeding. Id. at 3-4. The defendant argued that there was no tip implicating him in illegal

activity, that he didn't flee from the police, that he didn't act suspicious or nervous, that the hour wasn't late and the area was residential, that he didn't engage in counter-surveillance while driving and that he didn't encounter a known drug dealer. Id. at 4. He asked the court to schedule an evidentiary hearing to allow him to present evidence on these issues, and to allow the court to determine whether there was reasonable suspicion or probable cause. Id. at 5.

### III.    The First Evidentiary Hearing

At the evidentiary hearing before Judge Joseph, the government called four witnesses: Milwaukee Police Officers Michael Braunreiter, Eric Rom and James Filsinger, and Detective Thomas Obregon. Dkt. No. 35. The defendant testified, as did his private investigator, Angela Kvidera. Dkt. Id.

On the second day of the hearing, the government asked the court to strike Rom's testimony. Dkt. No. 53 at 5-11. The parties agreed on the facts underlying the motion. After Rom and Braunreiter had testified on the first day of the evidentiary hearing, they had gotten on the elevator; an attorney from the Federal Defender's office had been on the same elevator. Id. The officers were discussing their frustration with the fact that Braunreiter had been required to describe the undercover vehicle the officers had been in on the day of the defendant's arrest. Rom told Braunreiter that Braunreiter should have been more vague in answering the question, or should have said he didn't recall. Rather than have a mini-trial on the conversation, the government moved to strike Rom's testimony. Id. at 6-7. The defendant opposed the motion

on the ground that the conversation on the elevator showed that the officers believed "they can say whatever they want to say, even if it's not true, to obstruct justice." Id. at 8.

Judge Joseph ordered the description of the vehicle redacted from the transcript. Id. at 9. She took the government's request to strike the testimony under advisement. Id. at 10.

## IV.    Judge Joseph's Recommendation

Judge Joseph declined to strike Rom's testimony because the government "cannot just withdraw the evidence because it is not favorable to their case." Dkt. No. 48 at 25. She indicated that she would consider Rom's elevator statement when assessing his credibility. Id. She stated, however, that she would not consider it as bearing on the credibility of the other officers because there was no indication that Braunreiter or others "made similar statements, agreed with or adopted Rom's view." Id. at 26. That said, she included a comment on the gravity of Rom's statement. Id. She opined that willingness to testify falsely harms individual defendants and the public's confidence in law enforcement and the courts. Judge Joseph ordered the government to share the report and recommendation with Rom and his superiors. Id. The government assured the court that Rom would not testify in future hearings. Id.

Turning to the merits of the motion, Judge Joseph first addressed the standard governing the stop, noting that the government asserted the officers had reasonable suspicion to stop the defendant, while the defendant argued

that the officers did not have probable cause. Id. at 26-27. Judge Joseph

explained that in Navarette v. California, 572 U.S. 393, 396-97 (2014), the

Supreme Court held that the Fourth Amendment permits brief investigative

stops—like a traffic stop—when the officer has a "particularlized and objective

basis for suspecting the particular person stopped of a criminal activity." Id. at

27. She quoted the court as stating that the reasonable suspicion standard

"takes into account the totality of the circumstances—the whole picture." Id.

She emphasized the Navarette Court's reminder that reasonable suspicion is a

"'commonsense,' fact-bound inquiry based on 'the factual and practical

considerations of everyday life on which reasonable and prudent men, not legal

technicians, act.'" Id. at 28 (citing Navarette, 572 U.S. at 402). She also

observed that the Navarette Court rejected the defendant's argument that there

could have been an innocent, non-criminal explanation for the defendant's

conduct, emphasizing that "reasonable suspicion 'need not rule out the

possibility of innocent conduct.'" Id. (quoting Navarette, 572 U.S. at 403).

Judge Joseph also discussed the fact that in Whren v. United States, 517

U.S. 806, 210 (1996), the Court had found that a traffic stop justified by

probable cause did not violate the Fourth Amendment, and she noted that

some lower courts had cited Whren for the proposition that traffic stops are

reasonable when supported by probable cause. Id. at 28-29. She concluded

that either reasonable suspicion or probable cause could justify a traffic stop.

Id. at 29.

Having made that determination, Judge Joseph concluded that the police had reasonable suspicion that the defendant had engaged in a mobile-to-mobile drug transaction. Id. at 30. She cited Braunreiter's testimony about his observations of the Camry and Magnum and the interaction between the two drivers. Id. Specifically, she found that

> [I]t was reasonable for Braunreiter to suspect that drug activity was afoot given his experience with mobile-to-mobile drug transactions, the conduct of the occupant of the Camry in waiting and looking around for several minutes, the fact that at least one of the cars did not list to the block, the motion of the Magnum's occupants turning toward each other, and the brevity of the interaction between the two.

Id. She noted that the defendant's own testimony corroborated Braunreiter's observations. Judge Joseph dismissed the defendant's arguments that certain computer assisted dispatch, or "CAD," reports produced by the defense did not reflect mobile-to-mobile drug dealing on the block. Id. at 31. She pointed out that the CAD reports reflected only 911 calls, not all complaints received, and that officers investigating one call need not ignore all other criminal activity in the area. Id. at 31-2.

With respect to the government's argument that the stop was also justified by the traffic violations, Judge Joseph found Braunreiter's testimony that the defendant's car sped away to be credible. Id. at 33. She concluded that his testimony was corroborated by the two take-down officers. Id. The defendant's testimony about the drive shaft of his car causing a "big clunking noise" corroborated Braunreiter's testimony about the defendant's engine working hard to increase speed. Id. Judge Joseph did not give too much weight

to the officers' testimony about how high over the speed limit the defendant was traveling because they could not credibly testify about the precise rate of speed. Id. But she found the officers' testimony that the defendant was going over the speed limit to be credible. Id.

Finally, Judge Joseph determined that the officers had reasonable suspicion to believe the car windows were excessively tinted. Id. at 33-34. She concluded that the officers' testimony was consistent as to excessive window tint, and that her own review of a photograph of the car showed unusually dark windows. Id. at 34. Judge Joseph recommended that this court deny the motion to suppress.

## V.     The Defendant's Objections

The defendant made two arguments in support of his objection to Judge Joseph's recommendation. Dkt. No. 54. First, he argued that Braunreiter and Rom's observations did not give rise to a reasonable suspicion of criminal activity. Id. at 1-6.  Second, he argued that there was neither probable cause nor reasonable suspicion to believe that the defendant had committed a traffic violation. Id. at 6-13.

### A.     Reasonable Suspicion of Criminal Activity

As to reasonable suspicion of criminal activity, the defendant noted that Braunreiter and Rom had testified that they were in the area where they saw the defendant because they'd received complaints of drug dealing. Id. at 2. The defendant argued that the CAD reports showed that those complaints were specific—they complained of drug dealing at a particular address (2646 N. 34th

Street), by a specific person (a black male with a blonde mohawk) and specific conduct ("cars pulling up to 2646 N. 34th Street, then the black male with the blond mohawk exiting and handing the occupants of the vehicles items before returning to the residence"). Id. at 3. The defendant argued that the officers' descriptions of what they'd seen him doing didn't match the complaints. Id.

The defendant conceded that Braunreiter and Rom testified that they had had complaints of drug activity in the area other than those reflected in the CAD reports, but noted that while he'd asked for all records of drug dealing complaints, the government had given him only the CAD reports (which contain only drug complaints that result in calls to 911). Id. Emphasizing that neither Braunreiter nor Rom could explain what those other complaints were or who they came from, the defendant argued that their testimony on that point was not credible. Id. The defendant asserted that because the only evidence of drug dealing in the area where the officers saw the defendant was evidence relating to the man with the mohawk at 2646 N. 34th Street, Judge Joseph should have confined her analysis to determining whether what the officers observed *the defendant* doing created reasonable suspicion of criminal activity, and he argued that it did not. Id. at 3-4.

The defendant also conceded that "some drug dealers in Milwaukee sell drugs out of their cars," and that officer may use that knowledge in determining whether probable cause or reasonable suspicion exists. Id. at 4. But, he argued, "that doesn't mean that any time two people meet and talk in a car for a brief period of time, even in a high crime or high drug area, it's

reasonable to conclude that they've engaged in a drug transaction." Id. at 4. He posited that there were many reasons why two people might meet for a few minutes in a car, such as friends and family members meeting to talk or "exchange an item." Id. Defense counsel indicated that he himself often forgot items, requiring him to have brief meetings with other people to retrieve them. Id. He also posited that frequently people meet to complete on-line purchase transactions from sites such as Craigslist. Id. at 4-5. He pointed out that Craiglist itself warns sellers against conducting such transactions from their homes. Id. at 5, n.1.

Given these options, the defendant argued, "it is impossible to examine the reasonableness of the officers' conclusions without addressing bias and race." Id. at 5. He asserted that

> [t]he truth is that if police observed two white people on Milwaukee's East Side or Third Ward briefly interact in a vehicle, the officers would not suspect that a drug transaction had occurred. Black people in Milwaukee's inner city are entitled to the same inferences and conclusions. If one interaction isn't suspicious, the other isn't either.

Id.

The defendant took issue with the fact that Judge Joseph relied on Braunreiter's testimony that the man who got into the defendant's car had been waiting for a few minutes and looking around, and that his car was not registered to a house on that block. Id. The defendant asserted that neither of these facts was suspicious.

Finally, the defendant cited two cases—United States v. Keith, 559 F.3d 499 (6th Cir. 2009), and United States v. Sprinkle, 106 F.3d 613 (4th Cir.

1997)—in which (according to the defendant) other courts found that similar fact patterns did not give rise to reasonable suspicion. Id. at 5-6.

B.    Reasonable Suspicion of Traffic Violations

 The defendant disagreed with the government that reasonable suspicion that someone had committed a traffic violation was enough to justify a stop. Id. at 6-7. He argued that traffic stops require "probable cause to believe that traffic violation had occurred or reasonable suspicion that a crime was about to be or had been committed." United States v. Paniagu-Garcia, 813 F.3d 1013 (7th Cir. 2016). He also argued that the officers had neither reasonable suspicion nor probable cause to believe that the defendant committed traffic violations.

The officers had testified that the defendant was speeding. The defendant challenged Judge Joseph's determination that Braunreiter's testimony that the defendant was speeding was credible. Id. at 9. He argued that Officer Rom contradicted Braunreiter's testimony. Id. He also argued that there was no need for Braunreiter and Rom to follow the defendant once he left the area they had been surveilling; "[t]hat's what the take-down vehicle was for." Id. He asserted that body camera footage from the squad that arrived shortly after the stop showed that the undercover car was not present after the defendant was stopped. Id.

The defendant next argued that Judge Joseph erred in concluding that the noise the defendant's car made as it accelerated supported Braunreiter's

conclusion that the defendant was speeding. Id. at 10. The defendant argued that

> [o]f course [his] vehicle was accelerating. It had been stopped and needed to become mobile to do what cars are supposed to do. Accelerating is not speeding, but still requires the engine to rev. And due to [the defendant]'s car's mechanical troubles, his car was loud. But that's an altogether different sound than a vehicle speeding.

Id.

The officers also testified that the defendant's car windows were illegally tinted. The defendant challenged Judge Joseph's conclusion that Braunreiter and Rom were credible in their testimony about the window tint; the defendant asserted that "the combination of distance and angle would not have allowed the officers to determine whether the car's side windows were unlawfully tinted." Id. at 10-11.

The defendant then switched back to his argument that there was no probable cause for the officers to believe that the defendant was speeding, asserting that the testimony of Officer Filsinger (one of the officers in the take-down car) that the take-down car had been required to speed up to catch up to the defendant was the result, not of the defendant speeding, but of the defendant catching a green light while the officers were stuck at a red one. Id. at 11. The defendant also asserted that at the defendant's state court preliminary hearing, Filsinger had said nothing about stopping the defendant because he was speeding. Id.

The defendant argued that there were inconsistencies between Filsinger's testimony and that of the other officer in the take-down car, Detective Obregon.

Id. at 12. Filsinger said the take-down car was stationary when they received the call from the undercover officers; Obregon testified that the car was mobile. Id. Filsinger said he first saw the defendant's car around 35th and Locust, while Obregon said he saw it turning from Center Street onto 35th; the defendant asserted that it "defies logic that Obregon would have seen the target vehicle and kept that information to himself." Id.

Turning back to the question of window tint, the defendant asserted that the officers in the take-down car wouldn't have been in a position to see whether the "side windows" were tinted. Id. He also took issue with Judge Joseph's comment that the windows appear tinted in the photograph of the car presented as evidence at the hearing. Id. The defendant asserted that Judge Joseph should not have considered whether the windows appeared excessively tinted to her from the photo she had seen, but whether on the day of the defendant's arrest, the officers would have been in a position to observe whether the windows were excessively tinted. Id. at 13.

## VI. The Government's Response

The government pointed out that determining whether reasonable suspicion of criminal activity exists requires a review of the totality of the circumstances. Dkt. No. 56 at 3, citing United States v. Bullock, 632 F.3d 1004, 1012 (7th Cir 2011). It also noted that that reasonable suspicion could arise "from behavior that may in other circumstances be considered innocent; in other words, context matters." Id. (quoting United States v. Ruiz, 785 F.3d 1134, 1141 (7th Cir. 2015)).

The government asserted that the totality of the circumstances established that the officers had reasonable suspicion to conduct a <u>Terry</u>[1] stop because while conducting surveillance in a high crime area, they saw a Camry sitting on the block with its engine running (registered to a house a half mile away) and the occupant looked like he was waiting for someone; minutes later the defendant's pulled up on the other side of the street. <u>Id.</u> It noted that the occupant of the Camry got out of his car and got into the defendant's car, and that "[d]espite the excessive tint on the windows of [the defendant's car], Officer Braunreiter observed the silhouettes of [the defendant] and the other subject as they appeared to face one another in the car." <u>Id.</u> A minute or so later, the person got out of the defendant's car, got back into the Camry and drove away. The government asserted that the defendant then "drove off at a high rate of speed." <u>Id.</u> at 4. Given the totality of these facts, the government argued, the officers had reasonable suspicion to believe that the defendant may have been engaged in drug activity, sufficient to conduct a brief stop. <u>Id.</u> The government argued that neither of the cases the defendant cited were on fours with the facts of the defendant's case. <u>Id.</u> at 5.

Regarding the traffic violations, the government argued that Braunreiter and Filsinger had experience stopping cars with illegal tint. <u>Id.</u> at 7. It noted that three officers—Braunreiter, Filsinger and Obregon—testified that the defendant was speeding, and that even if they were wrong, that fact would not have deprived them of reason to stop the defendant. <u>Id.</u>

---

[1] <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968).

## VII.   The Evidentiary Hearing Before This Court

This court began its evidentiary hearing on July 23, 2019. Dkt. Nos. 63, 64. On that day, Braunreiter testified, as did an investigator for the defendant, William Gowin.[2] Officer Rom was in the courtroom, but the government was concerned about calling him as a witness, because as a result of the elevator conversation, Rom had instructions from his superior officers about whether he should testify. The government also indicated that it had subpoenaed Officer Filsinger and Detective Obregon, but that it appeared they had not received their subpoenas. For that reason, the court had to continue the hearing to August 8, 2019. Dkt. Nos. 66-68. Rom, Filsinger and Obregon testified the second day, as did the defendant. Id. Rom testified with the parties' agreement that, unless Rom denied the incident, the defendant would not go into his elevator comment.

Much of the testimony from Braunreiter, Rom, Filsinger, Obregon and the defendant before this court was similar to the testimony they gave before

---

[2] As seems to happen all too often when this court holds an evidentiary hearing after a magistrate judge has done so, the defendant presented different evidence to this court than it did to Judge Joseph. At the second day of the hearing before Judge Joseph, the defendant called investigator Angie Kvidera, who testified about asking for, obtaining and reviewing the CAD reports. Dkt. No. 53 at transcript pages 160 through 164. Investigator Kvidera did not testify at the hearing before this court. At the hearing before Judge Joseph, the defendant did not call investigator William Gowin. Before this court, Gowin testified about how he used his car to try to replicate the route that the officers indicated they took to follow the defendant, to determine whether the foot traffic in the area, vehicle traffic in the area and traffic light patterns would have supported the officers' testimony that the defendant was speeding. That testimony was not available to Judge Joseph, so this court does not see how it could conclude, based on Gowin's testimony, that Judge Joseph erred in finding that the officers credibly testified that the defendant was speeding.

Judge Joseph. The court will discuss in its analysis some of the defendant's allegations as to inconsistencies.

## VIII. Analysis

A.  <u>Legal Standard</u>

The parties agree that, if police have reasonable suspicion to believe that a crime has been committed, the Fourth Amendment permits a brief detention to enable further investigation. <u>United States v. Lickers</u>, 2019 WL 2635598, *3 (7th Cir. June 27, 2019). The validity of the <u>Terry</u> stop depends on an objective assessment of the totality of the facts and circumstances. <u>Id.</u> Whether an officer had reasonable suspicion for an investigatory stop "is dependent upon both the content of the information possessed by police and its degree of reliability." <u>United States v. Adair</u>, 925 F.3d 931, 935 (7th Cir. 2019) (quoting <u>Alabama v. White</u>, 496 U.S. 325, 330 (2014)). The Seventh Circuit has explained that "inarticulate hunches" are not enough, but reasonable suspicion is less than probable cause and less than a preponderance of the evidence. <u>Adair</u>, 925 F.3d at 935.

The parties disagree as to whether the officers needed reasonable suspicion or probable cause to stop the defendant based on a traffic violation. Judge Joseph determined that the Seventh Circuit appears to allow either reasonable suspicion or probable cause to justify a traffic stop. Dkt. No. 28 at 29 (citing <u>United States v. Paniagu-Garcia</u>, 813 F.3d 1013, 1014 (7th Cir. 2016). The court in <u>Paniagu-Garcia</u> held:

> The government concedes that the traffic stop constituted a seizure
> and therefore was lawful under the Fourth Amendment (held

applicable to state officers by interpretation of the Fourteenth Amendment) only if the officer had probable cause to believe that a traffic violation had occurred or reasonable suspicion that a crime was about to be or had been committed. The government failed to establish that the officer had probable cause or a reasonable suspicion that Paniagua was violating the no-texting law. The officer hadn't seen any texting; what he had seen was consistent with any one of a number of lawful uses of cellphones. The government presented no evidence of what percentage of drivers text, and is thus reduced to arguing that a mere possibility of unlawful use is enough to create a reasonable suspicion of a criminal act. But were that so, police could always, without warrant or reasonable suspicion, search a random pedestrian for guns or narcotics.

Id. at 1014. Four months after deciding Paniagu-Garcia, the Seventh Circuit wrote that a "traffic stop is reasonable when the officer has reasonable suspicion that criminal activity is afoot, which can extend to violations of traffic laws, which [United States v.] Uribe [709 F.3d 646 (7th Cir. 2013)] makes clear." United States v. Miranda-Sotolongo, 827 F.3d 663, 666 (7th Cir. 2016) (internal citations omitted).

Judge Joseph acknowledged that in Whren, 517 U.S. at 810, the Supreme Court held that the decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred. Dkt. No. 48 at 28. She noted, however, that in Whren, the petitioners had conceded that the officer had probable cause to believe that a traffic code had been violated. Id. at 28-29. She cited Paniagu-Garcia for her conclusion that either reasonable suspicion or probable cause could justify a traffic stop. Id.

Because this court agrees that the officers had reasonable suspicion that the defendant had committed a crime, it need not determine whether the

officers had either reasonable suspicion or probable cause to believe that the defendant committed traffic violations.

B.    <u>Reasonable Suspicion to Believe that the Defendant Had Committed a Crime</u>

The defendant's challenges to Judge Joseph's finding that Braunreiter and Rom had reasonable suspicion that the defendant had committed a crime fall into three categories.

1.    *Credibility*

The first category is credibility. The defendant has argued that Judge Joseph should not have believed, and that this court should not believe, Officer Braunreiter. He also implied to Judge Joseph that she should not believe Officer Rom, because of his remarks to Braunreiter in the elevator after the first day of the evidentiary hearing before Judge Joseph. There are several facets to the credibility argument, but this court does not find any of them persuasive.

Above, the court stated that defense counsel "implied" to Judge Joseph that she should not believe Rom because of the elevator conversation. Defense counsel's arguments about this issue were imprecise. At the outset of the second day of the evidentiary hearing before Judge Joseph, the government informed Judge Joseph of the elevator conversation, and asked the court to "exclude" Rom's testimony. Dkt. No. 53 at 5-7. Defense counsel responded that excluding Rom's testimony was not appropriate, stating that he thought that "what the conversation in the elevator reflects between these two officers is a belief that they can say whatever they want to say, even if it's not true, to

obstruct justice." Id. at 8. In his argument at the end of the hearing, the defendant stated that Rom's and Braunreiter's testimony "really can be called into question when given the statements that Officer Rom made to Officer Braunreiter after the hearing." Id. at 54. He told Judge Joseph that "[i]t demonstrates a complete willingness to obstruct justice, to prevent information that they didn't want being, you know, revealed from happening, and that's reflective of their character for truthfulness as witnesses." Id.

The court does not understand why defense counsel believes that *Rom's* statement to Braunreiter that Braunreiter should have altered his testimony to protect the description of the undercover car impacts *Braunreiter's* credibility. Neither the government nor defense counsel recounted any statements by *Braunreiter* indicating that he agreed with Rom, or that he thought he should have lied. In fact, Rom's complaint appears to have been that Braunreiter did *not* lie and did *not* testify vaguely. Rom seems to have been complaining about the fact that Braunreiter answered fully and truthfully the question asked of him, even though his answer arguably put the officers at risk by describing their undercover car on the record. The court cannot see how Rom's statement impugns *Braunreiter's* credibility. In the court's view, it weighs in favor of Judge Joseph and this court finding Braunreiter's testimony credible— Braunreiter told the truth about the car, even when reluctant to do so.

The government asked Judge Joseph to exclude Rom's testimony because it was concerned that the defendant would make a mini-trial out of cross-examining Rom about the elevator conversation. Rom's statements

provided the defense with a basis for arguing that Rom might be willing to be less than truthful, at least in a situation in which he thought the truth might put his and his partner's safety at risk. But oddly, at the evidentiary hearing before *this* court, defense counsel argued that this court should consider Rom's testimony, and should find it credible, because—according to defense counsel—it contradicted Braunreiter's testimony and thus undermined Braunreiter's credibility. The defendant has used Rom's elevator statement to argue that Rom was willing to lie and that that fact undermined Braunreiter's credibility, while also asserting that Rom's testimony as to what happened on the day of the defendant's arrest was truthful and that any discrepancies between his testimony and Braunreiter's undermined Braunreiter's credibility. The court is not persuaded by either of these contradictory arguments.

The defendant has argued that there are other reasons for the court to conclude that the two officers were not credible. Braunreiter testified before Judge Joseph that the area the officers were surveilling on the day of the defendant's arrest was a "hot spot" for criminal activity. Dkt. No. 52 at 10. He testified that he had conducted numerous traffic stops in that area that had resulted in gun and drug arrests. Id. He testified that he'd been conducting surveillance in that area approximately four to five days prior to the date of the defendant's arrest. Id. at 11. He testified that part of the reason he was conducting surveillance in the 2600 block of North 34th Street was because he and Rom "were also investigating a drug complaint further up the block, further north on 34th Street." Id. at 16. He testified that the officers had

"numerous complaints in the 2500 block where" the surveillance car was parked. Id. On cross, he testified that he believed he and Rom were investigating a tip about drug dealing at 2646 North 34th Street, and that there had been an increase in Shotspotter reports from the area. Id. at 34. He did not recall any specific arrests or drug seizures from the four or five days of surveillance that preceded the defendant's arrest. Id. at 39. He testified that police had "seen recent activity in the 2500 block," although he couldn't recall the specific time, and that they also had received multiple complaints in the 2400 block. Id. at 53.

On direct examination before Judge Joseph, Rom testified that in the 2600 block of North 34th Street, there were three or four houses which had received complaints for drug dealing, the 2500 block had two or three houses, and the 2400 black had another three or four houses. Id. at 60. He stated, "[i]t's a high-crime area, that block, the surrounding blocks around it. There's a lot of drug and gang activity, drug violence activity." Id. at 60-61. Rom testified that as to the one house at 2646 North 34th Street, he and Braunreiter had been conducting surveillance in the area for four to five days before the defendant's arrest. Id. at 62. He testified that the officers had "controlled buys" out of the suspicious house, and that a search warrant was executed there the week after the defendant's arrest. Id. at 63. He testified that in the four or five days he and Braunreiter had been conducting surveillance, there were "a total of, like, five different drug arrests from automobiles just regarding that one block." Id. at 90.

Both officers testified that there had been an increase in "mobile-to-mobile" drug transactions—people selling drugs out of their cars to people in other cars. Braunreiter testified that "[i]ndividuals began using vehicles as rolling drug houses due to recent policy changes; unable to pursue vehicles for anything except violent crimes. Individuals took to distributing narcotics around the entire City of Milwaukee, especially in that area via vehicle." Id. at 11. Rom went into more detail, testifying that

> As far as—you have houses, obviously. People are selling drugs from houses, or at least just storing drugs at houses. Another common way that came about in the City of Milwaukee due to policy changes that have recently been changed is mobile-to-mobile or vehicle drug trafficking was a very big one. Our policies did not allow us to chase vehicles any longer. Criminal understood that and quickly found out, so they started doing what we call moving or mobile drug houses where they would keep their drugs, money, guns, if they have it, everything with them in their car, and they would just go from place to place, do their deals, and then move on. That way if they were—attempted to get stopped by a police officer, they knew that we were not allowed to chase anymore. They would just flee. So that's a pretty common way to sell drugs in the City of Milwaukee now.

Id. at 63-64. Rom also testified that mobile-to-mobile drug deals were "very quick," that they happened "on the street in areas that people don't necessarily live in," and that "[t]he person will come, they'll do the deal at the car, and then they just move on, get out of the area." Id. at 65.

The defendant makes much of the fact that the CAD reports—which show 911 calls to the police dispatcher—discussed only the residence at 2646 N. 34th Street, and focused on a black man who either had a blond mohawk or used a street name that contained the word mohawk. Defense counsel argued before this court that there was no evidence to support the officers' testimony

21

that the complaints reflected in the CAD reports weren't the only complaints they had received about that area. But the officers testified that they received information from informants, community tipsters and their own observations, and that those would not be reflected in CAD reports, or perhaps in any reports at all.

Braunreiter and Rom both testified about complaints of drug dealing from the 2400, 2500 and 2600 blocks of North 34th Street, as well as having seen mobile-to-mobile drug dealing in the area. Rom testified that he'd conducted surveillance in that area numerous times over a six-year period. There is no dispute that the area in which the officers arrested the defendant was an area where drug dealing—out of houses and cars—happened frequently. The defendant asks this court to conclude, however, that because the officers' specific purpose in being at that location on March 31, 2018 was to investigate the complaints about dealing out of 2646 North 34th Street, they had to ignore any activity that was not identical to the activity the complaints had described at that address. That argument is illogical and unreasonable. If, while investigating a homicide, officers find evidence of money laundering, the law does not require them to ignore the evidence of money laundering because it was not their main purpose to investigate money laundering. Nor does the fact that the CAD reports did not reflect complaints about dealing other than out of 2646 North 34th Street in the days prior to the defendant's arrest require the conclusion that the officers lied about having received other complaints, and having (in Rom's case) observed other drug activity in the area.

The defendant argues that Braunreiter and Rom gave inconsistent testimony about how long they watched the Camry before the defendant arrived. On direct examination before Judge Joseph, Braunreiter testified that the Camry sat there—without moving, with the engine running and without anyone approaching or leaving it—for four to five minutes. Dkt. No. 52 at 20. He testified that based on that fact, he radioed the take-down car and asked the officers in it to run the license plate on the Camry. Id. at 20-21. The plate came back to an address in the area of 29th and Burleigh—about a half  to three-quarters of a mile from where the Camry was parked. Id. at 21. Braunreiter testified that the officers could see the driver of the Camry looking around, "almost as if he had been waiting for someone or waiting for someone to come out of a house." Id. He testified that after that four or five minutes, he saw the defendant's car pull up. Id.

On cross-examination, defense counsel asked Braunreiter whether he was "conducting long periods of surveillance that day." Id. at 33. Braunreiter responded, "If I had to approximate, we had been there for 30 to 45 minutes, but, again, that's just an approximation." Id. Later in the exam, defense counsel asked, "And you were there [in the 2500 block of North 34th Street], you indicate, about 30 to 45 minutes before [the defendant's] arrest?," and Braunreiter responded, "Yes. I stated it was an approximate." Id. at 41.

At the hearing before this court, Braunreiter testified that he observed the Camry for about four or five minutes before asking the take-down vehicle to run the license plates. He testified that the person in the car wasn't on the

phone, was just looking around. He testified that he thought the Camry's engine was running, but that he wasn't positive.

At the hearing before Judge Joseph, Officer Rom testified that he recalled seeing the Camry sitting there, and that the engine appeared to be running; the person inside was looking around like he was waiting for someone. Id. at 67. Rom testified that the car sat there for four to give minutes without making contact with anyone, and then the defendant's car pulled up. Id. at 68. On cross-examination, Rom testified that he had arrived at the location one to two minutes before noticing the Camry, and probably was there about ten minutes total. Id. at 75.

Both officers testified that they observed the Camry sitting there for four to five minutes, and its passenger looking around, before the defendant's car showed up. True, Braunreiter testified before Judge Joseph that he thought they'd been there approximately thirty to forty-five minutes, while Rom thought they were there ten minutes. Rom also appears to have contradicted himself— on direct, he testified that he saw the Camry sit there four to five minutes, and on cross, he said the undercover car had arrived one to two minutes before he noticed the Camry. But this court found Braunreiter's testimony credible (as did Judge Joseph). *Something* caused Braunreiter to radio the take-down car with a request to run the Camry's license plate; his testimony that seeing the car sitting there for four to give minutes, with no one coming or going and the occupant looking around like he was waiting for someone, would have been that "something." The court does not know whether Rom's conflicting testimony

was untruthful, or whether it was the result of the fact that the two officers had conducted surveillance in that same area several times over the past few days and that Rom had conducted surveillance in that area for years, or the fact that he is a bad estimator. But Braunreiter's testimony was logical and consistent at both hearings.

The defendant also asserts that the officers contradicted each other regarding whether they immediately followed the defendant as he left the area after the Camry driver got out. On direct before Judge Joseph, Braunreiter testified that they did not immediately follow the defendant, but waited to "give it some distance," because they wanted to follow the car but not alert the driver that he was being followed. Id. at 26. On cross, defense counsel asked Rom what the officers did after the defendant's car drove away. Rom responded, "I believe we probably stayed there and didn't take off immediately, but at some point, I believe we ended up driving around and passing the auto, yes." Id. at 87. Rom's testimony was the same before this court. As far as this court can tell, there is no discrepancy in the officers' testimony in this regard.

The defendant argues that Braunreiter testified there wasn't any activity going on at 2646 North 34th Street, while Rom claimed that there was a lot of activity going on there. It's not clear whether this argument relates to the day of the defendant's arrest, or the days leading up to it. Either way, it doesn't comport with the testimony. Braunreiter did not testify that there was no drug activity going on in the area. He testified that he couldn't remember whether there had been any arrests, or any drugs seized, in the four or five days they'd

been conducting their surveillance. Rom remembered both controlled buys relating to the 2646 North 34th Street address, and several arrests from mobile-to-mobile transactions. This testimony is not contradictory.

In summary, while the defendant argued that there were "glaring inconsistencies" between the testimony of the two officers, the court disagrees. And as to the critical details of what happened on March 31, 2018, the officers' testimony was quite consistent. Both recall the Camry owner sitting in the car, looking around as if he was waiting for someone. Both recall the defendant's Magnum pulling up across the street from the Camry. Both testified that the Magnum's windows were heavily tinted. Both testified that the Camry drive left his car and got into the Magnum for a minute or two, maybe less. Both testified that despite the heavy window tint, they could see the silhouettes of two people in the car, and that at one point, they leaned toward each other. Both testified that the Camry driver got out of the defendant's car, returned to his car and drove off, after which the defendant drove off quickly.

The defendant asserts that the officers' testimony was inconsistent with his testimony, and that is true. The defendant says that the Camry driver was in his car some four or five minutes, not one minute or less. At the hearing before this court, he testified that the Camry driver did not get out of the Camry, but came from a house to the defendant's car. He testified that he did not drive away from the area at a high rate of speed—in fact, he argued that he couldn't speed, due to mechanical issues with his car. And he testified that he met with the Camry driver because that person—someone with whom he'd

previously worked—owed him money, and was paying it back. He testified that the leaning toward each other that the officers had seen was a brotherly hug.

Perhaps the Camry owner did owe the defendant money, and perhaps he repaid that money while he was in the defendant's car. That fact is irrelevant to the question of whether the officers' testimony was credible. The officers conceded that they could not see what happened inside the defendant's car that day, other than to observe that there were two people in the car and that they leaned toward each other. As to the length of time the Camry owner was in the car, the defendant's estimate differs from the officers' by three to four minutes. The court finds Braunreiter's testimony the more credible, because the totality of the events he witnessed—including the length of time the Camry owner was in the defendant's car—caused him to believe that a drug deal was taking place.

## 2.   *Innocent explanations*

The second category of arguments from the defendant have to do with innocent explanations for several of the things the officers observed. The defendant argues that there is nothing suspicious about the Camry owner sitting in his car, with the engine running, looking around like he's waiting for someone. He posits that a person might engage in such activity if that person was meeting a family member, or buying something from someone off Craigslist. The court does not disagree. The defendant argues that for the same reasons, there is nothing suspicious about the fact that the Camry was parked a mile and a half from the residence to which it was registered. Again, the court

does not disagree. The defendant asserts that tinted windows are not, in themselves, suspicious. The court agrees. He argues that there could be innocent reasons for one person to get into another person's car for a few minutes, then return to his own car. The court agrees.

The problem with the defendant's arguments is that they ignore the fact that, as the government points out, officers and courts consider the *totality* of the circumstances in deciding whether reasonable suspicion exists to believe that a crime is being committed. United States v. Bullock, 632 F.3d 1004, 1011 (7th Cir. 2011) (quoting United States v. Lawshea, 461 F.3d 857, 859 (7th Cir. 2006)). While any one of the officers' observations, standing alone, might not have given rise to a reasonable suspicion of criminal activity, the combination of their observations—both on the day of the arrest and earlier—as well as their knowledge and training, did give rise to a reasonable suspicion. Braunreiter and Rom knew that there had been frequent drug activity in the 2400, 2500 and 2600 blocks of North 34th Street. They knew that mobile-to-mobile drug dealing had become more frequent in the city, and that it was frequent in that area. Rom, in particular, described these mobile-to-mobile encounters as quick interactions with someone getting into and out of someone else's car, in an area other than the one in which the participants reside. Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). In that context,

Braunreiter and Rom saw a car idling for several minutes, its occupant doing nothing except looking around expectantly, in an area of the city where there was frequent drug activity and frequent mobile-to-mobile drug activity. They learned that the car was registered to a house over a mile away. They saw another car with heavily tinted windows pull up, and the Camry driver get into that car for a minute or less, during which time the two occupants of the car leaned toward each other. They saw the Camry driver get out of the Magnum, return to his car and drive off. Finally, they saw the Magnum drive off.

The *totality* of those circumstances gave the officers reasonable suspicion to believe that the Camry driver and the Magnum driver had engaged in a mobile-to-mobile drug deal. The facts available to them "'warrant[ed] a man of reasonable caution in the belief' that the action taken was appropriate." Bullock, 632 F.3d at 1012 (quoting United States v. Tilmon, 19 F.3d 1221, 1224 (7th Cir. 1994)). Whether the defendant and the Camry driver engaged in a drug deal inside the defendant's car is not relevant to whether the officers' knowledge, training and observations provided them with reasonable suspicion to believe that that was what might have happened. "[T]he Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" Heien v. North Carolina, 574 U.S. 54, 135 S. Ct. 530, 536 (2014) (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)). And "even when innocent explanations exist for individual factors taken separately, reasonable suspicion may arise when the factors are considered together." United States v. Figueroa-Espana, 511

F.3d 696, 703 (7th Cir. 2007), citing <u>United States v. Baskin</u>, 401 F.3d 788, 793 (7th Cir. 2005) and <u>United States v. Finke</u>, 85 F.3d 1275, 1280 (7th Cir. 1996).

Because one must consider the totality of the circumstances when determining whether reasonable suspicion exists, it is difficult to point to the facts of one case and say that the decision in that case mandates a particular decision in another case. The defendant argues that the Sixth Circuit's decision in <u>Keith</u>, 559 F.3d 499, supports the conclusion that the officers in this case had no reasonable suspicion to believe that this defendant committed a crime. But there are notable differences between the facts in <u>Keith</u> and the facts in the defendant's case. The cases may have started out in a similar fashion—in <u>Keith</u>, officers who had been assisting in an unrelated arrest could see a nearby liquor store that they knew sold items used for smoking crack; they had effected narcotics arrests in that area before and considered the liquor store and its parking lot to be a high drug-trafficking crime area. <u>Id.</u> at 501. But what the <u>Keith</u> officers saw raised less suspicion that what the officers in this case saw. The <u>Keith</u> officers saw a car (driven by defendant Keith) that had pulled up to the drive-through of the liquor store. An individual walked up to the car and started talking to Keith, stuck his head into the passenger-side window for a few seconds, at one point looked back at the police, then pulled his head out of the window. <u>Id.</u> The car Keith was driving then pulled away from the drive-through window. <u>Id.</u> The car didn't pull out of the drive-through line before getting to the window, and one of the testifying officers said he

wasn't sure whether Keith had purchased anything or not at the window. <u>Id.</u> The car then drove across the liquor store parking lot (rather than using the exit closest to the drive-through window), turned and drove along the side of the store, out of the officers' sight. <u>Id.</u> at 501-502. While the individual who had walked up to the car in the drive-through also went to the side of the building, the officers couldn't see what (if anything) happened there, and the man on foot was out of sight for only about fifty seconds. <u>Id.</u> at 502. The officers speculated that the man on foot had met with the defendant on the side of the building to participate in a drug deal or to exchange alcohol purchased for someone underage. <u>Id.</u>

The Sixth Circuit noted that the exchange between the person on foot and the defendant "took place outside an open, operating business that sold a full range of legal products." <u>Id.</u> at 505. One of the testifying officers had conceded that there was nothing unusual about the defendant patronizing the liquor store at the time of the event, and that the store was a popular place at that hour. <u>Id.</u> The main thing the officers found suspicious was that the man on foot had glanced in their direction, and that both that man and the defendant had gone to the alley on the side of the store. <u>Id.</u> The Sixth Circuit said, "[w]e are not convinced that the manner in which the defendant and [the man on foot] moved from one side of [the liquor store] to the other, combined with [the man on foot's] two glances in the direction of the officers' flashing police lights, created reasonable suspicion of criminal conduct." <u>Id.</u> at 506. The court said that the officers did not know anything about the men, or anything

other than that the hour was late and the neighborhood was bad. The two men did not exchange anything or try to hide anything. Id.

In contrast, the officers in this defendant's case not only knew that there had been drug dealing in the area, but knew that there had been mobile-to-mobile drug deals in the area. The man in the Camry was not in line at an open, operating place of business; he was sitting in his car in a residential area, looking around expectantly. The residential area did not appear to be *his* residential area, because the Camry was registered to a residence a mile and a half away. When the defendant's car pulled up, the officers saw exactly the kind of activity that Rom described as having seen in mobile-to-mobile deals— the Camry driving getting into the Magnum (with its heavily tinted windows) for a short time, then getting out and driving away.

The same is true for the other case the defendant cited, Sprinkle, 106 F.3d 613. The facts in Sprinkle bear some resemblance to the facts of the defendant's case—while engaged in other activity in an area known for narcotics trafficking, officers saw a known drug offender sitting in the driver's seat of a car parked across the street. Id. at 615. An unknown man—defendant Sprinkle—walked out of a house across the street and got int the passenger side of the car. Id. at 616. The officers walked by the car; while one of them saw the two men inside "huddled to the center of the console" with their hands "close[] together," and saw the driver put his hand up to his face as if he was trying to avoid being seen, the officer also admitted that he could see the hands of the men in the car, and saw nothing in their hands. Id. Neither officer saw

drugs, money, guns, or drug paraphernalia in the car, and neither of the men in the car made any moves that looked like an attempt to hide anything. Id. As the officers headed for their cars, the driver pulled away at normal speed, committing no traffic violations. After driving only 150 feet or so, however, the driver was blocked by an unrelated traffic stop. Id. The officers stopped behind the driver, put on their lights, and walked to the car. By the time they got there, defendant Sprinkle had stepped out, and appeared nervous when one of the officers announced his intention to pat Sprinkle down. Id. As the officer started the pat-down, Sprinkle pushed away and ran, eventually pulling a handgun out of his pocket. Id. Sprinkle ignored repeated requests to drop the gun, and eventually fired a shot toward the pursing officer. Id. Eventually he dropped the gun, and the officers arrested him. Id.

The Fourth Circuit began by noting that the fact that the driver had a criminal history, without more, was not enough to create a reasonable suspicion. Id. at 617, citing United States v. Davis, 94 F.3d 1465, 1469 (10th Cir. 1996). It also found that the fact that the driver of the car was in a high-crime area on a sunny day at 5:30 p.m did not, standing alone, create reasonable suspicion. Id. (citations omitted). The fact that the two men were huddled together when the officers walked by was not enough, the court said, because the officer conceded that he could see the men's hands and that they didn't have anything illegal and weren't trying to hide anything illegal. Id. Nor was the fact that the driver pulled away after the officers walked by, given that he did drove in a "normal, unhurried manner." Id. at 618. The Fourth Circuit

conceded that it had to look at the totality of the circumstances, rather than each individual fact, to determine whether what the officers saw amounted to reasonable suspicion. But the court found persuasive the fact that the officer had been able to look right inside the car, to see both men's hands, and to see that they did not have anything illegal and were not trying to hide anything. Id. The court found that the fact that after the officer looked in the car, the driver seemed to try to hide his face was suspicious, but that single fact did not tip the scale in favor of reasonable suspicion. Id.

In this case, the officers could not see what was going on in the defendant's car because of the window tint. They could see only that the two individuals inside leaned in toward each other, and could observe only that the Camry driver was inside the Magnum for a minute or two, maybe less. The defendant did not drive off with the Camry driver still in the car; the Camry driver got out and returned to his own car, then drove away. The officers here focused on the Camry driver, not because they believed he had a criminal record, but because he sat in his idling car looking around for someone, and because his car registered to an address some distance away. The officer in Sprinkler saw for himself that there was nothing illegal going on between the two men, but decided to pursue them anyway because of the driver's criminal history and the fact that the neighborhood was a high drug-trafficking area. Here, the officers did not have evidence that what happened in the defendant's car was innocent, because they could not see inside it. They could do nothing more than analyze what they were able to see based on their training and

experience. That analysis provided them with reasonable suspicion that the defendant and the Camry driver had engaged in a mobile-to-mobile drug purchase.

### 3.   *Other*

The defendant makes a handful of other arguments. He asserts that there was no reason for the undercover officers to follow the defendant when he left the area, because they had the take-down car to make the stop. The court fails to see the relevance of this argument. If the defendant is arguing that the officers lied about following him, he provides no reason for why they would do so. By that point, they already had made the observations that gave rise to reasonable suspicion. He asserts that given the distance between the undercover car and the Magnum, the undercover officers could not have determined that the Magnum's window tint was excessive, and regardless of distance, they could not have known whether the tint was applied by the manufacturer (which under the tint ordinance is an exception). But both officers testified that they had stopped cars for illegal tint, and that while they didn't have a tint meter, the Magnum's windows appeared excessively dark.

On the heels of his assertion that none of the facts the officers observed could have provided reasonable suspicion that the defendant had committed a crime, the defendant argues that the two white officers must have assumed that what happened in the Magnum was a crime because the driver of the Camry was a black male and the neighborhood was a predominantly black, inner-city Milwaukee neighborhood. He asserts that if the officers had observed

the identical events in a predominantly white neighborhood, and the drivers of the cars had been white, the officers would not have considered the events suspicious. The court questions this assertion. Imagine that undercover officers had been conducting surveillance for several days in a predominantly white residential neighborhood, based on multiple reports of drug dealing. Imagine that as they conducted this surveillance, they noticed a man sitting in an idling Camry for several minutes, looking around as if waiting for someone. They ran the Camry's plates, and learned that the car was registered to a house a mile and a half away. Then they observed a car with heavily-tinted windows pull up across the street. They see a white man get out of the Camry and get into the other car. They see through the tinted windows that there are two people in the car and see them lean in toward each other. After a little less than a minute, the white man gets out of the car with tinted windows, gets back into the Camry and drives away, after which the car with heavily tinted windows pulls away. The court questions the defendant's confidence that the officers in that situation would not have been suspicious.

Again, because the officers and the courts look at the *totality* of the circumstances, any number of changes in the facts could have changed the analysis. If the man in the Camry—regardless of race or ethnicity—was dressed in a business suit, would that make the activity less suspicious? If the driver of the Camry had been a woman, would that have made the activity less suspicious? If the driver of the Camry had carried to the Magnum a shopping bag from the local grocery store, or a box with the Amazon logo on it, would

that have changed the analysis? If the meeting had taken place in the parking lot of a coffee shop, or a hardware store, rather than on a residential street where drug dealing had been reported, would that have made a difference? Any of these facts could have made a difference, regardless of whether the person in the Camry was black or white, and regardless of whether the transaction took place in a white suburb or in an inner-city neighborhood populated in the main by African Americans.

The court does not dispute that there are inner-city, predominantly black neighborhoods that are plagued with more crime, and more drug crime, than some white city or suburban neighborhoods. The court questions only the defendant's insistence that the fact that what these officers observed involved an African American man in one of those crime-plagued, inner-city, mostly-black neighborhoods mandates the conclusion that their suspicion was the result of racial bias, and not the result of the combination of their training, experience and observations.

### 4. *Conclusion*

The court concludes that the officers had reasonable suspicion to believe that the defendant had engaged in a mobile-to-mobile drug deal on March 31, 2018.

### C. Reasonable Suspicion or Probable Cause to Believe that the Defendant Had Committed Traffic Violations

Because the court concludes that the officers had reasonable suspicion to conduct a Terry stop based on the incident they observed between the defendant and the Camry driver, the court need not reach the question of the

standard for conducting a stop based on a traffic violation, and need not determine whether the officers had reasonable suspicion or probable case to believe that the defendant had committed traffic violations.

## IX.    Conclusion

The court **OVERRULES** the defendant's objections to Magistrate Judge Joseph's report and recommendation. Dkt. No. 54.

The court **ADOPTS** Judge Joseph's recommendation, dkt. no. 48, and **DENIES** the defendant's motion to suppress, dkt. no. 33.

The court's staff will contact the parties regarding further scheduling.

Dated in Milwaukee, Wisconsin this 9th day of September, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**